UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE DENNIS MONTALI, JUDGE

| | | |
|---|---|---|
| In Re: | ) | Case No. 08-30026-11 |
| | ) | |
| KIDS CONNECTION, INC., | ) | <u>STATUS CONFERENCE</u> |
| | ) | |
| Debtor. | ) | Wednesday, April 29, 2009 |
| | ) | San Francisco, California |

<u>Appearances</u>:

| | |
|---|---|
| For the Debtor: | Scott L. Goodsell, Esq.<br>Campeau Goodsell & Smith<br>44 North First Street, Suite 100<br>San Jose, California  95112 |
| For Burlingame Capital<br>Partners, II: | William W. Huckins, Esq.<br>Robert R. Moore, Esq.<br>Allen Matkins Leck Gamble & Mallory<br>Three Embarcadero Center, 12th Floor<br>San Francisco, California  94111-4074 |
| For Secured Creditor<br>City National Bank: | Richard Rogan, Esq.<br>Jeffer Mangels Butler & Marmaro LLP<br>Two Embarcadero Center, Fifth Floor<br>San Francisco, California  94111-3824 |
| The Examiner: | David A. Bradlow<br>3947 23rd Street<br>San Francisco, California  94114-3302 |
| For the Examiner: | Michael A. Isaacs, Esq.<br>Luce, Forward, Hamilton & Scripps<br>121 Spear Street, Suite 200<br>San Francisco, California  94105 |

Appearances continued on next page.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 1 of 69

<u>Appearances continued</u>:

For Chapter 7 Trustee    Mark S. Bostick, Esq.
Lois Brady (via            Wendel Rosen Black & Dean LLP
telephone):               1111 Broadway, 24th Floor
                          Oakland, California  94607

From the United        Patricia A. Cutler, Trial Attorney
States Trustee:        United States Department of Justice
                          Office of the United States Trustee
                          235 Pine Street, Suite 700
                          San Francisco, California  94104

Digital Court          United States Bankruptcy Court
Recorder:              Joneita Hammonds
                          235 Pine Street, 22nd Floor (94104)
                          Post Office Box 7341
                          San Francisco, California  94120-7341
                          (415) 268-2387

Certified Electronic    Palmer Reporting Services
Transcriber:            1948 Diamond Oak Way
                          Manteca, California  95336-9124

              Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 2 of 69

| | |
|---|---|
| 1 | Wednesday, April 29, 2009                    9:32 o'clock a.m. |

2                    P R O C E E D I N G S

3          THE CLERK:  All rise.  Court is now in session, the

4 Honorable Dennis Montali presiding.

5          THE COURT:  Good morning.

6          [COUNSEL]:  Good morning, Your Honor.

7          THE COURT:  Please be seated.

8          THE CLERK:  The matters of Kids Connection, Inc.

9          THE COURT:  Appearances.

10          MR. GOODSELL:  Your Honor, Scott Goodsell for the

11 debtor.

12          THE COURT:  Good morning.

13          MR. ISAACS:  Good morning, Your Honor.  Michael Isaacs

14 on behalf of the Examiner David Bradlow.

15          MR. BRADLOW:  Good morning, Your Honor.  David

16 Bradlow, the Examiner.

17          MR. ROGAN:  Good morning, Your Honor.  Richard Rogan,

18 Jeffer Mangels Butler and Marmaro, for City National Bank.

19          MR. HUCKINS:  Good morning, Your Honor.  Bill Huckins

20 and Bob Moore on behalf of Burlingame Capital.

21          THE COURT:  On the phone, please?

22          MR. BOSTICK:  Good morning, Your Honor.  Mark Bostick

23 for Lois Brady.

24          THE COURT:  Good morning.

25          Well, I've received some communications from teachers

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 3 of 69

1  at the school that are concerned about fees and I've received

2  from Mr. Goodsell's firm or Mr. Healy the request that I direct

3  Burlingame to respond to some discovery on notice of breach.

4  But unless somebody wants me to deal with those, those are —

5  none of those are action items today.

6          I did ask for some information.  Mr. Goodsell, do you

7  have some information for me about projected administrative

8  expenses?

9          MR. GOODSELL:  I sort of, yes.  I — the only

10 administrative claims that I'm aware of that are not otherwise

11 being paid in the ordinary course of business are the

12 professional fees.  The only professional fees would be those of

13 my firm, Mr. Bradlow, and Mr. Isaacs.  My firm through March,

14 which is the date of the fee application, and less the $30,000

15 retainer, would be about $430,000.

16          Over the past few months — I would say December,

17 January, February, March — the average costs that we've incurred

18 have been about 25 grand a month.  That involved a lot of

19 negotiating that presumably isn't necessary now but, on the

20 other hand, even since beginning of March, when the agreement

21 reached its pretty much final form, that level has kept up in

22 terms of additional request with the application and other

23 things.

24          THE COURT:  Is the — I haven't looked at the apps — is

25 that a March 31 cutoff?

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 4 of 69

1          MR. GOODSELL:  That's a March 23rd cutoff.

2          THE COURT:  The 23rd.  Okay.  But what's your estimate

3   since then?

4          MR. GOODSELL:  Actually I don't have time in through

5   the month of April.  Our April cutoff is the 23rd.  But I would

6   guess it's probably about 25k for April.  And since I don't know

7   when this deal will close, if you extend that forward, because I

8   assume that there won't be much now, but there might be a lot

9   before closing, you know, I would just guess 25k a month.  It

10  might be less.  It would be great if it were.

11         THE COURT:  Mr. Bradlow, your fees through the date of

12  your application, as I recall, are 81,000 fees and costs; is

13  that right?

14         MR. BRADLOW:  That's correct, Your Honor.

15         THE COURT:  What's the cutoff date on there?  I don't

16  — I didn't bring it.

17         MR. BRADLOW:  April 17th, Your Honor.

18         THE COURT:  Okay.  So we're two more weeks or 11 more

19  days.  I don't need to pin you down on what it might take to

20  close.

21         And how about you, Mr. Isaacs?

22         MR. ISAACS:  Your Honor, my fees were listed as an

23  expense under Mr. Bradlow's request.

24         THE COURT:  Okay.

25         MR. ISAACS:  And my fees were about $12,000.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 5 of
69

1          THE COURT:  Now, Mr. Goodsell, you said, I think,

2   these three claims, yours and the other two, are the only ones.

3   My recollection is that Ms. Koelling has an administrative claim

4   on file also, doesn't she?

5          MR. GOODSELL:  No.  Ms. Koelling filed a declaration

6   which Mr. Davis' office prepared, where he alleged that she

7   might have a claim based on her employment agreement.

8          THE COURT:  Right.

9          MR. GOODSELL:  But no proof of claim has been filed.

10          THE COURT:  Okay.

11          MR. GOODSELL:  And I'm not aware of any claim being

12   asserted.

13          THE COURT:  Okay.  But it hasn't been paid in any

14   event, I take it?

15          MR. GOODSELL:  No.  Not the —

16          THE COURT:  So it may or may not surface as an

17   administrative claim.  Okay.

18          And, Mr. Huckins, do you have some information about

19   projected costs after closing?

20          MR. HUCKINS:  Your Honor, I've got — I prepared a

21   schedule.  Maybe I'd be easier if I approach —

22          THE COURT:  Sure.

23          MR. HUCKINS:  — and pass it up.

24          How many copies would you like?

25          THE COURT:  One's enough for me.  I just wanted the

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 6 of
69

1   information.   (Receives documents from Mr. Huckins.)

2         MR. HUCKINS:  Your Honor, what we have is roughly a

3   $400,000 estimated amount after paying the secured claims.  We

4   don't have an updated notes, as the notes reflect, from City

5   National that the $5.3 million number was based upon an estimate

6   provided by Mr. Rogan to the debtor, I think a month and a half

7   ago.  He hasn't been able to get an updated number from his

8   client.  From what I understand, the Brian Fitzpatrick number is

9   accurate through April 28th.  The proration of taxes, as the

10  footnote suggests, could be a plus or a minus —

11        THE COURT:  No, I understand.  You can't be precise on

12  that.

13        MR. HUCKINS:  I can't be precise about that.  And the

14  only other — there are escrow expenses that are shared 50-50.

15  We don't know precisely what those are.  I mean a rough guess

16  might be approximately $5,000.

17        THE COURT:  Okay.  I mean there's no — there's no real

18  estate commission and so what about title insurance and so on?

19  Is that being split?

20        MR. HUCKINS:  Title insure is being born by

21  Burlingame.

22        THE COURT:  Mr. Rogan, is the 5.33 million still in

23  the ballpark for the bank or do you think it's more?

24        MR. ROGAN:  I think it's in the ballpark.  I don't

25  know how Mr. Huckins got to that number from whatever we had

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 7 of
69

1  before, but it's not far off.  The problem I had was my client

2  was gone last week.  He sent me an email last night that clearly

3  is erroneous, where he — we have two loans remaining, and he put

4  the same number in both — both — under both loans and sent it

5  back to me.  I tried to correct that and I haven't been able to

6  reach him, so.

7            THE COURT:  But in the ballpark?

8            MR. ROGAN:  It's in the ballpark.  It's not that far

9  off of whatever it is.

10            THE COURT:  And, Mr. Goodsell, do you have — do you

11  have an estimate of the cash onhand?

12            MR. GOODSELL:  Yes.

13            THE COURT:  And — at the school and, if so, is there

14  in fact a trust account for advanced tuitions or is it just one

15  big general account?

16            MR. GOODSELL:  Everything goes into one account,

17  although there is — well, everything goes into one checking

18  account, although there are some savings accounts that have very

19  small balances.  The — as best the bookkeeper can tell as of

20  like yesterday there was $177,000 in that account and there was

21  $122,500 in a payroll account.  Payroll is paid on the 2nd and

22  the 17th of the month.  And so the payroll account, the money

23  that's in there would be money that's been set aside — in

24  anticipation of next week's payroll.

25            THE COURT:  And I presume it's just transferred from

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 8 of
69

1  the general account into the payroll account to cover a payday?

2          MR. GOODSELL:  They seem to accumulate it there for

3  some reason.  That's been their habit.  It hasn't been

4  transferred in.  It's been accumulating there.  So when you look

5  at the monthly operating reports and the totals in cash, that

6  number is the accumulation of both.

7          The payroll runs about $84,000 per pay period.  Now of

8  the 177,-, instructions have been — have been previously issued

9  to the bank to transfer 61,000 into one of the savings accounts.

10  The 61,000 represents moneys that have been received for summer

11  camp, which is June and July, and some moneys received for

12  reservations for the next school year.  It doesn't represent a

13  payment for the full term of fall semester.  It's just a

14  reservation fee.

15          THE COURT:  Well, do you agree if the — leaving aside

16  whether there will be any earmarking, if the school were to be

17  shut down, certainly the advanced reservations for camp or for

18  next year would be — at the minimum would be administratively

19  priority claims?

20          MR. GOODSELL:  Yes, that's true.  I agree with that.

21  That's why we asked them to tease it out.  Now she was —

22          THE COURT:  I'm sorry.  Say again.  What?

23          MR. GOODSELL:  We asked her to tease it out from the

24  total deposits.

25          In — for the moneys that were received during the

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 9 of
69

1   month of April, and before our request, they had been made in

2   each instance where there was a deposit in two deposits, so she

3   could keep track of what was for April and what was for

4   prospective school fees.

5           THE COURT:  What — do you have an estimate of what's

6   in the savings accounts in addition to the 61,- that's being

7   transferred there?

8           MR. GOODSELL:  I don't.  I asked.  She said that it

9   would be small numbers.  I'm thinking, you know, 2,-, $3,000 —

10          THE COURT:  Okay.  I assume the MORs would reflect

11  some of the historical amounts —

12          MR. GOODSELL:  They — they would.  They would.

13          THE COURT:  Is there any — and this isn't something I

14  ask did you to be prepared to answer, so if you don't know it,

15  I'll certainly understand that, what is the average amount of

16  working cash that the school needs to keep onhand just to keep

17  the store — you know, to run properly and pay the

18  run-of-the-mill expenses?

19          MR. GOODSELL:  We — we asked that in a different way

20  and we asked that of both Ms. Koelling and of Sharon Bielche,

21  who's the outside bookkeeper, and of Kathy (phonetics) who does

22  the input, and the answer was that for the months from September

23  through July, that historically, since the business is

24  profitable, each month the cash that comes in is sufficient to

25  cover the expenses, that there's a little bit of adjustment

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 10 of
69

1  because the money that comes in during June and July is less,

2  but still it's enough to cover the expenses.

3          The teachers are paid on a 12-month payment period

4  even though their services only run pretty much from September,

5  for the most part, through May or June and July if they're part

6  of the summer session.  And so August is usually a net negative

7  month.

8          In terms of how much money is — is needed in reserve

9  to cover any ups and downs, I don't — I don't have a number —

10         THE COURT:  Well, again, if the school were to close —

11  and I'm not suggesting that, by the way.

12         MR. GOODSELL:  Right.

13         THE COURT:  I don't know how that would be in

14  anybody's interest and I'm certainly not of the mind to order

15  it, but if it were to then presumably some of the prorated

16  teachers' salaries would have administrative priority as well,

17  wouldn't they?

18         MR. GOODSELL:  That's correct, for —

19         THE COURT:  They've earned — they've earned it,

20  they're just delaying the payment of it?

21         MR. GOODSELL:  That's correct.

22         THE COURT:  Okay.  Well, I called this hearing

23  obviously in response to Mr. Bradlow's purported — or I

24  shouldn't say purported — his tender of his resignation and then

25  his concern about the circumstances that he described in his

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 11 of 69

1    correspondence.  And I don't want to have Mr. Bradlow off this

2    case.  I think he's indispensable.  I'm not pleased with at

3    least his rendition of the story.  Maybe the Burlingame Capital

4    has another story, another side of the story.  But when one

5    starts threatening to withhold an objection to one's fees, a

6    court officer such as the examiner, if that examiner takes a

7    position that maybe that examiner doesn't believe in, that has

8    very serious ramifications.  It implicates perhaps Title 18 as

9    well as other sections, but at the moment it's just — it's just

10   an explanation for Mr. Bradlow to tender his resignation.

11          My own personal view is that that would not be —

12   letting Mr. Bradlow off would not solve the problem of getting

13   the sale closed, so why don't I just go across the room starting

14   with the debtor and then the examiner and then the bank and then

15   Burlingame and see if anyone has a suggested course of action on

16   what I ought to do and what ought to be the future of this case.

17          Mr. Goodsell.

18          MR. GOODSELL:  Actually, Your Honor, for the first

19   time I don't have a suggestion.  I'm aware of what the issue is.

20   Certainly one issue is whether the — and I think the one that

21   was tendered up the hearing a week or so ago was the issue of

22   whether the debtor's accumulated cash belongs to Burlingame or

23   is subject to payment of the debtor's debts incurred during the

24   course of this proceeding.

25          At the time Burlingame made its original offer, back I

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 12 of
69

1  October, the debtor had about $95,000 in cash.  At the time that

2  the debtor made that — or at the time Burlingame made its

3  original offer, they anticipated about $250,000 would be paid

4  out in attorneys' fees.

5          THE COURT:  That was the projection back in March.

6  That was projecting a 40-percent distribution to unsecured

7  creditors, I believe.

8          MR. GOODSELL:  That's right.  But I'm — actually that

9  was the projection back in October.

10          THE COURT:  Yeah.

11          MR. GOODSELL:  And at that point in time that probably

12  was near to what the accumulated attorneys' fees had been.

13  Since then, as the Court's aware, we had lots of hearings in

14  October, November, December, some in January, February, March.

15  We have changed from one purchase agreement to another.

16          THE COURT:  Right.

17          MR. GOODSELL:  We've added Mr. Bradlow to the mix.

18  And now the accumulated cash as of the end of March was 253,000.

19  So the debtor had actually been operating at a profit and the

20  question is whether those profits should be used to pay the

21  concurrent expenses incurred to professionals or whether that's

22  a windfall to Burlingame.  And our position is that it is not —

23          THE COURT:  Or whether it's their contractual right.

24  I mean "windfall" is a pejorative term when it's used by the

25  person on the other side.

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 13 of
69

1        MR. GOODSELL:  I understand, but that's —

2        THE COURT:  Yeah.  Oh, I understand too.  But so —

3        MR. GOODSELL:  Their —

4        THE COURT:  — if you don't have — or the debtor

5   doesn't have a recommendation, I'm not going to push you for

6   one.  I'm trying to struggle with this and I want help from

7   everywhere I can get it on what we ought to do with the state of

8   the case.

9        MR. GOODSELL:  If — certainly we had an understanding

10  of that provision based on our — Burlingame copied the Nobel

11  (phonetic) agreement.  I mean that's really what it comes down

12  to, to —

13       THE COURT:  Nobel would have gotten the cash too?

14       MR. GOODSELL:  Exactly, but —

15       THE COURT:  I didn't go back and look.

16       MR. GOODSELL:  But in the Nobel agreement, and I think

17  in the Burlingame agreement as well, certainly there had been

18  discussions with Nobel about 'You're going to get the net cash.

19  You're going to get the net cash after a proration of all

20  expenses that the debtor's incurred.'  And I don't think that

21  Nobel was actually — Nobel had the resources, but I don't think

22  that they really cared so much.  I mean they — if they needed to

23  bring in money to operate the business, they were going to do

24  that.  Their pockets were pretty deep.  So this was not a really

25  significant issue.  And at this point —

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 14 of 69

1    THE COURT:  Well, if I may say, —

2    MR. GOODSELL:  — the debtor has a perception that if

3  the money isn't there, that if this deal closes it won't last

4  through August, which will be in a net negative month.  And if

5  that's the case, then, you know, probably this sale should just

6  not go ahead.  It's not going to accomplish what it was intended

7  to accomplish.  You know, unless, frankly, CGS or the

8  professionals take a hair cut so that the sale can work, and I

9  don't — I'm not prepared to do that and I doubt Mr. Bradlow is

10  either.

11    THE COURT:  The — you remember the discussion we had a

12  few days ago about getting the information to the state agency;

13  presumably the agency isn't going to approve a license of a

14  debtor that — I mean of a school that's doomed to fail from

15  financial limitations.

16    MR. GOODSELL:  I — we have asked for a copy of the

17  application that was filed last week and we have not received

18  it, so I don't know what they have in front of them.

19    THE COURT:  Okay.

20    MR. GOODSELL:  We did file —

21    THE COURT:  I said — I said it's not an action item on

22  some of these other items.  But what — what do you make of or

23  want me to make of this notice of breach that has been tendered

24  to Burlingame?  Does that — is that the debtor's position that

25  the debtor's excused from performance?

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 15 of 69

1      MR. GOODSELL:  No.  The debtor actually is just

2  putting Burlingame on notice that they believe that the

3  communications, the unapproved communications made by Mr. Judson

4  (phonetic) in the article with the San Mateo County —

5      THE COURT:  Right, I read the article.

6      MR. GOODSELL:  — *Times*, right, is a breach of its

7  obligations.  Now —

8      THE COURT:  But not one that would excuse performance

9  by the seller?

10      MR. GOODSELL:  Well, it — I'm not sure what the

11  remedies are.  I mean we could — certainly in any contract,

12  generically, I mean we could waive it.  We could go back and say

13  this is what we think the — you know, the damages are that

14  you're going to have to fix.  If Mr. Bradlow remains involved in

15  the case, I'd consult with him about what he thinks.  If he's

16  out of the case, then I guess it's more or less up to the debtor

17  to decide what they think the response should be —

18      THE COURT:  Well, as I said at the outset, I'm not

19  here to decide whether there's been a breach of contract.  And

20  Burlingame —

21      MR. GOODSELL:  No, I understand.

22      THE COURT:  — no doubt has its side of the story.  And

23  I don't even need to hear that side today.

24      You're not pounding on the table saying, 'They've

25  breach, we don't have to perform.'  You're —

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 16 of
69

1      MR. GOODSELL:  I'm saying that we think there's been

2    an event of breach and we haven't decided what the appropriate

3    response to that is.

4           THE COURT:  Well, okay.

5           MR. GOODSELL:  And they need to be on notice that we

6    think that's occurred.  And I think everybody else in the case

7    needs to be on notice that, you know, we think that's occurred,

8    including, you know, Mr. Rogan, any other creditors who follow

9    this.

10          THE COURT:  All right.  But the debtor — again, if you

11   don't have a position then you're conflicted because — I don't

12   mean in a legal sense — but because you personally may have one

13   view, you may be getting instructions from your client.

14   Otherwise do you want the sale to close or not?

15          MR. GOODSELL:  We have done everything within the

16   debtor's power to make the sale happen.  I think that we have

17   tried to follow the spirit and the letter of the contract and

18   the things that we think are extra contractual because of the

19   demands that have been made.

20          I don't — I'm very disappointed, frankly, in the — in

21   the breach of the publicity provision.  I mean that's been in

22   that contract since it started circulating on day one.  And I

23   believe that it has been breached and that's why we've made that

24   statement.

25          THE COURT:  Okay.  Let me just take a second.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 17 of
69

1      (The Court and Clerk confer.)

2          THE COURT:  Mr. Isaacs, or do you want to speak for

3  Mr. Bradlow or does he want to speak?

4          MR. ISAACS:  Your Honor, I think — I think Mr. Bradlow

5  would also like to speak for himself.  I think I would just make

6  a few comments, as I'm sort of an interloper appearing at the

7  last minute.  But I've sort of watched things going on from a

8  distance and now have been more intimately involved when it came

9  time for Mr. Bradlow to sign the asset purchase agreement.

10         I think when I looked at Mr. Bradlow's role in this

11  case, it really — he brought in — he was brought in for a task.

12  That is, he wasn't worried about the asset purchase agreement.

13  He wasn't — that was between the debtor and the buyers.  He was

14  to choose the best buyer, evaluate those, and facilitate

15  turnover of documents so the playing field would be leveled.  He

16  did that.  In effect, when you look at it, his job was to get in

17  and get out and — and be paid for those services.

18         And he wasn't put in a position as like a Chapter 11

19  trustee, to look at all of the ramifications, the tax

20  consequences, the other issues.  He was just in for a limited

21  purpose.  So I viewed them — when I look at this, I view it

22  almost as if he was a receiver appointed by the parties to

23  facilitate the sale.  And I think the way I looked at it is I

24  think he should have priority in payment for his services,

25  because of that.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 18 of
69

1       And then I think his role has been expended, I think

2   demands are made of him repeatedly.  And I think he's been put

3   in this dilemma by the buyers saying, 'Well, don't worry.

4   You'll get paid.  We just have to beat up on somebody else.'

5   And so the way I view this is that I think that Mr. Bradlow

6   should be paid for his services and he — there should be a

7   priority for that.

8       And I also think that there should be examination to

9   see how much of the money onhand is for deposits and how much is

10  needed to cover the teachers' salaries, because those are

11  important issues in order for the school to function.  So I

12  think those amounts need to be reserved.

13      I can't tell for sure from the cash analysis that Mr.

14  Goodsell went through with — so it's a little hard to tell what

15  those components are.  You know, although he did talk about a

16  $61,000 set-aside.  And so — but that wasn't for the month of

17  August teachers' salaries, or July.  I'm not sure how that would

18  work —

19      THE COURT:  That was for the summer camp and the fall

20  tuition, I thought he said.

21      MR. ISAACS:  Correct.  And so I think in order for the

22  school to function, that's just an issue that has to be

23  addressed.  So those are my comments.  And then Mr. Bradlow, who

24  has obviously been intimately involved in all of these

25  transactions and parent meetings and teacher meetings — and one

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 19 of
69

1  concern that I would raise, and I don't know, this is just as I

2  come in and view this, I think it's a mistake, the service list

3  in this case is a mistake.  I don't think —

4          THE COURT:  What, what's a mistake?

5          MR. ISAACS:  The service list that is utilized in this

6  case is a mistake.  I don't think it's right to keep sending a

7  bunch of notices to teachers that don't have anything — when

8  they receive that, they don't — there's no explanation with some

9  of the things they get.  And I think the service list should be

10 adapted on a going-forward basis.

11         THE COURT:  What services are you talking about?  The

12 Court service list —

13         MR. ISAACS:  The mailing list, Your Honor.

14         THE COURT:  The Court's list or the —

15         MR. ISAACS:  No.  The — it would be the mailing list

16 that is used, for example, when Mr. Goodsell's application went

17 out to all of the creditors, I think that caused a lot of angst.

18 The notice list that the examiner used, we talked about getting

19 an order limiting notice, so we could be more protective of the

20 operations, although the parties disagreed with that assessment

21 and believed while the teachers are all creditors, therefore

22 they all need to get every notice, it just seems to me that

23 something could be done in this case to try and lessen the

24 anxiety factor that is occurring right now.

25         THE COURT:  Well, the anxiety — the anxiety is there.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 20 of
69

1  I guess I'm a little confused.  I don't want to minimize the
2  anxiety that might exist for teachers and parents of children
3  who want the children in camp or school, or teachers who want to
4  know what their jobs are, but somehow excluding people from a
5  list perhaps is not the way to solve a problem.  But, again, we
6  can deal with that later.

7          Let's talk about today's issue, and that is whether
8  Mr. Bradlow should be discharged and relieved of his duties, to
9  use a military term, at his request, or — or stay on to see the
10 sale through to close.

11         Mr. Bradlow, why don't you speak for yourself.

12         MR. BRADLOW:  Your Honor, I'm not sure that I can add
13 very much to what I've already stated in my report.  It's a very
14 difficult situation.  Burlingame is estimating that there will
15 be $403,000 after the payment of the secured claims.  Campeau
16 Goodsell through March 23rd is already at 430,000.  I'm at 80,-,
17 plus Luce Forward, you know, that's around 90,-.  There's not
18 enough money.

19         If Burlingame is correct about their ownership of the
20 current cash in the school, there will be a working capital
21 deficiency.  I don't know what else to say.

22         THE COURT:  Well, let's talk — this is a tough
23 question for me to put to you, but let's divorce your
24 entitlement to be paid from what is the best thing to do with
25 this case.  So I'm asking you to take off your 'I'd like to get

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 21 of
69

1   paid hat' and put on your 'experienced trustee/examiner hat' and

2   say:  Walk me through what would happen if I grant your request

3   and say you are no longer expected to perform.  What do you see

4   happening from today forward if I say it?

5           I mean obviously you put in terms you asked to be

6   discharged.  I guess you could just simply resign on your own if

7   you wanted to.  I'm not telling you you can't.  But I

8   interpreted your letter to say you were requesting to be

9   relieved.  So — and I — you know, I think too much of you and

10  you're too familiar with the bankruptcy system to know that

11  sometimes you take the bad with the good.

12          But let's just assume that you cease to function for

13  whatever reason in this case from this day forward, what do you

14  see is the short-term future for this Chapter 11 and the sale

15  and the school?

16          MR. BRADLOW:  Well, I mean I think the school has to

17  be sold and I would like the transaction to proceed.  I think

18  it's important for the future of the school and I think it's

19  important for the secured creditors in this case.

20          Whether or not the transaction can proceed without me,

21  I don't know.  I have about 11 or 12 emails of requests from

22  Burlingame of things that need to be done.  There's one issue

23  that's not even on their list which is the teacher contracts,

24  which I'm not sure that that can be handled without me.  You

25  know, it's very difficult, Your Honor.  I don't know if they can

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 22 of
69

1  do it without me.  I would like to believe that they could, but

2  given the relationships between the parties, I'm not sure that

3  they can do it without me.

4      THE COURT:  Well, and that was really part of what we

5  talked about last time, right, that you were going to be the guy

6  in the middle to broker the analysis of who the teachers were

7  going to be and so on.

8      MR. BRADLOW:  And I'd love to believe that, you know,

9  that there could be a kumbaya moment between the seller and the

10  buyer and that I can step aside, but I'm not optimistic that

11  that can occur.

12      THE COURT:  Well, with a crystal ball in front of you,

13  what would be — and assuming that we didn't have this cloud of

14  whether you're going to get paid and whether you're being

15  improperly influenced to, you know, object to these fees if you

16  want your fees paid, what would your best judgment be on when

17  this deal could close now, as of now?

18      MR. BRADLOW:  I would have to punt that question to

19  Burlingame.  I think it depends.  What they tell me is that as

20  soon as their license application has been approved by the

21  Department of Social Services, then they will be in a position

22  to close.  I don't know what the latest information that they

23  have received from the department as to when the approval will

24  come through.  I think they're best qualified to respond to that

25  particular question.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 23 of 69

1      THE COURT:  And what about — you still haven't signed
2  the agreement, though; is that correct?
3      MR. BRADLOW:  The asset purchase agreement?
4      THE COURT:  Yeah.
5      MR. BRADLOW:  No, I've signed that, Your Honor.
6      THE COURT:  You have signed it?
7      MR. BRADLOW:  Yes, Your Honor.
8      THE COURT:  Okay.  So — so I gather from a — okay.
9  That was unclear, or maybe Mr. Goodsell mentioned it and I just
10  misunderstood him.
11      What your — what your duties are now are these 11 or
12  12 things just tying up lose ends or other than lose ends to
13  make the thing happen?
14      MR. BRADLOW:  Well, unfortunately, everything — I'm
15  sure that more matters will arise.  And, you know, as I think
16  I've stated to the Court previously, everything that ought to be
17  simple turns out to be an extended, protracted battle.  I mean
18  the latest example of it was the issue of the bank account
19  verifications.
20      THE COURT:  Right.  I thought we solved that problem,
21  no?  It's still a problem.
22      MR. BRADLOW:  I believe we've solved it, but I think
23  it's emblematic.
24      THE COURT:  So what's your recommendation?  You can
25  say none if you want.

1      MR. BRADLOW:  My recommendation —

2      THE COURT:  I'm reading a biography about Lincoln and

3  the No Nothing Party.  There was the No Nothing Party back in

4  the 1860s.  They just said, "I know nothing."  So you can claim

5  to be a member of the No Nothing Party if you want to, but

6  that's not going to make my job easier.

7      MR. BRADLOW:  I think that Burlingame needs to put

8  more money into the deal for the working capital.

9      THE COURT:  Okay.  Mr. Rogan, are you going to tell me

10  if you don't get paid pretty soon you're going to file for

11  relief from stay, right?

12      MR. ROGAN:  We're getting close.

13      THE COURT:  But — and the bank has not — from my point

14  of view, the bank has not been an adversary to this deal at all.

15  The reverse, you've been sitting there waiting.  But —

16      MR. ROGAN:  We're — we're —

17      THE COURT:  But at some point — at some point I wonder

18  if the bank has to step up and help out here too because you're

19  better off with a contentional sale than a foreclosure, aren't

20  you?

21      MR. ROGAN:  Perhaps.  Unfortunately there are people

22  behind us as well.

23      THE COURT:  You're right.

24      MR. ROGAN:  And if we foreclose, they obviously get

25  nothing.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 25 of 69

1        THE COURT:  Well, that's Fitzpatrick, right?

2        MR. ROGAN:  Yes.  And of course —

3        THE COURT:  He's the only — only one that's really in

4   the money on the — I mean I realize that Burlingame itself is

5   there in a position, but other than Mr. Fitzpatrick...

6        MR. ROGAN:  Well, the problem we have is this.  We've

7   been ready — we've sat on the sidelines and watched.  We've

8   tried to help.  Frankly, this process has dragged on

9   interminably.

10       THE COURT:  Right.

11       MR. ROGAN:  There's not a lot of good reason — I would

12  share Mr. Bradlow's comments.  I think some of the simplest

13  things have taken forever.  But, frankly, we do — we would like

14  to see Mr. Bradlow stay.  We think that the deal cannot close

15  between these two parties without him.  That's, again, of course

16  — I also think he ought to be paid for his services.

17            But, frankly, assuming that cash is a contractual

18  right of Burlingame, when I looked at the agreement, and I can't

19  say that I looked at it carefully for that purpose, but I did

20  not see any requirements about how much that cash was supposed

21  to be.  And —

22       THE COURT:  I think there's some ordinary, just

23  ordinary course type language in there.

24       MR. ROGAN:  Exactly.  But we are in a bankruptcy.  And

25  one has to know that paying one's lawyers and paying the

1   examiner and things like that, while they might be

2   administrative expenses, I'm not sure why those — those items

3   shouldn't be fairly and squarely on the table.

4              In addition, I don't understand why it is there's a

5   conception that the purchaser — that the seller somehow or

6   another should contribute to working capital after closing.  I

7   mean unless there are requirements in the contract as to what

8   has to be segregated, and I don't recall any, but I have to say

9   I didn't look that carefully, I don't know why this isn't the

10  obligation of the buyer, as it almost always is.

11             THE COURT:  Well, again, they'll speak for themselves,

12  but —

13             MR. ROGAN:  Right.

14             THE COURT:  — I think what — the point that I made at

15  a recent hearing and is evident again on a review of the APA and

16  Mr. Goodsell's own comments are, the contract contemplates the

17  buyer gets cash onhand, so —

18             MR. ROGAN:  Whatever it is.

19             THE COURT:  Huh?

20             MR. ROGAN:  Whatever it is.

21             THE COURT:  Right.  Right, whatever it is.  But in a

22  sense at some point a hypothetical buyer could say, 'You can't

23  hand me the keys to the deal with one dollar left in the bank

24  account, that wasn't what I bargained for, I won't close.'  I

25  mean so we're —

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 27 of
69

1    MR. ROGAN:  Well, although — although, frankly, I

2 would suggest that at any of the times during which the asset

3 purchase agreement was negotiated and ultimately signed, there's

4 never been enough cash to pull this off.  I don't there — that

5 we've ever had that situation.  If one were to sit down and

6 project, you know, what fees were likely to be in terms of

7 administrative obligations, I don't recall seeing any big pile

8 of cash sitting around in the operating statements.

9    THE COURT:  Well, the projection that I looked at this

10 morning that goes way back many months, I mean Mr. Huckins

11 prepared it, at some point in time when Nobel and Appletree and

12 the other offers were all being lined up side by side, at that

13 point the Burlingame proposal had enough cash to take care of

14 all the professional fees and leave 40 cents on the dollar for

15 unsecured creditors.  Now maybe we were —

16    MR. ROGAN:  Well, —

17    THE COURT:  — all smoking dope at that time to think —

18    MR. ROGAN:  Well, —

19    THE COURT:  — that it would ever happen now months

20 later at the same numbers, but —

21    MR. ROGAN:  Perhaps that was optimistic, but of course

22 had it closed many months ago, had the first Nobel offer, for

23 instance, at ten million and something or other closed, there

24 would have been plenty of cash.  Had this deal closed some

25 months ago, there would have been enough to distribute, and I

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 28 of 69

1   think that's what the Court is referring to, that projection.
2   But delay, as we all know is costly and particularly costly when
3   we have the type of interchange that has occurred here.  And, as
4   a result, we are now in a position where the practicalities of
5   the deal at the price that it is now at, which is not close to
6   the original prices for the sale of this asset, there simply
7   isn't a lot of cash available.
8         And, again, I do not understand why it is that the
9   ongoing working capital of the enterprise is not the
10  responsibility of the purchaser.  I think that that's what it's
11  supposed to be.  They bought the cash, but they didn't fence off
12  exactly how the cash could be sold other than a general,
13  ordinary course of business, then we get down to the question of
14  what's the ordinary course of business in a Chapter 11 debtor.
15        THE COURT:  Well, okay, but let's test that.  Suppose
16  Burlingame says, 'Wait a minute, paying the debtor's fees is not
17  ordinary' and suppose I overrule that objection and authorize
18  payment of fees, again I don't want to pit Mr. Bradlow against
19  Mr. Goodsell here — and, by the way, Mr. Goodsell, I'm not
20  telling you anything you don't know.  Parties-in-interest have a
21  right to object to your fees.  They don't have a right to tell
22  other people, 'I won't object to your fees if you object to
23  Goodsell's fees.'  That's where I find this case to be pushing
24  the envelope.
25        But suppose I said, 'Okay, Bradlow and Goodsell can

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 29 of
69

1   get paid,' and suppose that strips out cash, again leaving aside

2   such more sensitive things as teachers' accrued salary and

3   downpayments for children's summer camps, let's say that those

4   are not imperiled, and Burlingame says, 'Okay, I have an excuse

5   to perform.  I don't have to perform.  There's been a material

6   breach because the debtor expended cash out of the ordinary

7   course of business.'  Again, whether Burlingame's right or wrong

8   isn't the point.  The deal isn't going to close if Burlingame

9   doesn't want to make it close, right?  And then where are we?

10          MR. ROGAN:  No question.

11          THE COURT:  I mean, you know, I have to tell you I'm

12  as unhappy about this case as I'm sure many of you are and I

13  have been struggling for:  What are my options.  And I don't

14  know.  That's why we're having this hearing.

15          So what are my options at this point, Mr. Rogan?

16          MR. ROGAN:  Well, we are very — I'm told we are very

17  close to closing, that Burlingame's application has been

18  submitted and supposedly the authorities will act on it.  At

19  that point Burlingame's counsel has informed us that they're

20  ready to close.  I guess we can try to come up with pro forma

21  statements.  I don't know whether the school has had erosion.

22  It sounded like from some of the papers that were filed there

23  might have been some erosion in terms of the student body.

24  Certainly, I can't imagine this newspaper article will help in

25  terms of keeping students onboard.  Having been a trustee of a

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 30 of
69

1  private school before, those are not the kinds of things you

2  like to see in the paper.

3      THE COURT:  Not the kind of things you want to read in

4  the paper, that's right.

5      MR. ROGAN:  And so, you know, that's — that's a

6  practicality of a business.  It's also not the first Chapter 11

7  business that has not done well, as the case lingers on.

8      I think, frankly, what we have to do is pursue what we

9  have now and get the parties to try to resolve this in terms of

10  their numbers.  I do believe that unless the numbers are a lot

11  different than I think they are, as the school year draws to an

12  end, in this business the payments slow down, after next month

13  you will not be receiving the same amount of income, revenue

14  that we've had before.

15      I think at that point we will have a real problem.

16  And, to me, I still go back to the idea that a purchaser of an

17  ongoing business cannot expect the seller to contribute to

18  ongoing working capital unless there's a specific provision that

19  says so, and I didn't see one.  And I think that the idea that

20  working capital going forward should be part of this mix, to me,

21  is simply not the deal.

22      And I think if you take that out, the chances are that

23  you end up being able to close this deal.  Pretty thin but you

24  can probably close it.

25      THE COURT:  Well, I'm going to interpret your comments

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 31 of 69

1  to say that you think I should tell Mr. Bradlow, 'You'll have to

2  stick it out and see this thing through the close and' —

3        MR. ROGAN:  I sure would like to see Mr. Bradlow do

4  that.  Because, frankly, I would concur with his statements,

5  have sat in on a couple of conference calls during this tenure.

6  I think if Mr. Bradlow resigns, the Court has to do something

7  else.  I think that —

8        THE COURT:  I'm sorry.  Say that again.

9        MR. ROGAN:  The Court has to take other steps.  I

10  don't believe that this deal can survive that, as a practical

11  matter.  I wish it could because, as the Court points out, this

12  is by far and away the easiest way for my client to get paid.

13  But I think as a practical matter, if Mr. Bradlow leaves it's

14  very unlikely that these parties will be able to get closing.

15  If there are actually 11 or 12 items that still remain on the

16  to-do list, and as things get closer to tran-ing the keys over,

17  we know there is going to be more items that come up.  I think

18  that it's simply foolhardy to assume this deal could close

19  without Mr. Bradlow.

20        And so unless there's provisions made for him to be

21  paid and to continue — or to have a reasonable exception of

22  compensation for his services, which I think are valuable, I

23  think we have to find something else, which may require the

24  appointment of a trustee.  Again, I can't imagine as a secured

25  creditor I'm making that statement, but I don't see any other

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 32 of 69

1    way to do it.

2         The alternative — the other alternative of course is

3    conversion, which puts the business completely — you know, which

4    doesn't allow this business to continue as such.  So those are —

5         THE COURT:  No, you know what, —

6         MR. ROGAN:  — those are the tools we have.

7         THE COURT:  Yeah.

8         MR. ROGAN:  We don't have a lot of tools.  I mean the

9    other one is stay relief and at this point I'm pretty close to

10   being able to ask for cause if the parties can't get a deal

11   together and the examiner through certainly no fault of his own,

12   through his extraordinary efforts, can't get a deal to close, at

13   some point I think I'm entitled to come in here and ask the

14   Court for stay relief on the grounds — you know, on grounds of

15   cause.  And then maybe we're in the state court with a receiver

16   during a foreclosure period, because I don't believe we filed

17   any notices on this, if I recall.  We'd have four months to go.

18   Not a happy picture.

19        THE COURT:  One of the options that I have considered,

20   again, I'm not going to act on it today because of the reasons

21   I've stated, is to — is to order the case converted to Chapter

22   7, as incapable of reorganizing, but to order and authorize the

23   Chapter 7 trustee to operate the business, either that or

24   dispose of it.  Now that — does that solve a problem?  No, it

25   compounds a problem, but it changes the groundrules.  The

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 33 of
69

1   Chapter 7 trustee, and again this sounds like an anti-Bradlow

2   statement — and it's not at all, Mr. Bradlow — but a Chapter 7

3   trustee has statutory priority.

4          Unfortunately, the case law doesn't let me do what Mr.

5   Isaacs has asked me to do, is create a super priority for you

6   within the Chapter 11.  Now, Mr. Goodsell, I'll put the burden

7   on you.  If you would voluntarily subordinate your fees out Mr.

8   Bradlow's, then — and I don't run afoul of anything.  I'm not —

9   again, I'm not asking you to do anything about this today.

10         I'm just saying — and, believe it or not, about at

11  least a hundred years ago I was involved in a bankruptcy act

12  case — we didn't call them 7s then, but it was a private school.

13  It was a high school that went into straight bankruptcy.  And

14  the parents of the students rallied and came to the bankruptcy

15  court and put up money to get and support the bankruptcy trustee

16  to run the school long enough for the high school students to

17  finish out the year and get their diplomas and their degrees.

18         So back in my prior life I have precedent in my mind

19  for what was today's equivalent of a Chapter 7 trustee running a

20  school.  It's easy if you have three weeks to go to get high

21  school seniors their diplomas.  That's a little different from

22  sending K through 6 children to start their first school,

23  perhaps at a school being run by a bankruptcy trustee.

24         And the other anomaly in this case, for me at least,

25  is I can't recall a case ever where the business has been

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 34 of
69

1  perfectly healthy and all the problems have to do with matters

2  unrelated to the business.  I mean every indication is this is a

3  healthy, successful business.  Its problem is it's bogged down

4  by the problems that management got itself into to the

5  creditors.

6       Anyway, Mr. Huckins or Mr. Moore, one of you or both

7  of you, would you please weigh in on whatever you wish to weigh

8  in on?

9       MR. MOORE:  Your Honor, thank you.  We probably both

10  will be speaking in a little bit.  Let me just start by saying

11  one thing, and this email that was sent, I think at 4:30 in the

12  morning on April 24th, was we saw that at the same time probably

13  Mr. Bradlow saw that.  We were not involved in the formulation

14  or the advice.  Had we been involved in the formulation or the

15  advice of an email such as that, it wouldn't have happened.  And

16  I just want that on the record at this point in time.

17       THE COURT:  Okay.

18       MR. MOORE:  I also — I think, you know, given the

19  history of this, and I don't think there's — and I know Mr.

20  Bradlow's concerns about being paid and I know Mr. Bradlow's

21  concerns about the email he received, but I don't think this is

22  going to close if he is relieved at this point —

23       THE COURT:  I'm sorry.  Say that again.

24       MR. MOORE:  I said I do not think this transaction

25  will close if Mr. Bradlow steps aside.  As far as we're

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 35 of 69

1  concerned, we're way down the path.  I appreciate the efforts

2  he's made.  I understand his concern that there has been a

3  number — a lot of demands made on his time.  And without promise

4  of payment, that's difficult.

5          I don't have an answer to that right now.  I don't

6  have a proposal to solve that problem, but I do think without

7  him it's not going to close, and I think that would be a mistake

8  for everyone.

9          And with that, I'll turn it over to Mr. —

10         THE COURT:  Okay.  Mr. Huckins.

11         MR. MOORE:  — Huckins.

12         MR. HUCKINS:  Your Honor, yes, I echo Mr. Moore's

13  comments and —

14         THE COURT:  Just pull the microphone a little closer,

15  please.

16         MR. HUCKINS:  I echo Mr. Moore's comments.  I echo the

17  comments of others.  I think the only course that can be pursued

18  here that provides a sensible resolution in this case is to try

19  diligently to get this transaction to closing as expeditiously

20  as possible.

21         There have been questions asked about the status of

22  the transaction.  I circulated on Monday and then again on

23  Tuesday an updated commitment letter from Bank of Marin.  It has

24  been executed.  It has an outside closing date in late July — or

25  it has an — it's a commitment letter through late July, which

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 36 of
69

1  hopefully will provide ample time to close this transaction.

2         There are two conditions in that commitment letter.

3  One is obtaining the necessary licensing.  And debtor's counsel

4  is correct that the license has been submitted to the CDSS.  We

5  understand that, and I think this was a subject matter of the

6  prior status conference, that the consultant retained by

7  Burlingame is going to conduct a pre-audit prior to the

8  inspection by the CDSS.  And we anticipate that the CDSS will be

9  undertaking a physical inspection of the school for purposes of

10  their licensing review process perhaps in the next two weeks, if

11  that's possible.  We don't know, Your Honor, but that's a

12  possible timeframe.

13         The only other condition is a condition to deliver an

14  opinion of counsel, which we're prepared to work with the bank

15  on.  So basically there is one condition preceding to closing

16  the loan and that would be obtaining the license.

17         So that's — that is where we think the transaction

18  stands as best as we can tell.  Burlingame is working

19  expeditiously to get the transaction closed.

20         The other thing that I would like to comment, I think

21  Mr. Bradlow has commented, that there are several requests that

22  have been made of him for information.  And I think those have

23  been the subject matter of prior status conferences and other

24  requests for information.

25         I think the other thing that I don't want lost on this

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 37 of
69

1   is that we have a situation where we don't have a responsible

2   individual or we don't have anyone on behalf of the debtor to

3   execute the necessary transfer documents and documents necessary

4   to consummate the transaction.  So that will be a responsibility

5   of Mr. Bradlow.  And we agree with I think all the views that

6   Mr. Bradlow is necessary to close this transaction.

7          Now I'm going to — I think that gives you a status on

8   our views of, you know, where we think the case should proceed,

9   where we stand in trying to consummate the transaction, and the

10  necessity of Mr. Bradlow.

11         I guess I would like to turn to a bit of history on

12  this transaction.  And I don't think Mr. Goodsell, based upon

13  his comments, disagrees, but I think it's important to lay out

14  to the Court that from the outset of this transaction, and I can

15  provide the Court with docket entries repeatedly, where

16  Burlingame has plainly and clearly stated that it is purchasing

17  the cash of the business at closing.  If the Court would like me

18  to provide the instances —

19         THE COURT:  No, you don't have to.  I acknowledge that

20  it's in the agreement.  I heard — you know, Mr. Rogan made his

21  arguments, and I — it's there.  There's no denying it.

22         MR. HUCKINS:  Yeah.  Okay.  The next thing, Your

23  Honor, is that Burlingame has been candid about what its

24  transaction would provide and it has submitted projections.

25  Those projections were vetted by debtor's counsel.  Those

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 38 of
69

1  projections were vetted by the examiner.  And they were the best

2  projections of what the transaction would provide at the time.

3  And as recently as February, Burlingame was candid in saying

4  that it provides an estimated 4- or $500,000 that would be

5  available for distribution to allowed administrative expenses

6  and unsecured creditors.

7          I think this situation that we find ourselves in has

8  been fully revealed by Burlingame.  And it wasn't planned.  It

9  was a Burlingame offered to purchase the business, and it was

10  open and forthright about it.  So I don't want there to be any

11  confusion about that.

12          Your Honor, now there have been suggestions that the

13  asset purchase agreement may not necessary — there may be some

14  latitude within the asset purchase agreement that would allow

15  professional fees to be paid as an ordinary course expense.

16  Your Honor, I would suggest that through a combination of

17  provisions in the asset purchase agreement, that's not an

18  accurate statement, and I'd be happy to point the Court to those

19  provisions.

20          THE COURT:  No.  If that's your position, that's your

21  position.

22          MR. HUCKINS:  That is our position.  Not only is there

23  an express covenant that the debtor not — once entering into the

24  transaction, that it not make not ordinary-course payments but

25  further there are limitations on — in Section 5.7 as to what

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 39 of
69

1   payments are permissible.  Those would be payments incurred that

2   are no older than 30 days outstanding.  They're express

3   prescriptions in the asset purchase agreement that exclude

4   Burlingame's obligation for the professional fees of the seller.

5   So —

6           THE COURT:  Say that again, that...?

7           MR. HUCKINS:  There's an express provision in the

8   agreement.

9           THE COURT:  That relieve Burlingame of any

10  responsibility for the seller's professional fees.

11          MR. HUCKINS:  That makes it —

12          THE COURT:  Well, Mr. Bradlow is not the seller's

13  professional, he's —

14          MR. HUCKINS:  That's true.

15          THE COURT:  — the Court's professional, right?

16          MR. HUCKINS:  You're absolutely correct.

17          THE COURT:  Okay.  But I mean — but that means that

18  would be — that would be a post-closing obligation, right?  In

19  other words, what the seller does with any cash at close is its

20  own business, but you're saying nothing beyond that, right?

21  Isn't that how that would read?

22          MR. HUCKINS:  The section is Section 2.5- —

23          THE COURT:  Right.

24          MR. HUCKINS:  — -F.  And it simply makes clear what

25  obligations are not by assumed —

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 40 of
69

1          THE COURT:  Right.  Okay.

2          MR. HUCKINS:  — in any way, shape, or form by

3    Burlingame.  And those include the professional fees of the

4    seller.  Now —

5          THE COURT:  Well, let me — let me ask you a simple

6    question.  I do this with my law clerks sometimes, and they get

7    mad at me, so maybe you'll get mad at me.  Suppose there were no

8    bankruptcy, none, you never saw me.  And this was a private deal

9    and you had strained negotiations.  And you hired an

10   intermediary like Mr. Bradlow.  And at this point in the deal

11   Mr. Bradlow came to you and threw down his pen and said, 'I'm

12   out of here unless you cover my fees,' what would you do?

13         I would tell you you'd either pay his fees or cover

14   his fees or the deal would die, right?

15         MR. HUCKINS:  Your Honor, we have to confer with our

16   clients, but I think —

17         THE COURT:  I know.  And I'm not — I'm not asking —

18         MR. HUCKINS:  No.  No, no.  And —

19         THE COURT:  — you to commit your client.  I'm just

20   saying that's what your choices would be.  So why not analyze —

21         MR. HUCKINS:  I think those —

22         THE COURT:  — it this way?

23         MR. HUCKINS:  Excuse me?

24         THE COURT:  Why not — why don't I just take the same

25   position, that you're right.  Let's assume you're right across

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 41 of
69

1   the board on all your legal positions, but the deal isn't going

2   to close without him.  Everyone in the room agrees that this

3   deal doesn't really go down without Mr. Bradlow.

4        So I'm not — Mr. Huckins, I'm not asking you to commit

5   to anything.  If your client were here, I wouldn't even expect

6   him to say anything.  I'd say I think at some point you got to

7   look at this thing and decide is it more important to close the

8   deal than to kill the deal.  And it's your choice — I mean I

9   think it's your choice.  That's the way I see it as an

10   alternative coming up, but go ahead.  I —

11        MR. HUCKINS:  No, Your Honor, I think you have framed

12   the possible alternatives and the dialogue that may very well

13   take place with, you know, a hypothetical client that we have in

14   such a circumstance.  I mean you're absolutely right.  I mean

15   you have to look at the, you know, practical situation as

16   presented, and I think you've framed, you know, a scenario that

17   is very plausible.

18        So I think we would lay that out and we'll have to

19   see, you know, what — what a client would want to do.  I mean

20   that's as much as I can say and that's —

21        THE COURT:  Right.  And that's all I expect you to

22   say.  And I knew you'd — if you haven't done it already, you

23   would do it, you just need to hear it from me.  And, again, this

24   is not an anti-Goodsell comment.  If the law doesn't allow the

25   Court to create priorities within a priority, which I think is

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 42 of
69

1  well established by Ninth Circuit case law, and if one

2  professional says, 'I'm not going to subordinate to the other

3  one,' then it seems to me my only choice is to say to the buyer,

4  'You'll have to change the deal to cover the guy who's

5  indispensable.'  I'm sure — I'm sure the animosity with Mr.

6  Goodsell and Mr. Healy on the one side and your client on the

7  other, since nobody's willing to pay them anything, but I think

8  that I don't — I don't really see an option.  And if Mr. Judson

9  we're here I'd say you're going to have to — in my mind you're

10  going to have to cover Mr. Bradlow apart from this deal or I'm

11  going to let him out because he can't be expected to do this on

12  the house with this risk.

13       And I think Mr. Isaacs said it well:  This isn't what

14  he signed up for.  This guy enlisted in the army for six months,

15  you know, reserve duty at Fort Ord and they sent him to Iraq for

16  three years.

17       MR. HUCKINS:  Your Honor, we would readily acknowledge

18  that Mr. Bradlow has been put in a very, very difficult

19  position, an extremely difficult position.  And he's done a

20  commendable job in the position that he has been placed in.  I

21  guess I would ask the Court if you have any insight into how

22  such a structure might be accomplished within the constraints of

23  the Bankruptcy Code.  I mean if your —

24       THE COURT:  Well, frankly, again, I see Ms. Cutler's

25  here, and I did ask the United States Trustee to help me on

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 43 of
69

1   this.  But, as I think about it, if Burlingame said, 'Mr.

2   Bradlow, we're good for — we guaranty whatever the Court allows

3   you as your fees and, by the way, Mr. Bradlow, we have a right

4   to object to your fees, as anyone does,' and Mr. Bradlow was

5   satisfied that that was, you know, a worthwhile — it was not an

6   unreasonable credit risk, then I would say fine, 'Mr. Bradlow,

7   isn't that good enough.'  And then at some day in the future,

8   whether it's next week or some other day, I'll say, 'Mr.

9   Bradlow's fees are allowed in the sum of x dollars.'

10          And I don't care how the check gets written to him,

11  but it has to be, in a sense, coming out of Burlingame's pocket

12  at this point.  Now if the allowed professional fees — I mean I

13  guess it gets a little more convoluted here, but that's the

14  short answer.  I guess if under certain circumstances, and I

15  don't know how this is going to happen, there would be enough

16  cash in the bankruptcy estate to pay him anyway, then I guess

17  Burlingame would be entitled to some of it back.

18          But I don't think realisticly that's going to happen

19  because, you know, despite all the criticisms of Mr. Goodsell

20  and Mr. Healy, maybe their fees are high, but I can't imagine

21  they haven't earned a substantial portion of their fees under

22  any set of facts.  And that's why, again, Mr. Moore's made a

23  statement about the emails, and I accept his statement about it.

24  But Mr. Moore knows and you know that Mr. Healy and Mr. Goodsell

25  are going to be entitled to some significant fees in this case.

1    It's that simple.

2           So that's sort of a short answer.  I guess if

3    Burlingame is prepared to commit in some fashion, I would urge

4    Burlingame's counsel and Mr. Bradlow's counsel to confer on the

5    mechanics of it.  But offhand I don't see — well, let me say

6    this.  I have perhaps been in a minority with some of my

7    colleague-judges on the issue of when you start a case, can the

8    debtor's lawyer in a case have a guaranty from a third party.  I

9    believe that a debtor's lawyer can have a guaranty from a third

10   party, if it's clear that that third party is not the client

11   and, you know, there's no alter ego and anything else.

12          Now if I bring that same principle to the case now

13   where we're bogged down in this mess and the buyer says, 'I'll

14   cover Bradlow's fees regardless of anything else,' then I don't

15   know why that can't be permissible.

16          Ms. Cutler, do you want to weigh in on this at this

17   point or any other point?

18          MS. CUTLER:  I don't think I have anything to add.

19          THE COURT:  Okay.  So that's — again, Mr. Isaacs or

20   Mr. Bradlow, I don't know if you had thought about this before.

21   If you want to — and Burlingame hasn't made a commitment and,

22   frankly, it's about the only thing I see.  And what I'd almost

23   be inclined to do is to tell Mr. Bradlow I'm sympathetic to your

24   plight, I'm not letting you out of this case at this point, and

25   I'll see you on the day we have the fee apps and we'll have a

1  commitment up or down from Burlingame at that point — or by that

2  point.  And if Burlingame covers it, then we've got Mr. Bradlow

3  covered.  If Burlingame says no, then frankly I think the sale

4  is going down because I'm not going to make Mr. Bradlow work in

5  this case, I will let him out at that point.

6         MR. BRADLOW:  I don't have anything really to add.  I

7  did want to point out that as far as my fee hearing is

8  concerned, I have a family commitment in Chicago and I will be

9  at the airport.  So my plan is to call in telephonically if the

10  Court approves on the day of my fee hearing.

11         THE COURT:  Well,...

12         MR. BRADLOW:  Unfortunately I couldn't change the

13  family occasion in Chicago.

14         THE COURT:  No, of course.  I don't want you to do

15  that.

16         MR. HUCKINS:  Your Honor?

17         THE COURT:  Yes.

18         MR. HUCKINS:  Just may I interject since Mr. Bradlow

19  has raised that issue.  Mr. Moore has a conflict on that day as

20  well and would also like to be in attendance at the hearing.  So

21  if at all possible, if we could move that to the following week,

22  if that works with Mr. Bradlow, that would be preferable.

23         THE COURT:  Well, I think in fairness to Mr. Bradlow

24  we've got to get this more fundamental point pinned down.  If

25  Burlingame says, 'No, thank you, we're not covering it.  The

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 46 of 69

1    deal's the deal,' then I think you need to tell Burlingame that

2    the Judge isn't going to unilaterally tear up the contract.

3    That's not my role.  I don't have I have a right to do that.

4    But I'm going to relieve Mr. Bradlow —

5              MR. HUCKINS:  Right.

6              THE COURT:  — of his duties at his request.

7              MR. HUCKINS:  Okay.

8              THE COURT:  And I think Mr. — again, I said this

9    before, if Mr. Bradlow weren't a regular player in the

10   bankruptcy system, maybe he would have resigned and gone to

11   Chicago already, but he is a regular and I think the regulars

12   understand that you don't just bail, but I'm going to let him

13   off for all the reasons that we've said.

14             So, Mr. Bradlow, when do you leave for your trip?

15             MR. BRADLOW:  I leave that day, Your Honor.  Let me

16   just go —

17             THE COURT:  That's the 8th, right?  Am I right, the

18   8th?

19             MR. BRADLOW:  Yes.  The fee hearing is on Friday, May

20   the 8th, Your Honor, and the hearing is at 9:30 and my flight is

21   at 10:42 that day.

22             THE COURT:  No problem.  You can come here and then go

23   to the airport.  I'll give you my special pass through security

24   and you'll end in Mexico with the flu.

25        (Laughter.)

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 47 of 69

1      THE COURT:  What if we had a hearing a couple of days

2  prior and Burlingame by then has either said yes or no.  And if

3  Burlingame says, yes, we have an arrangement that is acceptable

4  to Burlingame and acceptable to Bradlow, that frankly — to be

5  blunt, it increases the purchase price by Bradlow's fees but not

6  through the case, — Mr. Goodsell, your fees will be heard and

7  considered, but I think that if Burlingame puts more money into

8  the deal, we'll right back into this dilemma.  And I don't like

9  to single you out as being competing with Mr. Bradlow.  But if

10  Burlingame on, quote, a side deal fully disclosed says, 'We're

11  guaranteeing Mr. Bradlow's fees,' then I hear the applications

12  and allow them, and it's a separate issue as to when they get

13  paid and how they get paid.

14      And so, Mr. Bradlow, what I'm suggesting is this is

15  that a day or two prior we have a hearing and see — or no

16  hearing.  I mean if there's — or reach an agreement.  If there's

17  a stipulation that has been worked out, we don't even have to

18  have a hearing.  Frankly, if no one has an objection to your

19  fees, although I independently have to make my own decision and

20  have to review — and, by the way, I mean aside, Bradlow's fees

21  means Isaacs' fees too — if we don't have — if you and

22  Burlingame don't have an agreement by, let's say, the 5th or the

23  6th, then I think it would be important to have a hearing like

24  this where I say, 'Okay, you're discharged.'  And then we can

25  have a continued hearing.

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 48 of 69

1    I think — let me put it this way.  If you're at odds

2 with Burlingame in the sense that they haven't agreed to cover

3 your fees and they would take issue with your entitlement or Mr.

4 Goodsell's entitlement to be paid out of the funds in the case,

5 I don't want to do that by you on the telephone at the airport.

6 I want everybody here so we can flesh it out.

7    So does anybody have a problem with the suggestion

8 that I just made?

9    MR. BRADLOW:  No.

10    MR. MOORE:  No.

11    THE COURT:  I mean, Mr. Huckins, I presume you can

12 talk to your client in the —

13    MR. HUCKINS:  Yeah.

14    THE COURT:  — next day or two and —

15    MR. MOORE:  Yeah.

16    THE COURT:  — make a decision on this.

17    MR. MOORE:  Your Honor, we will have an answer well

18 before that, I mean —

19    THE COURT:  Well, —

20    MR. MOORE:  — I assume with negotiating back and

21 forth.

22    THE COURT:  Well, yes, and —

23    MR. MOORE:  Right.

24    THE COURT:  — do it.  And if you reach a negotiation,

25 — I mean again, Mr. Bradlow, I'm not asking you to substitute

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 49 of
69

1  one risky claim for another.  You have every right to insist

2  that Burlingame provide you with some certainty that you're

3  going to be paid.  I'm not going to get into that negotiation.

4  I believe the exigencies — exigencies of this case permit me to

5  make an exception to what might be a different rule, that you're

6  not a trustee but you've been acting like a trustee.  And

7  normally trustees can't have, quote, side deals.  But this is

8  not a side deal.  It's a second source of payment.

9          And the very person who guarantees your fees has a

10  right to object to your fees.  I don't think they will, but they

11  have a right to.  And so do other people, other

12  parties-in-interest.

13          So that's what I propose then.  We have a continued

14  hearing middle of the next week, if necessary.  If Mr. Bradlow

15  and Burlingame reach an accommodation that is satisfactory, and

16  something is filed, then we don't have to have a hearing.  We'll

17  just — Mr. Goodsell, you'd still like to have your fees heard on

18  that day, I take it?

19          MR. GOODSELL:  I need to have it heard on that day.

20          THE COURT:  Yeah.

21          MR. GOODSELL:  I leave the following week on the 11th

22  and I'm —

23          THE COURT:  Fine.

24          Now, Mr. Moore, you don't need to be here for that

25  hearing, do you?  Your colleague can do it, can't you?

Case: 08-30026    Doc# 308    Filed: 06/29/09    Entered: 06/29/09 00:32:42    Page 50 of
69

1      MR. MOORE:  That's probably correct, Your Honor.

2  Yeah.

3      THE COURT:  Mr. Bradlow, I have an assignment for you,

4  though.  If you're capable of doing this, and this may be one of

5  those things you can't do.  Are you — do you have enough of a

6  handle on the economics of the school and the cashflows to be

7  able to tell me what in dollar amount — I don't mean today, but

8  I mean at a subsequent hearing — could be paid, leaving aside

9  Burlingame's legal objections.  If Burlingame persuades me that

10  I can't allow them to be paid, that's — they'll persuade me.

11      But suppose I said, 'I authorize on an interim basis

12  compensation in the amount of x dollars payable provided the

13  school's operating needs can be satisfied,' do you have a good

14  enough handle on the dollars to guess what that number might be?

15      MR. BRADLOW:  Not right now.  I would have to —

16      THE COURT:  No, no.  Not right now, but do you think

17  you could —

18      MR. BRADLOW:  I would have to do a cashflow analysis —

19      THE COURT:  — determine it?  You think you could

20  determine it?

21      MR. BRADLOW:  I could — I would have to look at

22  deposits, I'd have to look at teacher salaries, the timing of

23  the payments, the timing of cash inflows from tuition.  Can it

24  be done, yes.  Is it in my head, no.

25      THE COURT:  Well, as you know, frequently in difficult

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 51 of 69

1   cases people such as I authorize trustees or

2   debtors-in-possession to pay fees, allowed fees as long as the

3   cash needs of the debtor can afford to have that expenditure.

4        If Burlingame says, 'No, that's an improper

5   expenditure,' I'll deal with it. I'll either overrule them or

6   I'll agree with them. I don't have an answer today. But if I

7   wanted — if I did say, and this is partly for Mr. Goodsell and

8   partly for you, frankly, I mean if to the extent that — that the

9   operations of the school might be able to support the cashflow

10   out to the professionals, then that's an acceptance thing to do

11   unless Burlingame persuades me otherwise.

12        Well, I don't — look, you got enough to do and your 11

13   to 12 demands from Burlingame probably are ahead of mine, but

14   I'll put mine in as number 13, is to try to give me an estimate

15   when we have another hearing on what amount of cash could be

16   expended without jeopardizing the cashflow needs of the school

17   for the —

18        MR. BRADLOW: I understand, Your Honor.

19        THE COURT: — the term.

20        Mr. Huckins, let me go back to my first point. I

21   might not have articulated it well. This goes back to my own

22   personal view. I told you that I believe debtor's lawyers can

23   have third-party guaranties. They don't — it doesn't happen

24   very often and lots of cases don't permit it, but in my own

25   experience in the past, probably more as a lawyer than as a

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 52 of 69

1  judge, I have been involved where a third party guarantees the

2  fees to the lawyer and maybe even pays them, and then the lawyer

3  seeks fees from the estate and reimburses the guarantor.  I'm

4  not adverse to that either.  This is self-serving because the

5  very — you know the very expenditure of cash that you don't

6  think should be made would be made.  But if the — if the estate

7  can handle it, then it can.

8         I think what it comes down is to this.  We all

9  recognize Mr. Bradlow is there for a good reason and he can't be

10  expected to work on the house.  So if — if your client doesn't

11  want to do it, then you can discuss with him the consequences.

12         And, Mr. Moore, I will take your word on the

13  middle-of-the-night email, that you'll instruct your client the

14  next time he does that he might have something referred to a

15  United States Attorney.

16         MR. MOORE:  We will have that conversation, Your

17  Honor.

18         THE COURT:  All right.

19         MR. ROGAN:  Your Honor, one more thing, if you might —

20  if I might.  I think that — I certainly never understood the

21  transaction to be structured in a way that I've heard Mr.

22  Huckins now describe it.  And I can't — I'm not throwing stones

23  at him.  I just never thought of it in that fashion that a

24  Chapter 11 debtor in a case that has had a lot of activity could

25  not use the assets of the estate to pay for the costs of

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 53 of
69

1   administration after an asset purchase agreement is signed and

2   pending.  And I think that that's what I heard him say.

3           If that's the case, perhaps another way to do this and

4   perhaps in conjunction with third-party guaranty from Burlingame

5   would be simply to amend the asset purchase agreement so that

6   expenses of administration are clearly payable out of the

7   ongoing cashflow of the school, but that of course depends on

8   whether it's there —

9           THE COURT:  Well, I'll leave it — again, if Burlingame

10  is willing to make concessions that are acceptable to Mr.

11  Bradlow, I'm not going to second-guess it.  Again, Mr. Goodsell

12  has rights.  And I think we're back to the point if Burlingame

13  says, 'We're all for Bradlow.  We don't want to give Mr.

14  Goodsell a red cent,' then they got some law they're up against.

15  And so I'm not here to trample on Mr. Goodsell's rights any more

16  than on Burlingame's rights or Mr. Bradlow's rights.

17          MR. ROGAN:  Right.  I didn't — I didn't mean to — to

18  do that.  I meant to say any expenses of administration —

19          THE COURT:  But don't — but, Mr. Rogan, don't you

20  agree that if a buyer enters into a contract with a bankrupt

21  seller and says, you know, 'When we close the deal I want all

22  the chairs that are in the courtroom,' and by the time of the

23  sale all the chairs are gone because the debtor gave them all

24  away, would —

25          MR. ROGAN:  Oh, yeah.  No, I understand —

1          THE COURT:  — I mean you'd say, 'Wait, I bargained for
2    the chairs,' right?
3          MR. ROGAN:  It says what it says.  And of course
4    sitting in my seat I really didn't pay a lot of attention to
5    that.  It didn't matter.
6          THE COURT:  Same here.
7          MR. ROGAN:  Yeah.
8          MR. GOODSELL:  Your Honor, I — go ahead.  I'm sorry.
9          THE COURT:  Mr. Goodsell.
10         MR. GOODSELL:  I have two brief points.  While the
11   debtor appreciates Mr. Bradlow's services over the past several
12   months, I think you've brushed with a broadbrush.  If Mr.
13   Bradlow were not to go forward, I don't believe that it's — it's
14   certainly possible that this deal can still be concluded.  Most
15   of what Mr. Bradlow has been doing since October was facilitate
16   transfer of information.  And at this point I just can't imagine
17   with the application on file what other data is required that we
18   don't otherwise provide to the Court through operating reports
19   or otherwise.
20         THE COURT:  Oh, no.  Look, I —
21         MR. GOODSELL:  I —
22         THE COURT:  I fully agree with you.  If Mr. Bradlow
23   doesn't — isn't made comfortable by Burlingame and, in effect,
24   says, 'Okay, Judge, I'm taking you up on your offer,' and that
25   chair is empty next week, then I'll probably have the same kind

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 55 of
69

1  of conversation, 'Okay, fellows, now what.'  And if there's a

2  belief that the deal can close without him, fine.  We'll try —

3          MR. GOODSELL:  I think it's possible, but what's going

4  to happen is there will probably be a few more hearings in front

5  of you.  And let me give you an example.

6          There was the issue of whether Ms. Koelling on behalf

7  of Kids Connection should sign the application reflecting the

8  bank accounts.  The Kids Connection cash is part of a submission

9  on the CDSS item.  Ultimately that had to come to you because I

10  don't think Mr. — to the extent that Mr. Bradlow took a

11  position, I don't think that it was something that either party

12  was going to accept.  We had reasons for thinking that — that

13  this was not an appropriate thing to do.  They had reasons for

14  thinking it was.  And ultimately it did require the Court's

15  intervention.  So it is conceivable that there will be more of

16  those things between now and whenever this closes.

17          The second thing I want to mention is that you had

18  suggested that if Burlingame was not satisfied with, say, your

19  interpretation of what ordinary course of business means in

20  terms of expenses paid, that they could walk from this deal.

21  They could walk from this deal for a lot of reasons.

22          THE COURT:  Right.

23          MR. GOODSELL:  And if they walk that's not the end of

24  this case.  There are other purchasers, there have been other

25  purchasers that are out in the wings.  Those could be

1    resurrected.  If worse came to worse we could do a plan.

2            I mean it's not that there is one deal for this case

3    and then it's all over.

4            THE COURT:  I mean why are you saying that?  I didn't

5    say that if Burlingame walks the deal's in the tank.  I mean

6    we're considering all the options.

7            MR. GOODSELL:  I understand, but there was a

8    suggestion that if they don't get their way that they walk, and

9    then where are we, and the answer is, well, we're probably back

10   where we were last June.

11           THE COURT:  If Mr. Bradlow walks, I'm going to have a

12   conference to say what's next.

13           MR. GOODSELL:  Right.

14           THE COURT:  If Burlingame walks, I'm probably going to

15   have a conference to say what's next.

16           MR. GOODSELL:  That's true.

17           THE COURT:  If anybody else walks I'll probably recuse

18   myself from the case.

19       (Laughter.)

20           THE COURT:  Or I'll order you all over to Judge

21   Newsome to lock you up to settle the case.  He got PG&E done, he

22   could get this one done.

23           MR. GOODSELL:  But, at any rate, I just wanted to say

24   from the debtor's point of view while — while Mr. Bradlow has

25   been an asset, this deal could still happen if he makes the

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 57 of
69

1  election that he doesn't like the guaranty.  And the second

2  thing is that this — unlike many cases where the debtor has a

3  short fuse because they're losing money every month, if we just

4  take the numbers I gave you today, you know, the debtor is

5  actually paying all of its bills, paid its property taxes this

6  last month, and still continues to run a cash surplus.

7      THE COURT:  Right.  As I said, it's a healthy debtor.

8  It's just got the baggage it brought otherwise.

9      Well, look, you can tell your client that the Court

10  hasn't said it's Burlingame or nothing or this case closed.  And

11  just because I considered options doesn't mean I'm seriously —

12  first of all, I'm not sure that it would be appropriate for me

13  unilaterally to make such precipitous things like declare the

14  contract void or declare the school shut down.  That's not my

15  style, I don't think.  I try not to be.

16      So you should certainly leave here assuming that there

17  are options.  Unfortunately, it's still in a difficult

18  situation.  But right now, again to review where we are, we need

19  to pick a date.  If Mr. Bradlow is comfortable with whatever

20  accommodations Burlingame's prepared to extend to him, then I'm

21  going to treat his offer to withdraw as withdrawn.  If he is not

22  — does not make a satisfactory arrangements with Burlingame, I'm

23  going to relieve him as examiner and we'll see where we go from

24  here.

25      So do we have a date?  Let's see, we have something to

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 58 of
69

1   do in —

2               MR. ISAACS:  Your Honor?

3               THE COURT:  Yes.

4               MR. ISAACS:  Would it be possible to have that — I

5   realize you said we probably don't necessarily have to have a

6   hearing because Burlingame will either step up or not step up,

7   or whatever alternative happens happens.  But can that be a

8   deadline set of May 1st for that?

9               THE COURT:  Well, that's just two days from now.

10              MR. ISAACS:  Right.

11              THE COURT:  Is that — well, to —

12              MR. HUCKINS:  Early next week would be possible, Your

13  Honor.

14              THE COURT:  I'm sorry.  Say —

15              MR. HUCKINS:  Early next week.

16              MR. MOORE:  That's too early, I think, yeah.

17              MR. HUCKINS:  I mean if you were looking at 5/5, May

18  5th?

19              THE COURT:  Well, here's — maybe this isn't what Mr.

20  Isaacs is saying, so let me see if I can say it.  I don't think

21  Burlingame can — can delay a decision and make demands on

22  Bradlow at the same time.

23              MR. HUCKINS:  Understood.

24              THE COURT:  And if Burlingame sends 12 more emails to

25  Bradlow to say, 'Here, accomplish the following 12 things,' and

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 59 of
69

1   then the next email says, 'We're not covering your damned fees,'

2   I don't think that would be fair.

3         MR. MOORE:  Your Honor, if I could just say, I think

4   the question of whether or not they're prepared to negotiate and

5   try to come up with a solution to pay the fees is one thing.

6   Actually coming up with a structure might be something a little

7   more time-consuming.

8         THE COURT:  You just want to answer the first

9   question; is that what you're saying, Mr. Isaacs?

10         MR. ISAACS:  Your Honor, I mean I've seen this happen

11   — this is not complicated, I mean with respect to the fees.  All

12   that it amounts to is that one person pays and the other one

13   then gets whatever is paid out of the bankruptcy estate, —

14         THE COURT:  Right.

15         MR. ISAACS:  — it goes to that person.  So this is not

16   a complicated structure.  It doesn't take days and days.  And

17   the reason I raised the May 1st point was exactly what you said,

18   is:  There's 12 emails in the hopper now, there may be 10 by the

19   time Mr. Bradlow — 10 more when he gets back to his office.  And

20   I think we should either know from Burlingame one way or the

21   other.  And, again, it's not complicated as far as I can see.

22         THE COURT:  Well, I'd like to — I'd still like to

23   break it down into, yes, we'll do it, and then how we'll do it

24   as the second step.  Is May 1st —

25         MR. HUCKINS:  No, this is fine.  I think what makes

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 60 of 69

1    sense is — and I think where the Court was headed was setting a

2    hearing date some time next week whereby either the parties

3    appear and explain their positions to the Court and the Court

4    will relieve Mr. Bradlow or they have reached an agreement prior

5    to that point in time.

6              THE COURT:  Right.

7              MR. HUCKINS:  And I think that makes perfect sense.

8              THE COURT:  Right, but what I also said is you can't

9    string him along by giving him 10 more duties —

10             MR. HUCKINS:  And we agree with that and we understand

11   that.

12             MR. MOORE:  Yeah.  I mean I think getting an answer by

13   Friday or Monday, 'Yes, we're prepared to do this,' is doable.

14   And I also think that we will tell the client that 'In the

15   interim you can't ask for anything more, so you understand the

16   rule.'

17             I think at that point in time that not only will

18   motivate them to make a decision or not motivate them to make a

19   decision.

20             THE COURT:  Well, Mr. Isaacs, let's try it that way.

21   I mean I think — I think no one's —

22             MR. ISAACS:  That's —

23             THE COURT:  Is that all right?

24             MR. ISAACS:  Yeah.  Your Honor, that's fine.  That's

25   what I'm hearing.  As long as I understand that the excellent

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 61 of
69

1  service that they have been getting may be a little bit altered

2  while they contemplate what they should do in the future, that's

3  my only point that I wanted to make.

4      THE COURT:  Sort of like if you order dessert and the

5  waiter says, 'I'd like you to pay for the main course first

6  before I deliver it,' you pay him or give him your credit card

7  anyway.

8      Do we have time on the afternoon of the 6th?

9      THE CLERK:  Yes.

10      THE COURT:  Does the afternoon of the 6th work for

11  everyone?

12      MR. MOORE:  Yes, Your Honor.

13      MR. ISAACS:  That's fine.

14      THE COURT:  What time, Ms. Parada?

15      THE CLERK:  1:30.

16      THE COURT:  Okay.  1:30 on the 6th is a continued

17  status conference in connection with these matters.  As I say,

18  I'll leave it to Mr. Isaacs, on the one hand, Mr. Huckins, on

19  the other, to advise me and the other parties if there's been a

20  satisfactory accommodation.  Keep the United States Trustee

21  informed on what you end up with.  Ms. Cutler said she didn't

22  have a position to take and I think that means if she thought I

23  was announcing the biggest miscarriage of justice in the system

24  since the Code was enacted, she would have said something.  But

25  I do want her informed so that we have this thing fully above

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 62 of
69

1   board.

2           And if there is an agreement and no need to have the
3   hearing, we'll have no hearing.  And Mr. Bradlow will be
4   permitted to appear by telephone — you know what, Mr. Bradlow, I
5   think what I'd rather do, let's assume we have our hearing on
6   the 8th.  I don't want you on the phone when they're announcing
7   Flight 92.  You just don't have to appear.  If there are — I'm
8   not aware of any objections to your fees.  If I have any, I will
9   have my clerk notify your counsel that we'll have a follow-up
10  hearing where I can raise my questions.  But if there are no
11  objections from anyone else, and I have none, I don't need to
12  have you present in court.

13          MR. BRADLOW:  Thank you, Your Honor.

14          THE COURT:  Mr. Isaacs, you can appear by telephone,
15  cover for Mr. Bradlow, if you want, anyway.

16          MR. ISAACS:  All right.  Thank you, Your Honor.

17          THE COURT:  That's on the 8th.

18          And, Mr. Goodsell, you can appear by phone, but we'll
19  stick with it on the 8th for you and I'll deal with these
20  issues.  And, again, we're back to this point about if
21  Burlingame makes an accommodation that satisfies Mr. Bradlow,
22  Mr. Goodsell, you still have a right to be heard, you still have
23  a right to seek to be paid, and I have to deal with these other
24  issues as well.

25          And I think — I think — well, let's just leave it at

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 63 of
69

1 that at this point.

2       Mr. Bradlow, to the extent that I asked you to try to

3 make an estimate of cash available, you can let Mr. Isaacs

4 report that if you have an answer.  Because, look, if I — if I'm

5 going to authorize some payment from the bankruptcy estate with

6 or without Burlingame's consent, I still need a business person

7 looking at it to be able to say whether and how that's going to

8 be possible without imperiling the day-to-day operations of the

9 school.

10       MR. HUCKINS:  Your Honor, may I ask a clarifying

11 question, because what is not clear from what has transpired

12 today is the hearing on the 8th, would that simply be a hearing

13 on the applications for compensation, an allowance of that

14 compensation, and that the issue of payment would be deferred to

15 a later hearing with more of an evidentiary record before the

16 Court, before it makes any determination?

17       THE COURT:  Well, I mean normally those are just all

18 together.  I mean in the normal case, the fee application comes

19 up and you allow the fees and authorize the payment.  If in any

20 particular case the payment can't be made, either for a legal

21 reason, like you object and you convince me that I can't

22 authorize it, or an economic reason, like there isn't enough

23 cash, then you defer the payment.  But I don't — you know, let's

24 suppose that Mr. Bradlow says a $150,000 could be paid, who's to

25 say that I wouldn't authorize on an interim basis payment to

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 64 of
69

1  both professionals that are applying for it.  I mean I have to

2  say it can be both.

3      MR. HUCKINS:  Your Honor, you've hit the precise point

4  that I guess given the timeframe that we're dealing with right

5  now I'm concerned with, is that if we have a submission by Mr.

6  Bradlow as to what he believes the cash — what cash might be

7  available for payment of professional fees from the existing

8  resources of the estate, notwithstanding the asset purchase

9  agreement, no one would have seen that before that's submitted.

10  So what opportunities do people have to vet that and to prepare

11  any other submissions.  That's my concern and that's why I'm —

12      THE COURT:  Well, what would you submit?  I mean again

13  let's suppose that — you know, let's suppose the legal argument

14  is not made, it's just a dollar one, aren't you going to defer

15  to the business judgment of the operator to —

16      MR. HUCKINS:  It depends on what it is.

17      THE COURT:  Well, but who's going to second guess

18  them?

19      MR. HUCKINS:  Well, there may be other data out there,

20  Your Honor.  With all due respect, I don't know what it's going

21  to be, but if we simply, for example, work from the monthly

22  operating reports, that would provide at least one indicia of

23  whether or not moneys could be paid from the estate.

24      THE COURT:  But in the — in the typical case — here I

25  go again —

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 65 of
69

1        MR. HUCKINS:  Um-hum.

2        THE COURT:  — whether it be a Chapter 7 trustee or an

3  operating debtor-in-possession or a trustee, I say the fees are

4  allowed in the some of x, I only allow y dollars to be paid, or

5  I only allow the representative of the estate to pay the amount

6  that in that representative's business judgment can be paid

7  without jeopardizing the operation.  I don't — I don't have

8  people second-guessing that business judgment.

9        I mean if you're telling me that somebody from

10  Burlingame's going to go in and second-guess Mr. Bradlow, if he

11  says we can spend 50,- rather than 40,-, I'm not sure I'm

12  interested in that.  So I'm not sure what you're driving at.

13        MR. HUCKINS:  I guess what — what I'm concerned with,

14  Your Honor, is I've heard a lot today and the cash isn't

15  necessarily what I'd call unencumbered cash.  I mean the cash

16  that may very well be onhand, my represent advance deposits for

17  tuition and other programs —

18        THE COURT:  Right.

19        MR. HUCKINS:  — that are to take place in 2009 and

20  2010.  There are other interested parties who have an interest

21  in that cash.  There are also attendant liabilities and

22  obligations that may very well be Burlingame's with respect to

23  that cash.  And I think that all needs to be taken into

24  consideration.  And I don't know what those numbers are.  And

25  that's my concern.

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 66 of
69

1          THE COURT:  Mr. Bradlow, would it be possible for you

2   to make a quick estimate consistent with what we're talking

3   about by the time of — well, by the middle of next week?

4          MR. BRADLOW:  I will do my best, Your Honor.

5          THE COURT:  Well, again I don't — I'm not going to

6   asking you to go do an audit.

7          MR. BRADLOW:  Right.

8          THE COURT:  I'm asking you to be the — act like you're

9   the CFO for a moment and the Judge just said, you know,

10  professional fees of six figures can be paid, how much cash can

11  be paid.  And if you can do a quick thing like that, without

12  huge burden, and share it with the other parties, that will be

13  very helpful.

14         MR. BRADLOW:  I will do my best, Your Honor.

15         THE COURT:  Well, that's best we'll say.

16         Mr. Huckins, if we — if we come down to it and you

17  think you need more time, we'll deal with it.

18         MR. HUCKINS:  Okay.  That's fair.

19         THE COURT:  As I say, we're talking about Mr. Goodsell

20  more than anything else now because Mr. Bradlow is either going

21  to be accommodated or not by you.  Okay.

22         MR. GOODSELL:  Your Honor, the hearing on the 6th, do

23  you want counsel present?

24         THE COURT:  No, you can do it by phone.

25         MR. GOODSELL:  Can we appear by phone?

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 67 of
69

1      THE COURT:  You can do it by phone, that's fine.  I

2  realize it's an imposition on you to do that.  I wanted you here

3  by phone — in person today because this was sticky, sticky

4  wicket, and difficult, and I appreciate everyone's efforts in

5  here.  I can't think of anyone in this case that can be real

6  pleased with the way things have developed, and I'm not faulting

7  anyone at this point.  I'm just saying it's an awkward situation

8  at the moment and maybe there's a light at the end of the

9  tunnel.  Let's hope so.

10      THE COURT:  Okay.  Good luck.

11      [COUNSEL]:  Thank you, Your Honor.

12     (Proceedings were concluded at 11:03 o'clock a.m.)

13                      —o0o—

14

15

16

17

18

19

20

21

22

23

24

25

State of California          )
                            )     SS.
County of San Joaquin       )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of California, of the
proceedings taken on the date and time previously stated in the
above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate No. 00124.  Palmer Reporting Services
is approved by the Administrative Office of the United States
Courts to officially prepare transcripts for the U.S. District
and Bankruptcy Courts.



                                Susan Palmer
                                Palmer Reporting Services

                                Dated June 19, 2009

Case: 08-30026   Doc# 308   Filed: 06/29/09   Entered: 06/29/09 00:32:42   Page 69 of
69