1      UNITED STATES BANKRUPTCY COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3          (SAN FRANCISCO DIVISION)

4

5  In re:

6  KIDS CONNECTION, INC.,          Case No. 08-30026-DM

7                                  Chapter 11

8                                  San Francisco,California
                                   July 2, 2009
9                                  10:00 a.m.
           Debtor.
10  _____/

11
                 TRANSCRIPT OF PROCEEDINGS
12      PRELIMINARY HEARING - CITY NATIONAL BANK

13
          BEFORE THE HONORABLE DENNIS MONTALI
14         UNITED STATES BANKRUPTCY JUDGE

15

16  APPEARANCES:

17
                         ALLEN, MATKINS, LECK, GAMBLE &
18                       MALLORY, LLP
                         BY: WILLIAM W. HUCKINS, ESQ.
19                       Three Embarcadero Center, 12th
                         Floor
20                       San Francisco, California 94111

21

22  For the Debtor:      CAMPEAU GOODSELL SMITH, L.C.
                         BY: SCOTT GOODSELL, ESQ.
23                       440 North First Street, Suite 100
                         San Jose, California 95112

24

25

```
 1   APPEARANCES (CONTINUED):

 2

 3
     For City National:        JEFFER, MANGELS, BUTLER & MARMARO
 4                             BY: RICHARD A. ROGAN, ESQ.
                               Two Embarcadero Center, 5th Floor
 5                             San Francisco, California 94111

 6
     For Linda Koelling:       GOLDBERG, STINNETT, DAVIS AND
 7                             LINCHEY
                               BY: DENNIS DAVIS, ESQ.
 8                             44 Montgomery Street, #2900
                               San Francisco, California 94104
 9

10   For Brian Fitzpatrick:    LAW OFFICES OF WILLIAM C. LEWIS
                               BY: REBECCA EPSTEIN, ESQ.
11                             510 Waverly Street
                               Palo Alto, California 94301
12                             (Appearing Telephonically)

13

14   Court Recorder:           AKBAR MALAKOOTI
                               UNITED STATES BANKRUPTCY COURT
15                             235 Pine Street
                               San Francisco, California 94104
16

17   Transcription Service:    Jo McCall
                               Electronic Court
18                             Recording/Transcribing
                               2868 E. Clifton Court
19                             Gilbert, Arizona 85295
                               Telephone: (480)361-3790
20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2    July 2, 2009                          10:00 a.m.

3                         -–—oOo—–-

4          THE CLERK: All rise.  The court is now in

5    session, The Honorable Dennis Montali presiding.

6          THE COURT: Please be seated.

7          THE CLERK: Matter of <u>Kids Connection, Inc.</u>

8          THE COURT: Appearances?

9          MR. GOODSELL: Your Honor, Scott Goodsell for the

10   Debtor.

11         THE COURT: Good morning.  You can just stay there

12   by the microphone.

13         MR. ROGAN: Richard Rogan for City National Bank.

14         MR. DAVIS: Good morning, Your Honor, Dennis Davis

15   for Linda Koelling.

16         MR. HUCKINS: Good morning, Bill Huckins and Bob

17   Barnes on behalf of Burlingame Capital.

18         THE COURT: Good morning.  Let me -- just a

19   housekeeping --

20         THE CLERK: On the phone --

21         THE COURT: On the phone, please.

22         MS. EPSTEIN: Good morning, Your Honor, Rebecca

23   Epstein from the Law Offices of William C. Lewis for

24   creditor, Brian Fitzpatrick.

25         THE COURT: Good morning.  This morning I received

1  a letter from a parent of two children at the school.  The

2  letter expresses the parent's views about various matters.

3  I see no need to place this on the public record.  It

4  doesn't have anything to do with -- well, other than a

5  request that I be fair, which I will try to be -- I don't

6  see a reason to spread it on the record, but I've made

7  copies, and I'm going to give a copy to Mr. Huckins and to

8  Mr. Goodsell and as far as Mr. Rogan and Mr. Davis -- well,

9  Mr. Davis, maybe perhaps you should see it too since your

10  client is mentioned in there.  Mr. Rogan, I didn't make a

11  copy for you; it wasn't to exclude you.  You can certainly

12  read Mr. Davis' copy.

13            MR. ROGAN: We'll share.

14            THE COURT: I normally place letters of this

15  nature on the Court docket, but I'm not going to do it this

16  time because as I say, the writer of the letter is

17  undoubtedly expressing her views, but I find her views to

18  be not relevant to the matters that I have to decide.  So

19  my Law Clerk will just give you those copies.  You can read

20  the letter or not.  I'd rather than you not read it while

21  we're conducting other business, because it's just one of

22  those things.

23            Unless some of you have a different point of

24  view, I'd like to at least hear some -- discuss briefly the

25  bank's motion, and then I'll visit the Burlingame motion,

1  which seems to have more substance.  I mean -- that sounded

2  wrong.  The bank's motion doesn't lack substance; the

3  Burlingame motion seems to be of a higher priority to deal

4  with today, but on the bank's motion, Mr. Goodsell, the

5  court's -- our rules don't require debtors to file written

6  opposition, but I wonder, does the Debtor have an

7  opposition to this motion, because I didn't hear from you.

8          MR. GOODSELL: To the bank's motion?

9          THE COURT: Yeah.  I mean we don't require

10  opposition, but normally in Chapter 11's we get them, if

11  there are oppositions.

12          MR. GOODSELL: Right.  Well, obviously the Debtor

13  believes that the motion is not well taken under the

14  circumstances.  We've had this pending sale approved since

15  March.  The bank in fact was an advocate of that sale.

16  Everybody has been pushing forward to have that sale

17  concluded, and I don't see the point of the motion at all.

18  I mean it doesn't really advance the bank's interest at

19  all.  So the Debtor certainly opposes it, and it's

20  inconsistent with the efforts by everybody to get this sale

21  transaction closed.  If granted, all it's going to do is

22  add another element of cost, which would be the cost of the

23  bank who is going to pass through for any recording costs.

24  And in this estate, given the fact that we're quickly

25  running out of money even to pay administrative expenses,

1  you know, having the bank add additional fees or costs
2  because they're at the front end of this thing is --
3         THE COURT: As a practical matter though, again,
4  if I were to grant the bank relief, and the bank
5  foreclosed, as a practical matter, all of those costs would
6  just go into its credit bid; wouldn't it, and represent
7  simply a higher threshold for any other bidder to bid.  But
8  realistically it doesn't translate to a claim against the
9  bankruptcy estate.  Do you agree with that?  In practical
10 terms.
11        MR. GOODSELL: No, in practical terms, if the bank
12 were to record this afternoon, and this sale were to close
13 next week, the bank's demand is going to be increased by
14 those --
15        THE COURT: Okay.  Of course.  Fair enough.  I'm
16 sorry.  I was thinking of the doomsday scenario.  If the
17 bank goes to foreclosure, it's very, very tenuous.
18        MR. GOODSELL: Correct.
19        THE COURT: I agree with you, if the bank incurs
20 the additional expense, its payoff figure goes up dollar
21 for dollar.
22        MR. GOODSELL: Right.
23        THE COURT: Okay.  Would you clarify one other
24 thing.  The Burlingame papers say that the bank -- the debt
25 is being serviced, and the motion says that there are no

1  post-petition payments, and I don't remember what happened

2  early in the case as far as payments, if any.  What -- has

3  the Debtor been making payments to the bank?

4          MR. GOODSELL: My understanding is the Debtor is

5  fully current.

6          THE COURT: Is what?

7          MR. GOODSELL: Fully current, post-petition.

8          THE COURT: Well, but the loan is matured, so --

9  well, maybe Mr. Rogan, you can clarify that.  Burlingame

10  says you're being paid.  Are you being paid?

11          MR. ROGAN: We are being paid for the most part.

12  There have been some payments that were not made, and of

13  course, the Court is correct, that the loan is matured.

14  There also were some pre-petition defaults.

15          THE COURT: Well, but the cover sheet -- I think

16  it's your cover sheet -- indicates that there are 16 post-

17  petition defaults, and I don't think that's right; is it?

18          MR. ROGAN: There are defaults, but that's because

19  the loan was not current all the way along the line.

20          THE COURT: Well, would it be more accurate to say

21  that what you're saying is, it's 16 months past due.  I

22  mean --

23          MR. ROGAN: That's true.

24          THE COURT: In the run of the mill relief from

25  stay motions, I look on our cover sheet to see what is the

1  state of affairs as far as the Debtor is concerned.  If you

2  read the cover sheet by itself, it looks like no one has

3  paid the bank for 16 months.

4          MR. ROGAN: Yeah, that's not -- that's not

5  correct.

6          THE COURT: So it's misleading.

7          MR. ROGAN: Yes.

8          THE COURT: And it's more accurate to say the loan

9  is mature and it's been mature for whatever number of

10  months.  Then that's more accurate.

11          MR. ROGAN: That's right.

12          THE COURT: Okay.  Mr. Huckins, the opposition

13  says that there would be disruption if the NOD was

14  recorded.  There's not any evidence to support that.  I

15  mean where does that comes from, without evidence, or even

16  a declaration.  Even Ms. Judson's declaration doesn't say

17  that.  So where did that come from?

18          MR. HUCKINS: It comes from I guess my personal

19  view that the transaction is very close to closing, and

20  that if a notice were to be filed, that people would become

21  even more anxious about the transaction than they are

22  already, and --

23          THE COURT: But that is fudging a bit; isn't it,

24  for you to just tell me what your view is than to state a

25  fact?

1           MR. HUCKINS: It is argument, Your Honor.

2           THE COURT: There's no fact.  I mean we don't have

3   a declaration from an investor or a banker saying, if

4   there's a NOD, I'm walking.

5           MR. HUCKINS: I don't have a declaration

6   supporting that.  You're absolutely right.  We have

7   worked -- I will represent that we have worked very

8   diligently to get to this point.  I think it is fair to say

9   and I would make this offer, that I think there is a high

10  level of desire and concern to get this transaction closed,

11  and I don't want to jeopardize that.

12          THE COURT: That's a given.  That's a given.  But

13  I don't think it's a good practice to throw facts into an

14  opposition that has no support at all.  You would be highly

15  critical of your opponents if they did that, and have been.

16  And to say that I read it, and thought, well, that's fine.

17  I wonder what somebody is going to tell me when I read the

18  declarations, and I turned to Ms. Judson's declaration, and

19  I looked in vane to find a statement.  So I don't think

20  that advances the cause.  I am more aware -- as well aware

21  as you and your clients and all the other parties about the

22  state of affairs, but I frankly don't see -- to me, the

23  only reason not to let the bank record the Notice of

24  Default may be exactly the point that Mr. Goodsell says

25  that it's a minimal expense but it's just another expense.

1   So why do it?

2           Well, Mr. Rogan, I'm not going to act on the

3   motion until I hear the discussion on the other matter, but

4   do you want to be heard further?

5           MR. ROGAN: Yeah, the only thing I would say, Your

6   Honor, would be, as you know, the bank has been patient

7   throughout this.  We've done what we can to try to

8   facilitate anybody to be the buyer.  We're now down to what

9   we would hope is the final steps before a closing, but that

10  still hasn't happened and here we are now into the third

11  quarter of this year, which is an important thing for my

12  client, which has watched, of course, its equity cushion

13  essentially evaporate at this point.  We're right down

14  to -- fortunately, and it's unfortunate for the other

15  creditors -- I think we probably come out about right.  So

16  the long and short of this is, we haven't even started the

17  foreclosure process, and as a matter of State law, were the

18  Court to grant us stay relief, the Debtor would have until

19  five days before a foreclosure sale to pay us in full, and

20  that would be four months down the road.  So it's a long

21  way from --

22          THE COURT: And under Chapter 11 law, the Debtor

23  may have a lot longer than that, right?

24          MR. ROGAN: The Debtor might have a lot longer

25  than that.  That's conceivable as well.

1       THE COURT: Oh come on, you're not kidding

2   anybody.  I know the bank would rather be paid than

3   suddenly be the owner of a school.

4       MR. ROGAN: We would rather be paid.  Absolutely.

5   We would rather be paid.  We have hoped and prayed that

6   this will close, and of course the fact that you get stay

7   relief doesn't mean you're going to run off to the County

8   Recorder's Office the afternoon before the 4th of July

9   weekend.

10       THE COURT: Right.  What do you think the costs

11  would be just for the recording of the NOD?

12       MR. ROGAN: Oh, I really wouldn't have a clue,

13  but --

14       THE COURT: A couple thousand dollars?

15       MR. ROGAN: Yeah, something like that.

16       THE COURT: I mean it's the typical fee of the

17  escrow company, right?

18       MR. ROGAN: Yeah.

19       THE COURT: Well, what I've done in many, many

20  other cases that are simpler than this is, when we have a

21  sale that's threatening to close despite all odds and we

22  have a lender who's pushing to foreclose, I've been known

23  to say, fine, you can record your NOD, but you have to eat

24  the cost of it, and you can't pass the cost on to the

25  borrower, but let's hold that and --

1            MR. ROGAN: All right.  Or one other thing might
2  be a time frame on that as well, because I think without
3  any time frame in place, without an outside date, this
4  could drag on for a long, long time.  It needs to end for
5  everybody's sake.
6            THE COURT: Yeah.  No, I understand.  And we'll
7  come back to that in a minute.  Anyone else want to be
8  heard on this matter?
9            MR. DAVIS: That being the bank motion, Your
10 Honor?
11           THE COURT: Yeah.  No one.  Okay.  Well, I'm just
12 going to defer that for the moment, and let's talk about
13 the motion for aid.  Now, Mr. Goodsell, I saw that -- it
14 looks like you and Mr. Huckins have reached an agreement on
15 at least -- I take the Clerk off the hook; you're willing
16 to sign papers, but there still seem to be a number of open
17 issues.
18           MR. GOODSELL: I'd prefer that the Clerk did sign,
19 but I understand that this is not going to be simple.
20 There are a number of different documents, and I'm willing
21 to sign all the ones that are identified.
22           THE COURT: Well, I didn't -- again, I'll come to
23 the other issues, but, Mr. Huckins, if I read your
24 supplemental dec and Mr. Goodsell's submission on behalf of
25 the Debtor, it looks to me like all the documents you

1  wanted the Clerk of the Court to sign will now be signed by

2  Mr. Goodsell as attorney.  In fact did I miss any?

3          MR. HUCKINS: No, I think yesterday we had further

4  discussions with Debtor's counsel, and there were a couple

5  of items that I don't believe were part of the supplemental

6  decs that have now been included in the proposed order from

7  Debtor's counsel.

8          THE COURT: Pull the microphone a little closer,

9  please.

10          MR. HUCKINS: Yes.  The last two items –- there

11  are two additional items that Mr. Goodsell has agreed to

12  execute on behalf of the Debtor and the Debtor's estate, so

13  I think the two approaches are concurrent at this point so

14  that we could accomplish closing through either mechanism.

15          THE COURT: Okay.

16          MR. HUCKINS: The one distinction –- and we have

17  talked to Debtor's counsel about this, is, we have tried

18  diligently to identify all the documents necessary to

19  close, but I think the Court can appreciate and I know

20  Debtor's counsel can appreciate as well that there are

21  things that pop up in trying to close a transaction, and we

22  have provided for that in our proposed order, that either

23  the Court Clerk or Mr. Goodsell would have the authority to

24  execute those documents as necessary and appropriate

25  without being identified at this point.

1         THE COURT: Well, I'm trying to stay a little
2  clear of the Clerk, not that you can't ask, but I was
3  looking for authority in the papers and didn't find much.
4  In fact, in Footnote 7 of your paper, you cite Bankruptcy
5  Rule 6004(f)(2), and reading the footnote, one would think
6  that the Clerk is mentioned in that rule, and of course the
7  Clerk is not mentioned in that rule.  And again, placing
8  the Clerk into the footnote in the context of the rule is
9  hardly appropriate when the rule doesn't mention the Clerk.
10 But I want to keep the Clerk out of it, not because I
11 wouldn't direct the Clerk to do it if the law permitted it,
12 but if Mr. Goodsell is going to solve the problem, then we
13 don't have a problem.

14        I prefer –- and again, I'm open to suggestions
15 from all of you –- to take today's –- the Burlingame motion
16 and break it into two parts, and one part is that for the
17 documents that Mr. Goodsell on behalf of the Debtor and
18 Burlingame through its counsel agree need to be executed,
19 I'll sign an order that is consistent with the language
20 that you want and the language that Mr. Goodsell would like
21 and take care of that.  But the second half of the
22 Burlingame motion is a different issue, it seems to me.
23 And Mr. Goodsell, if I read your papers correctly, you'll
24 play by the agreement and you won't go outside the corners
25 of the agreement.  Is that accurate?

1      MR. GOODSELL: Well, yes.  We know from prior

2   experience in this case with respect to the Asset Purchase

3   Agreement that Ms. Koelling is not going to sign that, and

4   so an order directing her to do it is going to be

5   ineffective.

6      THE COURT: It might have been effective because I

7   was prepared, until you stepped up to the bat, to ask

8   whether I shouldn't issue an order to show cause why she

9   shouldn't be ordered to do it, and if she didn't comply

10  with an order, she would learn my views about coercive

11  contempt, that Mr. Huckins and his firm are well aware of,

12  but I'd rather not go there if we can get this thing done

13  some other way.

14     MR. GOODSELL: My understanding is that her

15  primary concern, other than ongoing and prior litigation

16  with Burlingame, is that she's not a proponent of this

17  particular transaction --

18     THE COURT: Right.

19     MR. GOODSELL: And doesn't want to --

20     THE COURT: Pull the microphone closer.

21     MR. GOODSELL: Yes.

22     THE COURT: No, my point is, I don't want to dwell

23  on it; I don't want to engage Mr. Davis or make him feel he

24  has to defend his client.  Ms. Koelling is free to live her

25  life.  If she occupies the position of responsible officer

1  of the Debtor, she ought to carry out those duties.  And I

2  was prepared to raise the question of, she can resign; but

3  she can't defy me or the court or the institution or ignore

4  her responsibilities, but --

5          MR. GOODSELL: I understand.

6          THE COURT:  -- but if Burlingame is satisfied

7  with your substitution, then that's a non-issue.  I'm not

8  going to make a further issue about it.

9          MR. GOODSELL: We sold it the last time because

10  Mr. Bradlow was there as an examiner, and this is simply to

11  do the same thing in Mr. Bradlow's absence.  It seems to

12  me, Your Honor, and I've had this discussion with Mr.

13  Huckins that there may appropriately be -- and I suggested

14  there really are kind of three orders.  One is an order

15  dealing with the signature of the documents.

16          THE COURT: That's the order that we just talked

17  about, right?

18          MR. GOODSELL: Yes.  The second -- and we're all

19  in agreement right down to the language on that order that

20  we prepared a separate order they've incorporated into

21  theirs, but a separate order would be fine with me, and the

22  language is in agreement, and that could be uploaded by the

23  time everybody got back to the office.  The second issue is

24  there is some -- what I'll call miscellaneous issues in the

25  order or in connection with the motion -- the APA has

1  been –- the Asset Purchase Agreement has been amended in a

2  couple of small matters.  The copier leases aren't going to

3  be assigned at this point.

4        THE COURT: Right.  That seems like a no-brainer.

5        MR. GOODSELL: Yeah, and these are all things that

6  if there needs to be an order just to clarify, fine.  And

7  it is a no-brainer.  Nobody disputes that.  The last issue

8  involves the disposition of the Debtor's cash in accounts,

9  and that is the issue on which there is no agreement.  I

10  have some data from the client that I'm happy to share, so

11  we know what it is that we're dealing with, but I suspect

12  that in connection with an anticipated close of escrow next

13  Tuesday, the best that can happen is for that money to

14  essentially be frozen in those accounts, pending an

15  accounting and a further court order.

16        Now, the Court's going to have to decide whether

17  professional fees have a claim on any of those monies, but

18  Burlingame is assuming no liabilities, so if this closes on

19  the 7th, or the 8th or the 10th or whatever date, but if it

20  closes on the 7th, there are going to be some checks in

21  transit against those accounts, and they should be honored.

22  And then there are going to be some expenses which may have

23  been incurred prior to the 7th, which the Debtor is

24  responsible for, and those should be paid.

25        THE COURT: But if there were no bankruptcy, and

1  there were no animosity, and this was just a run of the
2  mill asset sale, out in the real world, those things would
3  happen in their own course, right?

4          MR. GOODSELL: Yeah.

5          THE COURT: The normal course expenses would be
6  paid.  I think at the prior hearing, Burlingame didn't
7  dispute that.

8          MR. GOODSELL: There would be a provision in the
9  agreement that said something to the effect of, the Debtor
10  is going to retain or the seller is going to retain "X"
11  amount of dollars, and within two weeks or three weeks,
12  there will be an accounting, and then, you know, the net
13  will be paid.  Or there would be a provision that said the
14  buyer is taking the cash but they're also accepting all of
15  the --

16          THE COURT: Right.  The ordinary --

17          MR. GOODSELL:  -- the ordinary trade obligations.

18          THE COURT: I don't think -- I mean if Burlingame
19  has a different view of that world, they better tell me,
20  but I assume that that's consistent with any asset
21  acquisition.  The rub is with Mr. Bradlow's fees and your
22  fees.

23          MR. GOODSELL: Right.  Now, if -- just so that
24  we've all got the same information, here's what I know, and
25  the source of this is the Debtor's bookkeeper, the current

1  cash on hand is --

2          THE COURT: As of today?

3          MR. GOODSELL:  -- and this is as of yesterday --

4          THE COURT: Yesterday, July 1.

5          MR. GOODSELL: -- and supposedly this is -- we've

6  asked for everything in all accounts.  She's able to go

7  through her books because there's about four or five

8  different bank accounts that they use.  If I had my

9  druthers, I would have had this information -- I would have

10  had the detail information.  Unfortunately she just sent us

11  the summary information, and left for the day.  So here's

12  what I have.  Cash on hand is $254,000 and some change.

13  Payroll which goes out today is $93,500.  As of the end of

14  June, so June 22nd, prepaid tuition was 89,474, and Bill

15  Healy was told verbally by Kathy that there's no

16  additional -- that no additional prepaid tuition has come

17  in, in the past couple of weeks.  So if you take the cash

18  on hand, you cover for the payroll; you deduct out the

19  $90,000 on prepaid tuition, you're really only talking

20  about 50 or 60,000 bucks at best.  And you still have

21  probably a few checks to write out of that.

22          So that is my understanding of what we're talking

23  about in terms of that number.  It's not going to carry the

24  school forward by any means.  It's not going to make a huge

25  dent in whatever the professional fees are.

1          THE COURT: Well, it's not, but what are you

2    saying?  Are you saying you think it should be -- at least

3    that amount should be set aside?

4          MR. GOODSELL: Well, as I said, I think that

5    the -- the payroll is going to be paid out today.

6          THE COURT: Right.

7          MR. GOODSELL: Whether people cash their checks

8    today or --

9          THE COURT: Well, assume they do.  If they're

10   smart, they will, but I think from an analytical point of

11   view, we must assume it's money out the door.

12         MR. GOODSELL: Right.  So what I'm saying is

13   that --

14         THE COURT: And what does that -- what's that

15   payroll, through what date?

16         MR. GOODSELL: That's through the end of June.

17         THE COURT: So there's a quick -- there's not a

18   lag of any significant amount.

19         MR. GOODSELL: No.

20         THE COURT: Okay.

21         MR. GOODSELL: So my suggestion would be that

22   assuming a close on the 7th, which is next Tuesday, any

23   funds in those accounts, that no further checks should be

24   written after the -- well, I take that back.  The money

25   should stay in those debtor in possession accounts pending

1   a final accounting, that it doesn't get transferred to

2   Burlingame; it doesn't get transferred to the

3   professionals.  The only checks that are written out of it

4   are for remaining operating expenses through the 7th, and

5   then there will be an accounting and we'll have to come

6   back and get an order from the Court at some point as to

7   whether those residual funds are paid to professionals or

8   not, and I think that maintains the status quo.  If the

9   money goes to Burlingame and the Court decides that it

10  should have gone to professionals, I'm concerned that it

11  may be very hard to get it back.

12          THE COURT: Okay.  But let me -- you said

13  something that I was going to ask everybody.  Are you of

14  the view that this thing can close as early as next

15  Tuesday?  And then, Mr. Huckins, are you -- again, leaving

16  this cash issue as an issue -- is that the plan?

17          MR. HUCKINS: Next week --

18          THE COURT: Are your clients funding, is the

19  funding ready to commit?  You said -- I think the papers

20  say there's an escrow.

21          MR. HUCKINS: Correct.

22          THE COURT: The bank has put in a payoff, right,

23  Mr. Rogan?

24          MR. ROGAN: That's right.  We've already -- we've

25  sent it in now.  It did expire on June 30th, but we'll

1   update it.

2          THE COURT: And Mr. Davis, your client –- or you

3   provided me a recently filed Proof of Secured Claim, but I

4   don't know, your client hasn't taken a position on this

5   sale, right?  I mean she's not suggesting that there's any

6   issue there, right?

7          MR. DAVIS: No, there is an issue, Your Honor.

8          THE COURT: Okay.  Well, I'll come back to that in

9   a minute.  All right.  So maybe there's an issue; I want to

10  hear from Mr. Davis, but the –- Mr. Goodsell, if I can

11  restate it, the ninety-three, five is gone, under your

12  scenario by next Tuesday, because it's been paid out.

13         MR. GOODSELL: Yes.

14         THE COURT: I mean, again, I'm trying to be

15  practical rather than pretend I'm doing a bank audit, and

16  the eighty-nine, four seventy-four is sacred, in a sense,

17  because it's prepaids from post-petition students or their

18  parents, right?

19         MR. GOODSELL: Right.  We've all treated it that

20  way.

21         THE COURT: Yeah.  And you're not suggesting that

22  I depart from that.

23         MR. GOODSELL: No.

24         THE COURT: Okay.  So the difference between cash

25  and that of the 50 or 60,000, you believe should be subject

1  to the claims of your firm and Mr. Bradlow.  In Mr.

2  Bradlow's case, I've issued an order.  In your case, I've

3  been holding it under advisement.  And in your view then --

4  and therefore, let's say the escrow closed on the 7th, on

5  the morning of the 8th, it's Burlingame's problem to deal

6  with any expenses that happen and that occur.  It can dip

7  into the pre-petition account if it chooses.  It can

8  contribute money if it chooses.  But it can't tap this

9  escrow -- I mean, what we'll call the bankruptcy escrow of

10 these other funds.

11       MR. GOODSELL: Correct.

12       THE COURT: Okay.  Mr. Huckins, do you want to --

13 again, we'll come back to whatever Mr. Davis has to say,

14 and are you in agreement -- before we talk about the cash

15 because obviously this is an important issue -- are you in

16 agreement with Mr. Goodsell's breaking the orders down

17 into -- orders one, two and three, and the orders one and

18 two, consistent with your understanding?

19       MR. HUCKINS: We would prefer -- let me deal with

20 the procedural aspect of an order last and deal with the

21 substance first, if you don't mind.

22       THE COURT: Okay.

23       MR. HUCKINS: In terms of signing the documents, I

24 think Mr. Goodsell and I are in agreement on the 12

25 identified documents that need to be signed, and then Ms.

1  Markham (Phonetic) is going to sign the last one.

2          THE COURT: Is that -- by the way -- I'm sorry to

3  interrupt you, but does that require a separate order or

4  will the order for Mr. Goodsell cover Ms. Markham as well?

5          MR. HUCKINS: That's why -- can I come back to

6  that?

7          THE COURT: Yeah.

8          MR. HUCKINS: But under our proposal, it would be

9  covered in one unified order.

10          THE COURT: Okay.

11          MR. HUCKINS: The one thing that Mr. Goodsell and

12  I have not reached agreement on -- and I'm not sure if he's

13  changed his position, is paragraph 12.  We have included in

14  our proposed --

15          THE COURT: Of the proposed order?

16          MR. HUCKINS: Yes.  We have included in our

17  proposed order authority for Mr. Goodsell to sign other

18  documents and instruments that may be necessary that are

19  yet to be identified, and I want to get that on the table

20  right now.

21          THE COURT: Is that the exhibit on your

22  supplemental dec?

23          MR. HUCKINS: If you go to Exhibit A of my

24  supplemental dec --

25          THE COURT: Oh, Exhibit A, excuse me.  Okay.  I'm

1   sorry, I was looking at B.  Paragraph 12?

2           MR. HUCKINS: Yeah.  It's paragraph 12.

3           THE COURT: Okay.

4           MR. HUCKINS: And that just gives Mr. Goodsell, or

5   alternatively, if we went with the Clerk, it gave the Clerk

6   authority to sign other documents that may arise, so that

7   we can get this transaction closed.  So that's one thing

8   that we would like included in the order.

9           THE COURT: Keep in mind that authorizing is not

10  the same as directing.

11          MR. HUCKINS: I understand.

12          THE COURT: If I authorize and Mr. Goodsell

13  decides he's not going to do it, he's not in contempt.  The

14  sale may not close, but he's not in violation of any order.

15  Okay.

16          MR. HUCKINS: That true, and then I guess we'd

17  have to come back to the court, but --

18          THE COURT: Right.

19          MR. HUCKINS: -- I mean we would like to get that

20  authorized, if possible.

21          THE COURT: I doubt that Mr. Goodsell is going to

22  agree to sign 12 documents and refuse to sign the 13th.  If

23  it's an innocuous document, it just needs to be done, but

24  again, that's going to be his choice.  But all right, look,

25  so you want to make sure that paragraph 12 survives.

1          MR. HUCKINS: Correct.  Now, Mr. Goodsell talked

2     about a second proposed order, or we'll call it a "bucket

3     of issues," that are subsumed within our comprehensive

4     order, dealing with miscellaneous items, and one of the

5     issues –- one of the big issues is the information and

6     access necessary to effectuate a smooth transition of the

7     business and operations, and that is something we need to

8     have addressed.

9          There's a need for transitional information and

10    transitional access so that when the transaction does

11    close, that it's seamless.  The students don't notice that

12    there's been a change in ownership.  The parents don't

13    notice it.  The teachers' insurance and benefits are

14    handled, and we need to get a mechanism in place to

15    accomplish that.  And that is covered in our papers and in

16    our proposed order, and I believe that there is a –- there

17    is a disagreement on that with Debtor's counsel.  And I

18    think you framed it as the Debtor would like to follow the

19    letter of the Asset Purchase Agreement, but as we set forth

20    in our papers, the Asset Purchase Agreement provides

21    specifically what we are requesting right now in an order.

22    And the reason we have to bring this to the Court is, that

23    has been a problem.

24          Debtor's counsel and our side have tried to work

25    through that issue between our offices, and for the most

1    part, we have been very effective ultimately of getting the

2    necessary access and information.  It is not without some

3    contention at times, and I would like to remove that

4    obstacle.  We've got a very short period to closing, and

5    I'd like to make sure that Burlingame and K.C. Funding have

6    the necessary access to the tuition deposits, the student

7    contracts, the accounting records, the personal records,

8    the benefit policies that are in place, so that there can

9    be a smooth transition of the operations upon closing.

10   That's what I'm --

11           THE COURT: Well, this is an oversimplification,

12   but again, leaving aside the cash for the professionals --

13           MR. HUCKINS: M-hm.

14           THE COURT:  -- if this thing closes on Tuesday,

15   why can't your client arrive on Wednesday and there they

16   all are.  There are the files.  Then if there's something

17   missing, then the Debtor has to account.  What's so wrong

18   with that?

19           MR. HUCKINS: Well, Your Honor, the problem is, is

20   that, for example, there are insurance providers for the

21   employees who become K.C. Funding employees the day after

22   it closes.

23           THE COURT: Yeah.

24           MR. HUCKINS: And they can't get the policies in

25   place without access to the existing policy and the

1  necessary information and to be able to talk to the

2  existing provider so that the new provider can then put a

3  policy in place to insure continuity of coverage.

4       THE COURT: Well, with that kind of an answer,

5  then a Tuesday close is totally unrealistic; isn't it?

6       MR. HUCKINS: If they got access today -- and

7  let's deal with the closing issue right now.  Mr. Goodsell

8  has talked about a closing on Tuesday.  I think

9  realistically from what I saw yesterday, the closing

10  according to escrow was Wednesday.  I believe that --

11       MR. GOODSELL: It's always been Tuesday.  It's

12  always been Tuesday.

13       MR. HUCKINS: I thought --

14       THE COURT: Okay.  But whether it's Tuesday or

15  Wednesday, I mean, folks, is the title company going to

16  insure this without a final order?

17       MR. HUCKINS: The title company will insure this

18  based upon entry of the order in aid of execution --

19       THE COURT: But there is a final order on the

20  sale.

21       MR. HUCKINS: Correct.  There is a final order on

22  the sale.  They will --

23       THE COURT: But, okay, let's suppose I entered one

24  of your orders today.  It's not going to be final on

25  Tuesday.  Are they going to act on a non-final order?

1    MR. HUCKINS: It's an order in aid of

2  implementation of the sale order.  That's the way they're

3  viewing it.

4    THE COURT: That's not what I asked.  Are they

5  going to close if this order in aid is still subject to an

6  appeal, or potential for an appeal?

7    MR. HUCKINS: They have indicated that they would.

8    THE COURT: Okay.  Again, I'm not second guessing

9  it, I just wanted to see if it's realistic, and if it is;

10  it is.  You know better than I.  All right.  But whether

11  it's Tuesday or Wednesday, how -- with a holiday tomorrow

12  and a Saturday and a Sunday, is all this insurance and

13  employee and health care stuff going to all fall in place

14  in one and a half business days?

15    MR. HUCKINS: If the brokers who are trying to put

16  together the benefit package --

17    THE COURT: Mr. Bradlow, you're going to come

18  back; aren't you?

19    MR. BRADLOW: Yes, Your Honor.

20    THE COURT: Okay.  Because I am going to talk

21  about your situation.

22    MR. HUCKINS: If the brokers who are trying to put

23  together the benefit packages could communicate with one

24  another, could have the necessary data exchange so that

25  they could put a policy in place to insure coverage on the

1  first day of operation, that would be very important.

2          THE COURT: What would happen if none of that

3  transition took place and your client just closed and

4  became the owner on Wednesday, wouldn't the employees still

5  be covered by their existing insurance?  I mean isn't there

6  in a normal -- I mean if I'm a teacher at the school on

7  Tuesday and my employer is Kids Connection, and Wednesday

8  morning I get up sick and go to my health carrier, you

9  think they're not going to be required to help me under my

10 existing policy?

11         MR. HUCKINS: Your Honor, we have not seen the

12 policy so I can't answer that question.  The Debtor

13 perhaps --

14         THE COURT: How about -- I mean just common sense,

15 common sense.  How does an asset sale deprive an employee

16 of coverage because the owner of the asset is now someone

17 different?  The employer of the person at the time of the

18 illness is, I assume, in whatever the health plan is -- I

19 don't pretend to know the answers here; I'm just saying it

20 doesn't sound to me like you just suddenly leave everybody

21 high and dry without coverage.

22         MR. HUCKINS: I certainly would hope not, and

23 Debtor's counsel has indicated that premiums have been paid

24 I believe -- is it through July?

25         MR. GOODSELL: Yeah.  All the insurance has been

1 paid for Kids Connection through the end of July.

2          THE COURT: So am I correct, Mr. Goodsell, if I'm

3 an employee, my health coverage is there.  It's covered.

4          MR. GOODSELL: Yeah.  In addition, my experience

5 where I've been involved with this before, is that

6 Burlingame's new insurer, even if all of the detail for

7 that insurance isn't done for a week, will actually

8 backdate the policy to, you know, to the 8th.  But it's

9 pretty common in my experience to have stuff -- because the

10 insurers have to do their end of things too.  And so just

11 pick a date and say, okay, your insurance starts from this

12 date.  So I don't see it as being as significant an issue.

13          MR. HUCKINS: Your Honor, I guess my concern is,

14 I'm going to try to put myself in the shoes of one of the

15 teachers who would be affected by this, and if I had

16 uncertainty as to continuity of coverage, it would cause me

17 anxiety, and we're trying to avoid that issue.  And if for

18 some reason there was a lapse of coverage -- if for some

19 reason there was a lapse of coverage, I would be -- I as an

20 employee would be concerned --

21          THE COURT: And if I were the buyer, I would make

22 sure that I had my insurance broker issue a rider the

23 moment I close escrow that covers everybody, every single

24 one of them.

25          MR. HUCKINS: If we could do that.

1      THE COURT: Well, do it.  I mean what you're

2  asking Mr. Goodsell and the Debtor -- Mr. Goodsell

3  particularly, you're asking him to work for free to do

4  something that maybe isn't contemplated by the Asset

5  Purchase Agreement.

6      MR. HUCKINS: Your Honor, I think it is

7  specifically contemplated by the Asset Purchase Agreement.

8      THE COURT: Well, again, I'm not here to interpret

9  it.  This is not a contract action, and Mr. Goodsell, you

10 don't agree, right?

11     MR. GOODSELL: I don't agree, but more

12 importantly, Your Honor, let me point out that I don't run

13 Kids Connection.  I don't tell people what to do.  I don't

14 have the authority to tell people over there what to do.

15 The only officer over there is Ms. Koelling.  She is out of

16 town now.  She's out of town I think through next week.  I

17 am not going to take over the management role of telling

18 principals or other employees at Kids Connection what to

19 do.  And so that role, I won't take on.  There are things

20 that are being asked here which are -- in that particular

21 order which are absolutely contrary to the Asset Purchase

22 Agreement.  There is a provision that they can show up on

23 two hours notice.  That's not in the Asset Purchase

24 Agreement.  The Asset Purchase Agreement says we'll provide

25 reasonable access, during regular business hours.  So no, I

1   can't agree to expand it especially when the burden of what

2   they're asking for falls on my office.  We're not a party

3   to that agreement.

4           THE COURT: Let me switch topics.  Mr. Davis, your

5   client's position in connection with the sale -- I mean,

6   again, the sale order is final so I'm not sure what --

7   other than the fact that this claim arrived here, and I

8   guess -- I don't know if the other counsel have seen it,

9   but what am I supposed to do or what is your position on

10  today's request.  Just stay near the mike if you would.

11          MR. DAVIS: My concern is that we have an order

12  selling free and clear of Linda Koelling's secured claim

13  with her lien to attach to proceeds, and I've tried to do

14  the math of what the proceeds are, and they're not there.

15          THE COURT: Well, but, the order is also final;

16  isn't it?

17          MR. DAVIS: It is final, and --

18          THE COURT: I mean seriously, if Ms. Koelling had

19  a basis to object to the order, she could have; but she

20  didn't.  So what do you want me to do it about it?

21          MR. DAVIS: I'm just making sure that her lien

22  attaches to those proceeds, whatever they may be.  I'm not

23  saying the order isn't final, but I'm --

24          THE COURT: I don't recall.  Mr. Goodsell or Mr.

25  Huckins, can you remember for my sake what we did about --

1  on the sale order, not this aid order, but what's the state

2  of Ms. Koelling's claim?

3         MR. HUCKINS: Ms. Koelling's claim is specifically

4  delineated in the sale order.

5         THE COURT: It what?

6         MR. HUCKINS: It's specifically delineated in the

7  sale order in paragraph 5.

8         THE COURT: Remind me what it says.  I just don't

9  have --

10        MR. HUCKINS: It says -- I'll pull it for you

11 right now, but I believe it says exactly what Mr. Davis

12 says.

13        THE COURT: Okay.  Well, if that's the case.  I

14 mean I realize we may not have any proceeds to attach to,

15 but --

16        MR. DAVIS: That's of some concern.  There is

17 still this issue up in the air about taking proceeds that

18 are in the school, and I understood that --

19        THE COURT: Well, Ms. Koelling doesn't claim a

20 lien on cash on hand in the bank today; does she?

21        MR. DAVIS: Well, I had heard noises that the

22 buyers were somehow intending to credit bid and not pay

23 in --

24        THE COURT: No, I'm asking a different question.

25 There's money -- you just heard Mr. Goodsell say there's

1  $254,000 in the bank today.  Does Ms. Koelling claim a lien

2  on any of that money?

3          MR. DAVIS: She has a lien on all the assets of

4  the Debtor, yes.

5          THE COURT: And how does she come to have a lien

6  on that cash?

7          MR. DAVIS: With a security interest.

8          THE COURT: Is it perfected on the cash in the

9  bank?

10          MR. DAVIS: Well, the issue of perfection of cash

11  in the bank is another issue, and you're right, it probably

12  is not perfected as to cash in the bank.

13          THE COURT: So she probably doesn't have a valid

14  lien.  So if I were to authorize payment of cash out of the

15  bank to the professionals, you probably don't have a

16  complaint as a lien claimant.  Burlingame may have a

17  complaint under the Asset Purchase Agreement, but your

18  client I gather does not.  I mean, again, Mr. Davis, I'm

19  not asking you to give away something, but realistically,

20  you're an experienced lawyer, you know as well as I, she

21  probably doesn't have a perfected lien on the bank

22  accounts.

23          MR. DAVIS: I can't commit to that, Your Honor.

24  I'm not sure that's accurate.  You know, if you take

25  proceeds and put it in a bank account and then say she

1  doesn't have a lien on it --

2            THE COURT: Proceeds of what?

3            MR. DAVIS: Proceeds of the sale.

4            THE COURT: Well, no, I didn't say proceeds of the

5  sale.  I'm talking about the money in the bank today.

6            MR. DAVIS: Yes.

7            THE COURT: Which is proceeds of operations of the

8  business.  I don't recall -- Mr. Goodsell, do you recall

9  under the schedules, did the schedules show Ms. Koelling as

10  a secured creditor on the bank accounts?

11            MR. GOODSELL: I don't have a recollection.

12            MR. DAVIS: I believe the schedules show her to

13  have a security interest in all the assets, without

14  specification.

15            THE COURT: Okay.  Well, look -- I understand, but

16  that's your concern here today, but Mr. Huckins, did you

17  confirm, if the escrow closes, am I right, the order that

18  is final now does transfer whatever claim of lien she has

19  to the proceeds of the sale?

20            MR. HUCKINS: That's paragraph 5(f), that's what

21  it says.

22            THE COURT: Have you seen that order, Mr. Davis?

23            MR. DAVIS: This is the order that's been -- not a

24  new order today; we're talking about the order that's

25  already entered.

1    THE COURT: No, there was one order that
2  authorized the sale.  Then it had to be modified just to
3  pick up a property description, as I recall.

4    MR. DAVIS: I'm not sure I've seen the modified
5  one, so to be on the safe side --

6    THE COURT: Well, you can take a look there.

7    MR. DAVIS: I will.

8    THE COURT: I mean, look, that order is what it
9  is, and if it went through without Ms. Koelling's rights
10 protected, I guess she'll have to do something about it.
11 If it went through with her rights protected, then it
12 shouldn't be worth worrying about today.

13   MR. DAVIS: Other than a mistake in grammar, it's
14 fine.  It refers to Linda Koelling as "they."

15   THE COURT: Mr. Davis, if you'd been in this case
16 as long as I have, you'd waive all rules of grammar.

17   (Laughter.)

18   MR. DAVIS: It's a school case.  It should be
19 grammar --

20   THE COURT: I'm sure Mr. Goodsell and the Judsons
21 and Mr. Huckins would join me that grammar rules are
22 suspended for the time being.

23   (Laughter.)

24   Let me tell you what I was thinking as I read
25 these papers, a bit of history, and of course I probably

1  don't have to remind any of you of the history, but I think
2  it was the very last hearing we had, I was very upset with
3  where things were, as was everyone, and I threatened but
4  didn't act, on taking a more precipitous act on the school,
5  and I didn't -- I didn't on that day and didn't frankly
6  until a few days ago know what the fate of the sale was.  I
7  of course didn't act on Mr. Goodsell's fee application, not
8  because I didn't think it was important to him, but I
9  didn't think it had any practical significance.  And
10 Burlingame objected to those fees.  And so when the papers
11 came in for today's hearing, I must say I saw progress,
12 despite all the problems, and as much as I as well as a lot
13 of you have considered alternatives for resolution of this
14 case, the sale to Burlingame seems to be better than all
15 the other alternatives in my mind, even though it's not the
16 way any of us expected it to happen.

17         But that prompted me to revisit the question that
18 I've just deferred to, because I didn't worry about it, and
19 there was presented to me the issue, first, how much should
20 the Goodsell firm be allowed in the face of objections, but
21 then more importantly, because I think even Mr. Huckins
22 conceded that no matter what I did with Burlingame's
23 objections, Mr. Goodsell's firm is entitled to some amount
24 of money.  And then the question is, well, if this escrow
25 closes, the deal closes, I think Mr. Goodsell, you touched

1  on it -- I raised it myself -- I don't know that there is

2  even any legal authority or jurisdiction to then say to

3  Burlingame or the entity that's the buyer -- by the way,

4  you have to pay these attorney's fees.  So in my mind, it

5  has to be dealt with up front, and that gets to the

6  question of whether payment of professional fees in this

7  Chapter 11 was contemplated or not by the sale agreement.

8          And, you know, again, based upon the numbers that

9  Mr. Goodsell read into the record, the most that could

10  possibly be impacted here is somewhere in the $50,000

11  range.  Mr. Bradlow, as I recall, with his own attorneys,

12  is upwards of $90,000, and Mr. Goodsell, under any set of

13  facts, it's inconceivable to me that your fees wouldn't be

14  several hundred thousand dollars even if I sustained

15  virtually all the objections.  And I for one have concluded

16  that it's simply not proper for Burlingame to take the

17  position that they can impose so many duties and so many

18  burdens on first Mr. Bradlow and then Mr. Goodsell's firm

19  to close this deal and then take the position that this

20  isn't part of the deal.  I'm prepared to authorize the

21  payment of as much funds as can be paid consistent with the

22  agreement, in my interpretation of the agreement, and

23  before the sale closes.  And if Burlingame doesn't like

24  that, they can decide what they want to do about it.

25          I was prepared -- Mr. Goodsell, you got the jump

1   on me -- I was prepared to say that I would issue an order

2   on an interim allowance basis of some amount of money for

3   you, and I was going to direct you to then take that

4   interim allowance of "X" dollars plus Mr. Bradlow's "Y"

5   dollars and have someone from your side, from the school,

6   tell me and tell Burlingame how much that person --

7   remember when Mr. Bradlow was in office, I wanted him to do

8   it.  Mr. Bradlow, for the reasons that we don't have to

9   revisit, was allowed to resign from his position -- and

10  again, I'm going to great lengths to tell you my thinking,

11  because frankly, I hadn't a clue that the parties

12  contemplated closing as early as next Tuesday or Wednesday.

13          And in fairness to Burlingame, I was going to

14  say, okay, if the Debtor's position is we can spend "X"

15  dollars on the professionals, then I was going to give

16  Burlingame an opportunity either to say that's okay, we

17  agree, or if they disagree, to be heard on the subject.  I

18  wasn't just going to have somebody write a check today.

19          So here's what I'm thinking of.  I'm prepared,

20  on -- and, Mr. Bradlow, I say this to you, I complimented

21  you in the past for heroic duty, but I have to add Mr.

22  Goodsell to it.  I think the two of you, frankly, and I

23  think Burlingame takes the responsibility for driving you,

24  Mr. Bradlow, out of office by inappropriate leveraging to

25  you and insisting that you do things that were

1  inappropriate.  And I think Burlingame has demanded far
2  more from Mr. Goodsell than it should ever be allowed to do
3  free of charge, and I can't make Burlingame pay all of your
4  fees, but I certainly can say that I'm going to authorize
5  as much as can be paid.  And so it would be my intention to
6  issue an order that would on an interim -- oh, and by the
7  way, and then, Mr. Goodsell, this is where it gets
8  difficult for me because I'm sympathetic to both you and to
9  Mr. Bradlow, and I compliment you, but every dollar I give
10 you is a dollar less for Mr. Bradlow, and I'm not favoring
11 one or the other.  You both get medals of honor if this
12 thing closes, in my opinion.

13           So unless there's some voluntary agreement to
14 adjust it, I want to give you a fair shake, but every time
15 I give you more, then I take it out of Mr. Bradlow's
16 pocket, and both of you, I think, unfortunately for both of
17 you, you're going to take a huge hit in this case unless
18 there's some other pot of gold at the end of the rainbow.
19 Burlingame declined my invitation to make a separate
20 arrangement, to at least take care of Mr. Bradlow.  I think
21 that was ill advised for them to refuse to do it.  But they
22 did it, and I couldn't change them of that, and the only
23 thing I can do is interpret an agreement and I interpret
24 the agreement to say that it is ordinary course in a
25 Chapter 11 for the professionals who are managing the

1  Chapter 11 to get paid for the management of the very

2  transaction that they are managing.  And I'm not going to

3  jeopardize the innocent employees who are entitled to their

4  paycheck, and I'm not going to jeopardize the -- or put at

5  risk, economic risk, the parents of children whose

6  enrollment tuition has been prepaid.  Nor am I going to

7  authorize stripping the bank account of every single dollar

8  so that it can't meet an immediate need.

9          But I'm prepared, Mr. Goodsell, to enter an

10  order, and I will do so today, that allows your fees in the

11  amount of $200,000 on an interim basis, only on an interim

12  basis.  I might allow you far more; I doubt that I'd allow

13  you less, and I will then give Burlingame -- first of all,

14  I'll give Burlingame the option just to agree.  If they

15  want to agree, fine; if they don't want to agree, I owe

16  them an opportunity to be heard further on it.  And I don't

17  mean in five minutes; I mean after today.  And I would

18  direct that the Debtor pay on a pro-rata basis, Mr.

19  Goodsell's firm and the Mr. Bradlow, based upon those

20  allowances and consistent with my observations about your

21  entitlement to it.  And if there is ever any more money to

22  worry about in this case, I will deal with the balance of

23  the objections.  I owe it to Burlingame to consider their

24  objections, and to settle on a final allowance of Mr.

25  Goodsell's fees.

1    And so, Mr. Huckins, I'm telling you and your

2   clients that's my position.  If you're willing and your

3   clients want to say they can live with that, fine.  If they

4   want to oppose it, then there's no way this thing is going

5   to close next Tuesday no matter what order I sign because

6   I'm not going to let this thing close and leave these two

7   professionals high and dry with a thank you and here's a

8   poke in the eye.  I mean it.  I think Mr. and Mrs. Judson

9   are responsible for driving Bradlow out of office, and I

10   think if Mr. Bradlow had stayed in office, this deal would

11   have been much more seamless and we wouldn't have had these

12   issues about everything that you're arguing about now,

13   including signing the documents.  And so that's my personal

14   view about it and my judge's view of how I'm going to

15   administer this case.

16    On a personal matter, I'm not going to even be

17   here next week.  There's hardly a bankruptcy judge in

18   Northern California that's going to be here next week.

19   Maybe somebody is staying behind, but we're all supposed to

20   be at a conference in the Midwest.  So if Burlingame is

21   willing to go along with this procedure, then I'm prepared

22   tonight or today or tomorrow to sign the order that

23   authorizes the documents that Mr. Goodsell would sign, to

24   authorize the interim fees, to authorize the payment, and

25   frankly, I'm not so sure I'm going to go to the next order,

1 the so-called, you know, miscellaneous, do everything that

2 we want done, because I think Mr. Goodsell's point is well

3 taken.

4        If Burlingame says no, that's outrageous, we

5 won't allow that to happen, then that's fine. I'll have a

6 hearing. But I won't have a hearing until the following

7 week. I just can't do it, physically I can't do it, and

8 I'm not going to ask any other judge to take this on.

9        MR. HUCKINS: Your Honor, may I --

10        THE COURT: Isn't it ironic that a lot of this

11 could be solved if somebody had said to Mr. Bradlow, we

12 want you back in. But they haven't. So you want to take a

13 break and talk to your clients or --

14        MR. HUCKINS: May I ask for a bit of clarification

15 before that.

16        THE COURT: Yes.

17        MR. HUCKINS: if I understand where things stand

18 at the moment, upon closing the -- I guess the advance

19 tuition deposits of 89,000 some odd dollars will be turned

20 over to Burlingame; is that correct?

21        THE COURT: Yeah. I mean I used the word

22 "sacred." Mr. Goodsell didn't oppose it. I mean in legal

23 terms, I'm not so sure it gets special treatment. If the

24 Debtor went into Chapter 7 today, I think the trustee would

25 get that money, and those parents would have an

1 | administrative -- Chapter 11 administrative claim,

2 | alongside of Goodsell and Bradlow. But I think in reality,

3 | there's no desire on Mr. Goodsell's or the Debtor's part to

4 | do that. So am I right, Mr. Goodsell, the 89,474 stays in

5 | place and goes to the buyer? Right?

6 | MR. GOODSELL: I'd like it if I thought I was

7 | entitled to it, but the fact is, as you've pointed out,

8 | it's a prepayment for services to be provided, and I think

9 | if --

10 | THE COURT: Legally, you're all in the same boat.

11 | Practically and functionally, it just isn't right.

12 | MR. GOODSELL: Yes.

13 | THE COURT: And I think I agree and you agree and

14 | Mr. Bradlow can speak up if he feels otherwise, but -- yes,

15 | that's a long answer, a long yes, Mr. Huckins.

16 | MR. HUCKINS: And then the second piece of the

17 | equation I need to understand, and then I would like to

18 | take a break if you would not mind, is, the Court has

19 | indicated that it is going to authorize a pro-rata payment

20 | of the allowed claims to date to the Goodsell firm as well

21 | as Mr. Bradlow --

22 | THE COURT: Well, am I right, let's go back. Mr.

23 | Goodsell's firm had asked for over 400,000 and you

24 | objected.

25 | MR. HUCKINS: Right.

1    THE COURT: I'm sure their fees are even much

2  higher now, but I have that matter under advisement.

3    MR. HUCKINS: I understand.

4    THE COURT: I do this in many cases.  I allow an

5  interim amount of a lesser amount.  In this case, as I

6  tried to explain to Mr. Goodsell, I'm torn between which of

7  these two gets better duty -- gets better combat pay, and

8  Mr. Goodsell is chucking up in much bigger numbers.  But I

9  would enter an order for 200,000 interim --

10    MR. HUCKINS: Right.

11    THE COURT: -- and authorize payment of Bradlow

12  and Goodsell on a pro-rata basis.

13    MR. HUCKINS: Okay.  And --

14    THE COURT: And by the way, unless independently

15  they agree to a different formula.

16    MR. HUCKINS: And then the question becomes of how

17  much.  Is that the 50 to 60 that remains?

18    THE COURT: Yes.

19    MR. HUCKINS: Okay.

20    THE COURT: Right, Mr. Goodsell?

21    MR. GOODSELL: Yes.

22    THE COURT: I mean you wanted to say something

23  else.

24    MR. GOODSELL: No, I just wanted to say that

25  proration is somewhere around 70-30, a little bit more.

1          THE COURT: Yeah, as I say, if –- I'm not going to

2    get into it.  If –-

3          MR. GOODSELL: Correct.  I understand what you're

4    saying is that on the interim award to my firm, plus the

5    final award to Mr. Bradlow, that you'd take the total of

6    about 300 and then pro-rate it out.

7          THE COURT: And if we say 50 –- let's just for

8    discussion purposes, if $60,000 were paid, it would be 20

9    percent.

10          MR. GOODSELL: Yes.

11          THE COURT: So you would each be paid 20 percent

12    of those respective allowances.  Right?  Is my math wrong?

13    If I allow –- Mr. Goodsell, I allow you 200,000 –-

14          MR. GOODSELL: Let me put it this way.  Let me

15    give it back to you this way.  If we were distributing

16    $60,000 –-

17          THE COURT: Yeah.

18          MR. GOODSELL:  –- it would be $20,000 to Mr.

19    Bradlow and 20 to us.

20          THE COURT: Yeah.

21          MR. GOODSELL: Right.  Okay.

22          THE COURT: No, no, it would be 40 to you and 20

23    to Mr. Bradlow.

24          MR. HUCKINS: It would be 40 to you.

25          MR. GOODSELL: Forty to us, that's right.

1          THE COURT: And what I'm saying is that's about 20
2    cents –- 20 percent.
3          MR. GOODSELL: Yes.
4          THE COURT: My Law Clerk looked at me like I had
5    my math wrong.  It's 20 cents.  Mr. Bradlow, it's 20
6    percent, right?
7          MR. BRADLOW: Yes.
8          MR. GOODSELL: There we go.
9          THE COURT: It's better than a poke in the eye.
10   It's not a hundred percent.  So, Mr. Huckins, again, if
11   your clients don't like my result, then that's fine, they
12   are entitled to disagree.  I'm not –- I've expressed my
13   views about why this came to be.  I'm sure they have their
14   own opinion, but I'm just giving my opinion, and if they
15   say no, that's outrageous, then fine; I'll hear them, but
16   I'll hear them well after next Tuesday or Wednesday.
17         MR. HUCKINS: I understand.
18         THE COURT: And so –-
19         MR. HUCKINS: Can we take a break?
20         THE COURT: Sure.  Just let Ms. Parada know
21   when –- before we take a break, Mr. Rogan, it should be
22   obvious I'm not going to grant relief at this point, and if
23   you want, I can conclude the matter; I can continue your
24   motion for a short period of time.  I think recording the
25   NOD just doesn't make sense at this point.  This deal

1   sounds like it might close despite all odds.

2          MR. ROGAN: I was going to suggest that perhaps

3   there might be some sort of a time limitation such as the

4   order for relief, the stay relief is granted to allow us to

5   record, you know, within a week or two, something like

6   that.

7          THE COURT: Well, let's see what Burlingame and

8   its counsel come back to us, and so before you -- Mr.

9   Huckins, before we break, I'm prepared to enter the order

10  that authorizes the fees -- it orders the fees consistent

11  with what I said, and to authorize the execution of

12  documents, and I think including your paragraph 12, which

13  is an authorization but not a direction.  I'm not at this

14  point prepared to give you that other order.  I think what

15  I'm telling you is that Mr. Goodsell and the Debtor will be

16  ordered to comply with the APA.  So let Ms. Parada know

17  when you're ready, and I can come back.

18         MR. HUCKINS: Thank you very much.

19      (Whereupon, a recess is taken at 11:01 a.m., and the

20  court is reconvened at 11:41 a.m.)

21         THE COURT: Yes, actually court call telephone

22  means chambers, to say that Ms. Epstein chose to hang up,

23  so she's not -- you know, she's wasn't really monitoring.

24         Mr. Huckins.

25         MR. HUCKINS: Your Honor, I think we've got good

1  news.

2          THE COURT: Okay.

3          MR. HUCKINS:  I'll just rehash, but in large

4  part, Burlingame and K.C. Funding are in agreement with

5  what the Court is proposing.  But let me recap it so that

6  there's no misunderstanding.

7          In terms of signatories of documents, Mr.

8  Goodsell will be the primary signatory on the identified

9  documents, and we will include a catch-all provision

10  authorizing him to sign other documents, but he will not be

11  obligated to do so.

12          THE COURT: Paragraph 12 language.

13          MR. HUCKINS: Correct.  Ms. Markham will be the

14  signatory on the owner's affidavit, which is specified in

15  the order, so that will take care of that.

16          In terms of the advance deposits, the advance

17  deposits will be turned over to Burlingame and K.C. Funding

18  at closing, and there will be basically the actual amount

19  rather than just the 89,000.  Whatever the actual amount

20  is, will be turned over to Burlingame, along with the

21  supporting detail to account for the $89,000 -- $89,000

22  estimate of the advance deposits.

23          THE COURT: You mean like whose money, you know,

24  Mrs. So and So had $500 and so on.

25          MR. HUCKINS: Exactly, just so that we have, you

1  know, proper documentation going forward.

2         THE COURT: Okay.

3         MR. HUCKINS: In terms of what we're going to do,

4  is Mr. Goodsell is going to prepare an order addressing the

5  interim allowance of his fees, so that's not going to be

6  part of the order in aid --

7         THE COURT: Actually I was prepared to do that,

8  but go ahead.

9         MR. HUCKINS: Okay.  Well, I mean I'm amenable to

10 either, but --

11        THE COURT: I get paid for it.

12        MR. HUCKINS: Okay.

13        THE COURT: I get paid even if I don't do it.  I

14 just don't get paid very much.  Okay.

15        MR. HUCKINS: All right.  And then on the cash,

16 Burlingame and K.C. Funding will agree that the Campeau

17 firm as well as Mr. Bradlow can be paid pro-rata -- can be

18 paid on a pro-rata basis based upon the allowed amount of

19 their fees and expenses from the available cash that exists

20 in the Debtor's accounts.  What Mr. Goodsell has agreed to

21 do is to provide Burlingame and K.C. Funding with an

22 accounting of the amounts that are available for

23 distribution and the disbursements prior to making that

24 pro-rata payment to his firm and to Mr. Bradlow.

25        THE COURT: You mean just to confirm the amount,

1  the amount that he said was 50 to 60,000 today.

2          MR. HUCKINS: To confirm the amount -- yes, so

3  that we can see how that number came to be, and, you know,

4  basically what was disbursed in the interim.

5          THE COURT: Okay.

6          MR. HUCKINS:  And I think the last issue on the

7  order itself is that we're going to add a provision of the

8  order dealing with the net proceeds from escrow that will

9  direct the escrow company to disburse the net proceeds to

10  Debtor's counsel to be held in trust --

11          THE COURT: The original order doesn't say that?

12          MR. HUCKINS: It does not say that.

13          THE COURT: Okay.

14          MR. HUCKINS: So we will include a provision to

15  that effect.

16          THE COURT: So escrow will pay the bank, will pay

17  Mr. Fitzpatrick, is that his name?

18          MR. HUCKINS: Mr. Fitzpatrick.

19          THE COURT: And the normal escrow close and the

20  balance to Mr. Goodsell.

21          MR. HUCKINS: Correct.  And we will include a

22  provision in the order that Rule 6004 does not apply.

23          THE COURT: What provision of 6004?  Do you mean

24  the ten-day stay?

25          MR. HUCKINS: Correct.

1          THE COURT: That's fine.

2          MR. HUCKINS: Okay.

3          THE COURT: Mr. Goodsell -- oh, I'm sorry; is that

4    it?

5          MR. HUCKINS: The only other issue that we have is

6    that based upon the dialogue today in court and the Court's

7    comments, we would expect that the Debtor would comply with

8    the provisions of the Asset Purchase Agreement and

9    specifically Section 5.1 about reasonable access between

10   this hearing and the closing date, to the extent that

11   Burlingame can be accommodated.  So we would like to make

12   sure that that happens, but that will not be part of the

13   order.

14         THE COURT: I mean it effectively already is part

15   of the order, an existing order.  It's an agreement, right?

16         MR. HUCKINS: Correct.

17         THE COURT: I mean, Mr. Goodsell, again, we're

18   back to the issue, you can't -- you're not the manager of

19   the facility, but you don't have a problems with this?

20         MR. GOODSELL: No.

21         THE COURT: You've said you'll comply with the

22   agreement.

23         MR. HUCKINS: Yes.  And I'm just clarifying that

24   we will request reasonable access pursuant to the

25   provisions.

1          THE COURT: Okay.

2          MR. HUCKINS: The last point logistically in terms

3    of getting the transaction closed is that once the Court

4    enters the order, title and escrow have indicated they need

5    a certified copy of the order.  So we'll have to work that

6    out with the Court to expedite certification of the order.

7          THE COURT: Well, there are a couple of ways to do

8    that.  We're closed tomorrow, but we're electronically

9    always open.

10         MR. HUCKINS: M-hm.

11         THE COURT: And I would urge both of you to upload

12   orders as soon as possible.  Physically what happens -- or

13   digitally what happens, when the order is uploaded, it goes

14   through a series of places that ends up where I can sign

15   and I do sign them electronically, and I frequently do

16   that, you know, weekends, nights, blackberry, airports, but

17   they don't get docketed until the court staff gets to it,

18   and so there's no way that -- assuming you get this order

19   either today or tomorrow, Saturday, it won't be docketed

20   until Monday, and you can arrange through the Clerk's

21   Office to get a certified copy.  I don't typically --

22   excuse me, I don't know whether they want it docketed or

23   not, but the point is, the only person who can certify it

24   is the court staff and there will be no court staff

25   available until Monday.

1          So again, I might be telling you stuff that's far
2    more detailed than you need, but let's suppose tonight, at
3    midnight, I sign an order.  It goes into an electronic
4    folder called "The Signed Order."  I can produce a copy,
5    and we could e-mail to you an image of that order that'll
6    have my signature, but it won't have been docketed.
7          MR. HUCKINS: Right.
8          THE COURT: And so therefore it just sits there
9    until there's a case person to docket it.  Now if by chance
10   you got an order today, you know, at 3:30 or so, we
11   probably could have it docketed right away, but you could
12   certainly arrange -- and by the way, then you don't get
13   your notice of electronic filing until the Clerk dockets
14   it.
15         MR. HUCKINS: Correct.
16         THE COURT: All right.  So you all know this, but
17   I just needed to say it.
18         MR. HUCKINS: Yeah.  No, I think logistically if
19   we could work with your Law Clerk or your chambers once the
20   order has been signed and then if we can essentially then
21   try to work it through the Clerk's Office --
22         THE COURT: Yeah.  Unfortunately, we're very, very
23   thin on chambers people next week, but it shouldn't be a
24   problem.  If you tell me that I will get an order by
25   Saturday --

1          MR. HUCKINS: M-hm.

2          THE COURT: -- I mean frankly, I can sign it next

3   week from a remote location.  The key is not my staff or my

4   Law Clerk; it's downstairs.

5          MR. HUCKINS: I understand.

6          THE COURT: And so the steps again are, when I

7   sign the order, I can instruct the staff through an e-mail,

8   docket this right away, but it still won't be docketed

9   until Monday morning.

10         MR. HUCKINS: Right.

11         THE COURT: Do you get your e-mails, your notices,

12  once a day or --

13         MR. HUCKINS: I get them once a day.

14         THE COURT: Okay.  But if you -- so you won't get

15  a notice of electronic filing until the end of the day.

16         MR. HUCKINS: Correct.

17         THE COURT: But you could go on line --

18         MR. HUCKINS: We check periodically.

19         THE COURT: Huh?

20         MR. HUCKINS: I check periodically.

21         THE COURT: Or you can just check it, and if it's

22  docketed, then of course you can arrange to have someone

23  come over and get it certified.  The problem is normally I

24  could have my Law Clerk or someone contact you as soon as

25  that's done, but they're not here either.  The whole place

1 is shutting down, at least the chambers staff, we're out of

2 pocket next week, but that doesn't mean you can't get it

3 done.  This will not be a problem for you.

4 　　　　　MR. HUCKINS: Okay.

5 　　　　　THE COURT: Well, as an emergency, you can do

6 that, but I don't think you'll need to do that, because

7 they can take it up with the staff, but you can do that;

8 that's fine.  Ms. Brister can tell you how to reach her

9 electronically later on, but she won't be here either.

10 　　　　　MR. HUCKINS: Thank you.  No, I think logistically

11 that will work.  We just have -- at times, we've had a bit

12 of a delay because we've actually gotten some of the orders

13 certified with the Clerk's Office, but we'll work through

14 it as best we can.

15 　　　　　THE COURT: Well, our division manager, Ms.

16 Lucero, will be here Monday morning.  If there's a problem,

17 take it up with her.

18 　　　　　MR. HUCKINS: Okay.

19 　　　　　THE COURT: Now when's a realistic time for the

20 orders to get to me?  Is there any chance of getting them

21 today?

22 　　　　　MR. HUCKINS: We're going to go back to our

23 offices and try to draft them --

24 　　　　　THE COURT: Okay.

25 　　　　　MR. HUCKINS:  -- and get them to Debtor's counsel

1  to make sure that they agree, and if we can do that, we

2  would like to get it uploaded this afternoon.

3       THE COURT: Mr. Goodsell, first of all, are you on

4  board with everything that you just heard?  Is this all

5  consistent with --

6       MR. GOODSELL: Yes.

7       THE COURT: Okay.  I said I was prepared to do an

8  order for your interim allowance, but I think I'd like you

9  and Mr. Huckins to agree on the order for the payment.

10      MR. GOODSELL: Yes.

11      THE COURT: Now do you want to do them both?  It

12  doesn't matter.  I mean believe me, it'll take me 30

13  seconds to do the order that makes the interim allowance

14  for you, and I don't mind doing it.  You've got your hands

15  full, so what's your pleasure?

16      MR. GOODSELL: If the Court wants to do that, even

17  if it's just a minute order, that's fine.

18      THE COURT: No, it's not going to be a minute

19  order.

20      MR. GOODSELL: Okay.

21      THE COURT: It'll be a formal order.

22      MR. GOODSELL: All right.

23      THE COURT: Ms. Brister was already told to be

24  prepared to do it and to draft it for me.

25      (Laughter.)

1          MR. GOODSELL: Well then I'm sure she's already
2   got one done.
3          THE COURT: Well, no, the only key is, we want to
4   make sure it identifies your original filing and, you know,
5   it's no problem.  But you need --
6          MR. GOODSELL: If you will do that, that will be
7   fine.  I don't think that's one of the orders that you're
8   going to require to be certified --
9          THE COURT: No, I don't think so.  Well, you
10  should -- you, though, Mr. Goodsell, should prepare, with
11  Mr. Huckins' consent, the order that assumes that Mr.
12  Bradlow -- of course we already know, Mr. Bradlow already
13  is the recipient of an order that has a finite dollar
14  amount in it --
15         MR. GOODSELL: Right.
16         THE COURT:  -- and yours will have the $200,000
17  figure in it, and then you do the language about the pro-
18  rata.
19         MR. GOODSELL: Correct.  Correct.
20         THE COURT: Okay.
21         MR. HUCKINS: Your Honor, we were going to include
22  that as part of the order in aid of implementation, just
23  essentially try to deal with the cash that is in the
24  Debtor's estate, essentially --
25         THE COURT: The payment piece of it.

1          MR. HUCKINS: Yes.

2          THE COURT: Oh, okay.  Well, again, if both of you

3    agree on where it shows up, I think, Mr. Huckins, again,

4    your clients are taking the practical approach here, and I

5    don't imagine they're going to be filing an appeal of my

6    order, so putting the supplemental order -- I mean dealing

7    with the distribution of funds, fine.  The allowance of

8    funds is a separate matter.

9          MR. HUCKINS: Yes, exactly.

10          THE COURT: And that's why I'll take care of that.

11          MR. HUCKINS: Yeah, no, we appreciate that.

12          THE COURT: Okay.

13          MR. HUCKINS: Just a last comment for the Court,

14    I'm not going to rehash any of the proceedings from the

15    prior hearings, but I just want to state for the record

16    that Burlingame and K.C. Funding do not necessarily agree

17    with the Court's opinions --

18          THE COURT: I understand.

19          MR. HUCKINS:  -- as to how we got to this

20    position and so forth.

21          THE COURT: I understand.  And I'm not asking them

22    to roll over and accept my characterization, and, you know,

23    we all have our points of view.  The point is to get the

24    damned thing closed, right?

25          MR. HUCKINS: We agree with that.

1        THE COURT: Okay.  Mr. Rogan, I think under the

2   circumstances, it sounds like it's awful close, and I'm

3   going to decline the invitation to put a deadline -- what I

4   will do is I'll give you a short continued hearing date,

5   and it'll go off calendar obviously if you're paid.

6        MR. ROGAN: All right.  That's fine.  Are we -- do

7   we have a -- the one thing I didn't hear in the recitation

8   is when we might expect a closing?

9        THE COURT: Well, okay.  I mean are you still --

10        MR. HUCKINS:  I believe that it will be -- like I

11   said, I'm looking realistically, I'm thinking Wednesday,

12   Thursday of next week is probably what -- I mean everyone

13   is shooting for Tuesday recordation and a Wednesday closing

14   at this point, and we may accomplish that.  I could see it

15   slipping by maybe a day.

16        THE COURT: Well, you're more optimistic than I

17   would ever be.

18        MR. HUCKINS: We want this closed.

19        THE COURT: No, I understand.  Mr. Rogan -- I'm

20   sorry, Ms. Parada, we have a July 16th date, right?  I'll

21   put the bank's preliminary hearing over to July 16th at

22   9:30.  That's just a regular relief from stay calendar.

23   Obviously if your client is paid, you can notify Ms. Parada

24   that the matter is moot.

25        MR. ROGAN: We will.

1       THE COURT: And we'll drop it.  If the deal hasn't
2  closed, I'll listen to -- I mean we'll use that as an
3  opportunity to take it up.
4       MR. ROGAN: Yes.
5       THE COURT: Okay.  So, Mr. Huckins, back to
6  certification, well, again, whatever you want and get, are
7  you going to need the power of attorney order certified
8  also?
9       MR. HUCKINS: Yes.
10       THE COURT: Okay.  So those two, right, I mean the
11  fee order -- the fee order that I'm doing is --
12       MR. HUCKINS: We don't need that.  It's just
13  the --
14       THE COURT: It's the order that -- the order that
15  has Mr. Goodsell sign the documents and the order that
16  deals with these other matters, the dollars.
17       MR. HUCKINS: Yeah, and just so that the Court is
18  clear, it's going to be -- what we're contemplating is
19  taking what was Exhibit A to my supplemental declaration
20  and paring that down, incorporating all the signatory
21  discussion, and then incorporating the discussion that we
22  just went over about the payment of the advance deposits
23  and the payment of Mr. Goodsell's firm and Mr. Bradlow from
24  the available cash.  So it will all be part of that one
25  order.

```
 1          THE COURT: Just for my information, do you have a

 2   present estimate of what will be the amount that gets

 3   turned over to Mr. Goodsell?  The net.  I mean have you

 4   done a pro forma?  Is it going to be six figures or five?

 5          MR. HUCKINS: I have not done one since you asked

 6   me for one -- six figures -- oh --

 7          THE COURT: It is what it is.  I just --

 8          MR. HUCKINS: It should be -- that, I think it

 9   should be six figures.

10          THE COURT: Well, the bank's payoff is five --

11          MR. ROGAN: Five million, four, roughly.

12          THE COURT: Five million -- a little over five

13   million, and Fitzpatrick's is what, two plus, and then the

14   closing costs and so on.

15          MR. HUCKINS: No, I -- it should be -- it should

16   be six figures, in the six figures range.

17          THE COURT: Okay.

18          MR. HUCKINS: I don't know exactly what the number

19   is.  I don't have an updated number, other than I gave you

20   a few weeks ago.

21          THE COURT: Okay.  And Burlingame voluntarily

22   subordinates its lien.  Mr. Fitzpatrick will be paid; the

23   bank will be paid.  Ms. Koelling's claim of lien will

24   attach -- I've forgotten, is there anybody else whose lien

25   attaches?
```

1          MR. DAVIS: There's one post-petition judgment

2    that's recorded apparently.  Has that been resolved?

3          MR. HUCKINS: Mr. Martel?

4          MR. DAVIS: Yes.

5          MR. HUCKINS: That's provided for in the sale

6    order as well.  So whatever rights he has, he attaches to

7    the proceeds.

8          THE COURT: Okay.  So, Mr. Goodsell -- I'm sorry,

9    Mr. Davis?

10          MR. DAVIS: I think those are the only two, Martel

11    and Koelling.

12          THE COURT: So, Mr. Goodsell, to the extent

13    that -- well, before I can distribute any further funds on

14    the professional fees --

15          MR. GOODSELL: Correct.

16          THE COURT:  -- you're going to have to decide

17    what to do about those liens.

18          MR. GOODSELL: That's correct.

19          THE COURT: Okay.  All right.  Well, I -- let's do

20    this, Mr. Huckins, maybe -- it's noon now.  I'll give you a

21    chance to catch your breath and review the bidding and so

22    on.  Maybe somewhere around mid afternoon, if you could

23    give Mr. Brister an e-mail that just tells her what your

24    likely timetable is and say -- if it's tonight or tomorrow,

25    that's okay.  I'm not trying to put extra pressure on you.

```
1    It's just that we switch into an electronic mode, and a
2    remote mode, once we go home, because --
3              MR. HUCKINS: Okay.
4              THE COURT: But we're here.
5              MR. HUCKINS: Okay.
6              THE COURT: And we'll do it.  Okay.
7              MR. HUCKINS: Great.  Thank you very much.
8              THE COURT: Thank you very much.  Good luck
9    everyone.  Hope you close it.
10             MR. HUCKINS: Appreciate it, Your Honor.
11             MR. GOODSELL: Thanks.
12        (Whereupon, the proceedings are concluded at 11:59
13   a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7

8           I certify that the foregoing is a correct

9   transcript from the digital sound recording of the

10  proceedings in the above-entitled matter.

11

12  DATED: July 30, 2009

13

14                      By:___/s/ Jo McCall_____

15

16

17

18

19

20

21

22

23

24

25