1             UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              (SAN FRANCISCO DIVISION)

4

5  In re:

6  KIDS CONNECTION, INC.,         Case No. 08-30026-DM

7                          Chapter 11

8                          San Francisco,California
                                August 21, 2009

9                          11:14 a.m.
           Debtor.

10  _____/

11

12               TRANSCRIPT OF PROCEEDINGS
       BURLINGAME CAPITAL PARTNERS II, L.P.'S MOTION
13    FOR AN ORDER ENFORCING ASSET PURCHASE AGREEMENT
                AND COURT ORDERS

14       BEFORE THE HONORABLE DENNIS MONTALI
          UNITED STATES BANKRUPTCY JUDGE

15

16  APPEARANCES:

17

18  For Burlingame Capital:  JW HOWARD ATTORNEYS, LTD.
                       BY: JOHN W. HOWARD, ESQ.
19                    1508 West Lewis Street
                    San Diego, California 92103

20

21                       -and-

22                  THE McMILLAN LAW FIRM, a
                    Professional Corporation
                    BY: SCOTT McMILLAN, ESQ.
23                    4670 Nebo Drive, Suite 200
                    La Mesa, California 91941

24

25

```
 1  APPEARANCES (CONTINUED):

 2
    For the Debtor:          CAMPEAU GOODSELL SMITH, L.C.
 3                           BY: SCOTT GOODSELL, ESQ.
                             440 North First Street, Suite 100
 4                           San Jose, California 95112

 5

 6  The Former Examiner:     DAVID BRADLOW
                             3947 - 23$^{RD}$ Street
 7                           San Francisco, California 94114

 8

 9  Court Recorder:          JONEITA HAMMONDS
                             UNITED STATES BANKRUPTCY COURT
10                           235 Pine Street
                             San Francisco, California 94104
11

12
    Transcription Service:   Jo McCall
13                           Electronic Court
                             Recording/Transcribing
14                           2868 E. Clifton Court
                             Gilbert, Arizona 85295
15                           Telephone: (480)361-3790

16

17

18

19

20

21

22

23

24

25
```

1        P R O C E E D I N G S

2  August 21, 2009                    11:14 a.m.

3                    ---oOo---

4        THE CLERK: Matter of <u>Kids Connection, Inc.</u>

5        THE COURT: Good morning.

6        MR. HOWARD: Good morning, Your Honor, John Howard

7  appearing for K.C. Funding and Burlingame Capital Partners

8  II, and appearing with me, specially appear with me, is

9  Scott McMillan.

10        MR. McMILLAN: Good morning, Your Honor.

11        THE COURT: Good morning.

12        MR. GOODSELL: Your Honor, Scott Goodsell for the

13  Debtor.

14        THE COURT: Mr. Howard, you're saying Mr. McMillan

15  is appearing specially.  Is he -- I mean what does that

16  mean?  Is he with you?

17        MR. HOWARD: He's with me, yes, but he hasn't made

18  an appearance formally.

19        THE COURT: Oh, okay.  That's fine.  I mean

20  sometimes that's for out of town lawyers who aren't members

21  of the Bar or something, the Bar of this Court.

22        MR. HOWARD: But he is.

23        THE COURT: Okay.

24        MR. HOWARD: As of this morning, in fact.

25        THE COURT: Mr. Bradlow?

1          MR. BRADLOW: Good morning, Your Honor, David

2     Bradlow, the former examiner.

3          THE COURT: All right.  Please be seated.  Mr.

4     Howard, let's see if I've got it right.  What your client

5     wants is me to order Mr. Goodsell to release 203,310 plus

6     69,000 and change.  I've forgotten the rest of it, those

7     two amounts, right?

8          MR. HOWARD: That is correct, Your Honor.

9          THE COURT: And the 203,000 figure is for the

10    prorated wages up to July 7 or July 9 -- July 7, July 9.

11         MR. HOWARD: Up through July 9th, right.

12         THE COURT: July 9th, excuse me.  And of course,

13    the 69,000 figure is the deposit for the summer camp and

14    the things that are different from the prepaid tuitions.

15    So the one thing that I think you answered, and I answered

16    it myself after I thought it through, but, you know, I felt

17    like I needed a CPA with me when I was reading these

18    papers.  The 157,000 that was turned over is in the bank,

19    in effect.  That's not a credit against anything.  Leaving

20    aside the sanctions motion, your client wants 272,000 on

21    account of those two things.  I mean actually it would be

22    more in the nature of, I would order Kids Connection to pay

23    the wages, right?  They would pay the wages to the

24    employees, not turn them over to Burlingame.

25         MR. HOWARD: Right.

```
 1          THE COURT: I mean I realize, as a mechanical
 2   matter, maybe turning the money over to Burlingame is more
 3   efficient, but economically, your goal is to get those
 4   $203,000 into the hands of the people that earned them.
 5          MR. HOWARD: Absolutely, Yes.
 6          THE COURT: Okay.  All right.  Well, now let me
 7   see -- and Mr. Goodsell, your point -- and again, I'm just
 8   summarizing what I've read -- you've got the 322 in trust;
 9   the Debtor has another 27 in its main account; and that you
10   say that the summer school and the camp fees, based upon
11   Ms. Koelling's declaration, those are never under any --
12   traditionally haven't been escrowed, if you will, or
13   treated as any kind of a trust fund, and that -- and that's
14   it.  But I guess what I'm not quite sure is, you seem to
15   say, well, if I were to order the $69,000 portion turned
16   over, then I should allow you to reconsider your
17   willingness to have the prorated fees and so on.  Is that
18   right, or am I misstating that?
19          In other words, I leveraged you a bit, and Mr.
20   Bradlow, and said certain things have to be paid, and
21   Burlingame agreed that they would absorb some of it, and
22   you and Mr. Bradlow were allowed partial fees and that's
23   what happened.  But what I understand your position here
24   is, you thought the 157 was all that had to be sort of
25   treated as though it were special, not the 203,000 more.
```

1          MR. GOODSELL: Well, let me break down the numbers

2    a little bit differently.

3          THE COURT: Okay.

4          MR. GOODSELL: The 157 -- I guess 155, but to be

5    consistent, 157 is tuition received for the school year

6    that starts in September.

7          THE COURT: Right.

8          MR. GOODSELL: Okay.  It was never held in trust.

9    It was always used when received -- and there's no right to

10   a refund.  It was always used to pay the July and August

11   operating expenses.  That's what the Debtor has done, and

12   in fact, that's in Ms. Judson's declaration as well.

13         THE COURT: Okay.  But the fact is, that was the

14   figure that -- trust was my word -- that was the one that

15   looked like it had to get special treatment because of the

16   fact that parents had paid for the children for the coming

17   school year.

18         MR. GOODSELL: We were prepared to give it that

19   treatment on the understanding that it was going to be used

20   and applied to July and August payrolls.  Now here's where

21   the 203 comes from, and this is why these numbers do

22   require almost a spreadsheet.  The normal payroll ending

23   July 9th would have been about $46,000.

24         THE COURT: Yes, I think you said that in the

25   papers.

1    MR. GOODSELL: Okay.  Elementary school

2    teachers -- and this is also set forth in the declarations,

3    I think in Burlingame's declarations -- are paid on a 12-

4    month schedule, even though they don't really work in July

5    and August.

6    THE COURT: Right.

7    MR. GOODSELL: So at the time that we're doing

8    this deal, we're assuming that after July 9th, all the

9    payrolls, all other obligations that are going to be

10   incurred, are going to be Burlingame's.  Burlingame is

11   taking the position that --

12   THE COURT: Excuse me.  I'm going to stop you

13   there.  So you're saying the teacher who has finished the

14   work but wasn't due a paycheck until August --

15   MR. GOODSELL: Would be paid on a normal payroll

16   in August.

17   THE COURT:  -- would be Burlingame's obligation.

18   MR. GOODSELL: Right.

19   THE COURT: Even though it was earned, in a

20   technical sense -- not technical, in a factual sense, the

21   teacher performed the services in the past.

22   MR. GOODSELL: Sure.

23   THE COURT: Okay.

24   MR. GOODSELL: And -- I mean there would never

25   have been a July 9th payroll for 200,000 bucks, is what I'm

1   saying.  And if there was going to be a July payroll for

2   200,000 bucks, then we would have reserved the 155 to make

3   that payroll.  There wouldn't have been enough money

4   otherwise.  Now, in addition --

5           THE COURT: Well, let me stop you there.  Aren't

6   you really saying, if you thought 203,000 had to be paid by

7   July 9th, you couldn't have -- rationally, you couldn't have

8   justified treating the prepaid tuition the way it was

9   treated.

10          MR. GOODSELL: Absolutely.  We figured --

11          THE COURT: And if there had never been a

12   bankruptcy; there never had been a sale, presumably all

13   those payments would have been made out of the cash flow

14   from the tuition.

15          MR. GOODSELL: The burden has to follow the

16   benefit, and you can't take the benefit, which was the '09-

17   '10 tuition, which was traditionally used to pay the burden

18   and then throw the burden on the Debtor.  I mean it's just

19   that -- that's not right; that's not what anybody agreed

20   to.

21          THE COURT: Well, okay, if we go to the APA, and

22   Mr. Howard's motion, which is an excerpt of -- a portion of

23   it at the top of page 4, I'm paraphrasing, Debtor shall

24   retain responsibility for salary, wages, et cetera, and

25   shall pay the amount of salaries, wages and benefits earned

1  through the closing date, not payable through the closing

2  date, but earned through the closing date.  And you're

3  interpreting that as payable through the closing date,

4  right?

5          MR. GOODSELL: Right.

6          THE COURT: Right.  Well, how can I turn "earned"

7  into "payable"?  How can I change the word of the

8  agreement?

9          MR. GOODSELL: Your Honor, if that was an error,

10 it was an error.  There were never any numbers, other than

11 the ones that I presented at the hearing on July 2nd, and

12 that didn't include payment in advance for all of those

13 folks who are now working for Burlingame.

14         THE COURT: Well, what I don't recall -- maybe you

15 do recall -- we discussed on July 2nd the 157, but did we

16 discuss the 46?  In other words, did we discuss the portion

17 of the payroll that was payable?

18         MR. GOODSELL: No, because we didn't know when it

19 was going to close.  On July 2nd, we discussed $89,000 being

20 the '09-'10 tuition.  That's all that we had calculated as

21 of the date that I came into the hearing.

22         THE COURT: Right.  So therefore perhaps --

23         MR. GOODSELL: So that number grew subsequently.

24         THE COURT: Perhaps if we had thought about the

25 difference between payable and earned, maybe we would have

1  flagged the problem.  But we didn't.  Okay.

2          MR. GOODSELL: The conversations I had with Mr.

3  Huckins and so forth did not turn on that issue.  I told

4  him the last payroll we're responsible for is for the 9th,

5  and they said absolutely, and I said, after that, it's

6  yours, and they said absolutely.  And that's when we made

7  the call.  We said, well then, fine, you can have the '09-

8  '10 revenues.  We never told them that they could have the

9  summer camp revenues or the July revenues, and again, if

10  you read the declarations, that was not part of what Kathy

11  Parker had considered.  There was not a -- what essentially

12  is coming up now is, in the first nine days of July, you

13  collected money which was more than your expenses for the

14  first nine days of July, therefore you should turn that all

15  over.  And again, that's never something that I agreed to,

16  certainly nothing that Mr. Bradlow could have been aware

17  of.

18          THE COURT: Well, you just alluded to a

19  conversation you had with Mr. Huckins.  Was that

20  memorialized anywhere?

21          MR. GOODSELL: No.

22          THE COURT: I mean I don't even have it in the

23  papers.  Your representation is that Huckins and you

24  discussed, quote, "we'll pay the payroll as of July 9."

25          MR. GOODSELL: Right.

1          THE COURT: But you haven't paid even the 46,

2    right?

3          MR. GOODSELL: We don't have the money to pay

4    that.

5          THE COURT: Well, you have it if I direct it to be

6    paid out of that 322.

7          MR. GOODSELL: That's right.

8          THE COURT: Okay.  Okay.

9          MR. GOODSELL: But those are subject to further

10   court order.  There are liens against that.

11         THE COURT: Well, I know.  I understand, but it

12   could have been paid.  I mean why couldn't it have been

13   paid?  I mean --

14         MR. GOODSELL: It could have been paid how?  We --

15         THE COURT: Paid the employees effective on the

16   closing date.

17         MR. GOODSELL: Well, first of all, there was no

18   calculation as to what the employees were claiming until

19   July 30th.

20         THE COURT: I understood there was no calculation.

21   Of course.  I understand there was no calculation, but if

22   you had a magic calculator, you could have said, okay, here

23   on this day of July 9, here's 46,000 we're handing over to

24   the employees.  No?

25         MR. GOODSELL: Actually, we couldn't have.

1          THE COURT: Why not?

2          MR. GOODSELL: Because the money in the bank

3  account as of the close of business on the 8th was zero

4  dollars.  The money in the bank account as of the close of

5  business, the Debtor's bank account, on the 9th was

6  something less than $20,000.  The money that showed up in

7  my trust account by wire transfer at the end of the day on

8  the 9th, subject to, you will hold this money in trust, was

9  the 322.

10          THE COURT: The 322.

11          MR. GOODSELL: So I don't -- I certainly was not

12  going -- I didn't think I had the discretion, and I

13  certainly was not going to exercise the discretion, to

14  write a check out of my trust account which I might have to

15  put back in for the benefit of Mr. Martel (Phonetic) or

16  Linda Koelling.

17          THE COURT: Okay.  So you're --

18          MR. GOODSELL: There was not a bank account that

19  the Debtor controlled that was -- that had enough money to

20  pay $46,000.  It could have paid maybe 20.

21          THE COURT: Well --

22          MR. HOWARD: That's not exactly right, Your Honor,

23  because they paid Mr. Bradlow and Mr. Goodsell $92,000 out

24  of that account.

25          THE COURT: Well, out of that fund.  I mean

1 they -- how were you and Mr. Bradlow paid? Were you paid

2 out of the trust account or out of the escrow?

3        MR. GOODSELL: No, no, no. None of the trust

4 money has ever been touched.

5        THE COURT: You mean you haven't been paid yet?

6        MR. GOODSELL: What happened was, on the 6th, I

7 think, and on the 7th -- or it could have been the 7th and

8 the 8th -- I sat down -- this is in my declaration -- with

9 Kathy Parker, who's the bookkeeper --

10        THE COURT: Right.

11        MR. GOODSELL:  -- and we went through a list of

12 the things that she said needed to be paid. These were

13 bills that she had in process that were attributable to

14 Kids Connection, as opposed to things for the following

15 year. And she paid that out, and then she disbursed the

16 balance in a Kids Connection check to me and a Kids

17 Connection check to Mr. Bradlow in the amounts that are set

18 forth in my declaration. That's why I said, there was zero

19 money as of the close of business on the 8th.

20        THE COURT: Yeah, right, okay. All right. So

21 yes, my recollection was we -- yes, it was funds not from

22 the buyers but funds on hand that were authorizing those

23 payments.

24        MR. GOODSELL: Right. And you had a discussion --

25        THE COURT: Yeah, we had that discussion about

1  what was --

2         MR. GOODSELL:  -- with Mr. Davis on the record as

3  to whether he was making a claim that his client had an

4  interest in those funds or not.

5         THE COURT: Right.  Okay, so what do you think I

6  should do today on this request?  Do you think I should

7  order the payment of the 46,000?

8         MR. GOODSELL: I don't know how you can do that

9  without giving notice to the folks who have a claim,

10 however legitimate --

11        THE COURT: But if the sale hadn't closed for two

12 more weeks, Kids Connection would have made its payroll,

13 would have paid its payroll.

14        MR. GOODSELL: Yeah, we probably would have paid

15 it out of the 155 that we turned over to Burlingame,

16 because that's what they would have done in their normal

17 practice.

18        THE COURT: So you're saying that the disputed

19 liens, the Koelling lien and the Martel lien, encumbered

20 the money in your trust account.

21        MR. GOODSELL: That's what the court order says,

22 approving the sale.

23        THE COURT: Well, but the reason why those liens

24 encumber that money is because that money came in.  That

25 was a proceed of the sale.

1             MR. GOODSELL: Right, but there was -- what I'm

2  saying, Your Honor, is, there was no provision in this deal

3  that that money was going into my trust account without

4  liens or that that money was going to be used to pay

5  payroll or anything else.

6             THE COURT: No, I know that, and my

7  recollection -- correct me if I'm wrong -- Mr. Davis,

8  representing Ms. Koelling, said he just wanted to make sure

9  his client's lien attached to the proceeds.

10            MR. GOODSELL: Correct.

11            THE COURT: And I had forgotten about Martel.

12  Martel simply consented, right?  He consented to the sale.

13            MR. GOODSELL: He did a long time ago.  Martel's

14  lien is a pre-petition, I think, deed that he had that he

15  recorded post-petition.

16            THE COURT: And probably avoidable, but the point

17  is --

18            MR. GOODSELL: Very much.

19            THE COURT:  -- your statement to me I guess now

20  is, there are at least two potential lien claimants who

21  have first dibs on that $322,000.

22            MR. GOODSELL: That's right.  I don't --

23            THE COURT: And if I were to direct payment of it,

24  then we have a question of whether that collateral can be

25  paid.  So what you're saying is that -- well, okay.  The

1  only money that the estate has that isn't subject to that

2  lien is the twenty some odd thousand dollars in general

3  funds, 27,000.

4          MR. GOODSELL: It's about 30 now.  We've gotten

5  back an insurance payment and some other dollars.  But

6  there was about 20 grand on the 9th.  It's about 30 now.

7          THE COURT: Well, suppose I interpreted the

8  agreement to say that Kids Connection is supposed to pay

9  payroll of the closing that's payable.  You still don't

10 have a solution.  It's still there's no way to pay it; is

11 there?

12         MR. GOODSELL: That's correct.

13         THE COURT: Other than the 30,000.

14         MR. GOODSELL: Correct.

15         THE COURT:  In other words, unless the lien

16 claimants consent, your concern is that they -- well, I

17 just said it -- can't spend that money, and the 30,000 it

18 could, but even that doesn't get anywhere near what

19 Burlingame wants me to authorize to be paid.

20         MR. HOWARD: But that's not correct, Your Honor --

21         THE COURT:  Okay.  Well, I'm going to -- I

22 haven't called on you.  I'm going to let you have as much

23 time as you want.

24         MR. HOWARD: Okay.  I apologize.

25         THE COURT: I just wanted to get the facts

1 straight and I'm ready to hear from you. What do you

2 think, Mr. Howard?

3       MR. HOWARD: Well, first of all, that money should

4 never have gone into Mr. Goodsell's bank account. We

5 bought these -- K.C. Funding and Burlingame Capital

6 Partners bought these assets out of bankruptcy, free and

7 clear of all liens, as you ordered, all liens.

8       THE COURT: Well, you bought the assets free, but

9 the liens transferred to the proceeds.

10       MR. HOWARD: And the assets -- among the assets we

11 bought was the payment to the teachers, all of the payment

12 to the teachers of all of their money, their benefits, and

13 all money earned up through -- earned up through July 9th,

14 number one. Number two, we also bought all deposits, not

15 just the deposits for 2009 and 2010.

16       THE COURT: But wait a minute, you didn't buy the

17 deposit that you were making. I understand the point, and

18 that was a point of some discussion in many hearings. The

19 cash in the bank the moment before close, your client was

20 buying. I insisted that they allow some of that money to

21 be paid, and they agreed. The money that is the

22 consideration of the purchase price wasn't -- you weren't

23 buying money that you were paying.

24       MR. HOWARD: No, what we were buying, Your Honor,

25 was a particular list of assets --

1          THE COURT: Right.

2          MR. HOWARD:  –– and that particular list of

3   assets included on page 8 of the APA ––

4          THE COURT: No, I remember it.  I mean, listen, we

5   had many hearings.  You're the newcomer here.

6          MR. HOWARD: I understand.

7          THE COURT: Your clients sat through it all.  Mr.

8   Goodsell sat through it all, and I sat through it all, and

9   I expressed concerns early on in the deal that I for one

10  didn't realize that Burlingame had a contract that

11  allowed –– divided the bank accounts, but it did, and, you

12  know, I didn't rewrite the contract, but I insisted –– I

13  interpreted the contract to include that one of the

14  expenses that Kids Connection could pay pre-closing were

15  some of the professional fees.  You know, your clients

16  weren't happy, but they agreed to it, so that's how –– from

17  what I'll call the pre-close cash, the two professionals

18  were paid a modest amount of their claim.

19         MR. HOWARD: It wasn't that we were just buying

20  the bank accounts, Your Honor, we were buying pre-paid

21  tuition deposits and registration fees.  Now whether they

22  chose to sequester those or act irresponsibly and pay

23  current expenses from things for future, which should have

24  been trust funds for those parents who put their money in

25  good faith into paying for their children's education in

1  the future.  Those are all prepaid tuition deposits and

2  registration fees, and it doesn't say prepaid registration

3  fees and deposits, unless we decide to --

4        THE COURT: You know, I'm not following you,

5  because we know that 157,000 was turned over.  So that was

6  a portion of the cash that your clients bought, and as I

7  see it, the only cash that your clients were buying that

8  they maybe didn't get was the cash that is now $30,000, and

9  I don't even know that that's true, because I don't know

10  enough about when it came in.  But on the day of close, the

11  cash was either paid for expenses that were pre-petition,

12  ordinary course expenses, or professional fees or turned

13  over to your client.

14        MR. HOWARD: On the day of close, there was a

15  balance that could have been and should have been applied

16  to the obligations that Kids Connection had under the APA

17  and your orders, and that balance, that $322,000 balance,

18  should have gone toward paying the --

19        THE COURT: Mr. Howard, where did that 322,000

20  come from?

21        MR. HOWARD: From my clients.

22        THE COURT: As the purchase price.

23        MR. HOWARD: Correct, as part of the purchase

24  price.

25        THE COURT: They weren't purchasing the purchase

1 price.  They were purchasing the assets on hand, the tables

2 and chairs and desks and bank accounts.  They weren't

3 purchasing what they were paying with.  That just doesn't

4 make sense.

5          MR. HOWARD: No, and -- it makes perfect sense,

6 and here's what --

7          THE COURT: Not to me.

8          MR. HOWARD: Well, let me tell you why it does,

9 Your Honor.  I mean you're not saying that -- or you

10 shouldn't be saying, I would urge, that prepaid tuition

11 deposits and registration fees are some finite thing that

12 is definable by the amount of money in the bank.  It's the

13 same thing as a security --

14          THE COURT: Well, you know, the contract doesn't

15 say, I don't think -- correct me if I've got it wrong -- it

16 doesn't say, the purchase price is six million minus the

17 prepaid tuition that we're going to offset against the

18 600,000.

19          MR. HOWARD: No, but what it does say is, we're

20 buying a concept, and the concept is prepaid tuition and

21 deposits, just like a security deposit on an apartment

22 building.

23          THE COURT: Right.

24          MR. HOWARD: And if you are ready to move out,

25 you're going to get that security deposit back, in its

1  full -- not just part of it.  If the landlord says, well, I

2  spent it on current expenses, therefore it's not in my

3  account, therefore I don't have to pay it.  No.  That's not

4  the way it works.  They bought an asset --

5       THE COURT: Well, again, I don't know how I can

6  convince you to believe me when I tell you that when the

7  representation is that 157,000 that traditionally had not

8  been treated as a trust account was treated as a trust

9  account and turned over, it was because I insisted that it

10 be turned over because it was prepaid tuition, and I didn't

11 know there was day camp amounts until I read these papers.

12 So my point is that the 157,000 was a fund; it was a res

13 that existed, and had the company gone -- or the Debtor

14 gone into Chapter 7, it might well have been in the pool

15 for all administrative expenses, and I said that I felt

16 that the people who were the parents and had paid the

17 tuition had to be treated as though they were trust

18 accounts, and they were, and I think with some resistance

19 from the Debtor.

20       So I guess what we're hung up on is you want me

21 to say that the Debtor should have paid back to Burlingame

22 cash that Burlingame paid as part of the purchase, and I

23 don't see how that right exists under the agreement.  I

24 just don't know how to get there.  So my question to you

25 is, if the $322,000 on hand is subject to liens, how can I

1  authorize the payment of it today without even notice to

2  the lien holders.

3          MR. HOWARD: Mr. McMillan will address that.

4          THE COURT: Okay.  Fine.

5          MR. McMILLAN: Good morning, Your Honor.

6          THE COURT: Good morning.  You can use the podium

7  or use the table.  I just need you near a microphone.

8          MR. McMILLAN: I spent some time going over these

9  papers, and, Your Honor, in the years of your practice as a

10 bankruptcy attorney and also as a judge, you oversaw many

11 sales free and clear.  And what Burlingame Partners bought

12 here was a going business, and with that going business was

13 good will, and that good will included happy parents and

14 happy teachers.  And Burlingame tendered money sufficient

15 to cure the unhappiness that they perceived that the

16 teachers would be experiencing by not being paid.  They

17 tendered sufficient money, Your Honor, to cure the

18 unhappiness that those parents who had tendered their

19 deposits with the expectation --

20         THE COURT: Well, you're pushing on an open door.

21 Those parents' 157,000 has been provided for.

22         MR. McMILLAN: Exactly.

23         THE COURT: Provided for, period.

24         MR. McMILLIAN: Your Honor, what my point is, is

25 that it's two sides of the same coin.  This is a going

1  business that was sold.  Under your April order, under the

2  APA, paragraph 2.1, it provides specifically.  There's a

3  laundry list of items.  It was the intellectual property;

4  it was the playground equipment.

5          THE COURT: Let's focus on what the dispute is

6  about.  I know all that.

7          MR. McMILLAN: Yes.

8          THE COURT: Let's focus on what I'm supposed to do

9  about this current problem.

10          MR. McMILLAN: Your Honor, this is really not a

11  problem.  It's -- what has happened is money that was

12  tendered to be part of the res, that was transferred

13  according to your sale, free and clear, under 363(f).  That

14  money was paid.  That money that Mr. Goodsell is holding,

15  that's part of that res.

16          THE COURT: But really, was that money on hand the

17  day before the sale?

18          MR. McMILLAN: It was part of that --

19          THE COURT: Was it on hand the day before the sale

20  closed?

21          MR. McMILLAN: Constructively it was, because --

22          THE COURT: How?

23          MR. McMILLAN:  -- it was in the escrow.

24          THE COURT: Come on, Mr. McMillan, don't give me

25  that.  If the company had gone into Chapter 7 on July 8th,

1  would the trustee in bankruptcy have gotten that $322,000?

2  No, because your client wouldn't have parted with it yet.

3          MR. McMILLAN: I disagree.

4          THE COURT: Okay.  How would the trustee have

5  gotten it?

6          MR. McMILLAN: Because the -- if it had gone into

7  Chapter 7, unless the trustee could have avoided the

8  Court's order under 363(f), which was entered in April, and

9  became final ten days thereafter, that was out of play.

10  That money is gone.  It's out of the estate.

11          THE COURT: It hadn't come into the estate.

12          MR. McMILLAN: It wasn't in the estate to begin

13  with.

14          THE COURT: You know, again, I don't understand

15  the argument that the two of you are making.  I didn't

16  understand -- I didn't glean it from the papers.  You tell

17  me about all the sales free and clear I've been involved

18  with; I've never heard anybody claim to have purchased the

19  purchase price.

20          MR. McMILLAN: We're not claiming the purchase

21  price, Your Honor --

22          THE COURT: Well, that's what you're arguing

23  because that's where the 322 came from.

24          MR. McMILLAN: Your Honor, how Burlingame

25  perceived it, Burlingame was -- the idea was, is that at

Case: 08-30026   Doc# 373   Filed: 09/21/09   Entered: 09/21/09 20:23:14   Page 24 of
72

1  the outset, Burlingame was going to cure the unpaid wages,

2  and they had asked the Debtor to tender books.  The Debtor

3  could not tender the books.  I understand the Court had

4  ordered -- had issued orders for the turnover of those

5  books.

6          THE COURT: I understand.  I've never seen a more

7  contentious deal than this one.  Again, you're a newcomer.

8          MR. McMILLIAN: I understand.

9          THE COURT: Let me tell you, it was contentious.

10         MR. McMILLAN: I understand that.

11         THE COURT: Ask Mr. Bradlow if you don't believe

12  it.

13         MR. McMILLAN: I've heard a lot about it.

14         THE COURT: Okay.

15         MR. McMILLAN: But anyway, what happened, they

16  reached an agreement.  Burlingame threw up its hands and

17  they said, fine, you cure the amounts earned.  We're going

18  to tender this purchase price.  You cure it.  It's your

19  issue.  And so what happened was --

20         THE COURT: Where is that documented?

21         MR. McMILLAN: I'm sorry, Your Honor?

22         THE COURT: Where is that documented?

23         MR. McMILLAN: That's on the order that you

24  approved on July 2nd, on the second amendment to the APA.

25         THE COURT: And can you tell me the language

1　again, the language that gets us there.

2　　　　　MR. McMILLAN: All right.  If I can just --

3　　　　　THE COURT: Sure.  I think I have the order here,

4　I think, somewhere.

5　　　　　MR. McMILLAN: Section 3, Your Honor, of the

6　second amendment, page -- it's on the first page.

7　　　　　THE COURT: Okay.  I just have to find it in the

8　papers.  Can you remind me where I would find it in today's

9　papers.  I don't have everything with me.

10　　　　　MR. McMILLAN: Exhibit 6, Section 3.

11　　　　　THE COURT: Exhibit 6, to what?

12　　　　　MR. McMILLAN: The second order, Your Honor.

13　　　　　THE COURT: Okay.  What I'm asking you, did you --

14　I'm looking for the order, and I don't know -- has the

15　order been reproduced in today's package of papers?  I can

16　pull it up on the screen.  I just need to know where I can

17　find it.  That's all.

18　　　　　MR. HOWARD: It's Exhibit C to the declaration, I

19　think, of Jan Judson.  But it's --

20　　　　　MR. McMILLAN: Yes, Your Honor, it's Exhibit C of

21　the --

22　　　　　THE COURT: Do you have that?  Peggy, do you have

23　that?

24　　　　　MR. McMILLAN: I have it on my computer, I can

25　pass it --

1          THE COURT: Well, I can get it on my computer.
2   I'm just -- sorry, to slow down on this, I thought I had
3   all the papers I needed here, and let me take just one more
4   check -- here's Ms. Judson's declaration.  Exhibit A is the
5   first order.  You said it's Exhibit C.
6          MR. McMILLAN: Is your order granting the order
7   for --
8          THE COURT: It's Exhibit C, right?
9          MR. HOWARD: Right.
10         MR. McMILLAN: Yes.
11         THE COURT: Okay.  I think I'm going to get there.
12         MR. McMILLAN: It's called "Order Granting Motion
13  in Aid of Sale Order."
14         THE COURT: For some reason, Ms. Judson's
15  declaration came apart, and -- sorry, to take the time
16  here.  All right.  Declaration of Janice Judson, there it
17  is.  Now to find --
18         MR. McMILLAN: And, Your Honor, the second
19  amendment to the Asset Purchase Agreement is Exhibit D.
20         MR. HOWARD: I think, Your Honor, that we need to
21  focus on the two separate items, because --
22         THE COURT: Okay, but you both need to give me a
23  minute to catch up to the document you're referring to.
24  I'm sorry I didn't -- I wanted to look at it with you.  I
25  want it here where -- all right, now I've got the order.

1    And Mr. McMillan, your representation was that this

2    supplemental order in effect empowers or creates the

3    situation where you prepay and get it back.  Now what do I

4    look at to find that?

5              MR. McMILLAN: You're going to look at paragraph 3

6    of the agreement, which is entitled "Employees and Employee

7    Benefits."

8              THE COURT: Okay.

9              MR. McMILLAN: And it's subsection (c), and the

10   language, Your Honor, if I can read, is:

11             "Seller shall retain responsibility for salary,

12             wages, commissions, bonuses and related payroll

13             taxes for all business employees for all periods

14             up to and including the closing date.  Seller

15             shall pay on or prior to the closing date the

16             amount of salaries, wages, and benefits earned

17             through the closing date by each business

18             employee."

19   And how this came about, Your Honor, as we said before, is

20   they didn't want to turn over the books so Burlingame could

21   cure these deficiencies or take into account these

22   deficiencies before the closing date.  And so the seller,

23   to accommodate this problem so they didn't have to, you

24   know, overload the Court further with this contentious

25   case, they said fine, you deal with it.  So that money that

1  was to be paid went into Mr. Goodsell's account, and that's

2  where it sits.  So that is part of the purchase price; it

3  was intended.  And that order is also final, Your Honor.

4  The ten days have passed for that -- for an appeal on that.

5          THE COURT: Does the -- no, I know that -- does

6  the second amendment to the purchase agreement adjust the

7  purchase price?

8          THE COURT: No.

9          THE COURT: Does the order?  In other orders, I'm

10 still -- I understand -- I hear what you're saying.  I'm

11 reading the language.  It's helpful to understand the

12 language.  I'm trying to find out how that paragraph 3(c)

13 establishes, or any document, establishes the notion that

14 the seller is going to perform 3(c) out of the

15 consideration for the purchase, because that's really what

16 you're saying.  I mean again, I debated with you, and to

17 this day still believe that every dollar in Mr. Goodsell's

18 trust account came from Burlingame.  So I'm saying -- and I

19 asked you where's the credit against the purchase price.

20 In other words, how was the Debtor supposed to perform its

21 obligations under 3(c)?

22          MR. McMILLAN: Well, there's a surplus on the

23 money that went in.  There was an amount that was paid out

24 of the escrow, and that should have -- and in hindsight,

25 Your Honor --

1          THE COURT: But read the language.  "Seller shall
2   pay on or prior to the closing date the amount of wages."
3          MR. McMILLAN: All right.  Well, the closing date,
4   on the closing date, that means that considers it as going
5   to be done contemporaneously as part of the closing.
6          THE COURT: Okay.  So -- again this is -- forget
7   all that discussion about sales free and clear and good
8   will and everything else.  Your point is that, by providing
9   the dollars to pay the bank and to pay the closing costs,
10  Burlingame was also providing the dollars for seller, the
11  Debtor, to perform the 3(c) obligations.
12         MR. McMILLAN: That's it, Your Honor.
13         THE COURT: Okay.  Now, I understand it.  Mr.
14  Goodsell, what's wrong with that interpretation?
15         MR. HOWARD: Excuse me --
16         THE COURT: Yes, sir, go ahead.
17         MR. HOWARD: Okay.  No, go ahead, I'm sorry, Your
18  Honor --
19         THE COURT: No, I intend to have discussions
20  rather than traditional argument.  So if you want to say
21  something, say what you want to say.
22         MR. HOWARD: No, that's fine.  I think it's fine,
23  because I was going to turn the attention to the other item
24  as well, so --
25         THE COURT: Well, okay.  And Mr. Goodsell, this

1  was amended obviously, last-minute amendment.

2          MR. GOODSELL: Well, Your Honor, I'd actually like

3  you to read the parts in Section (c) in that second

4  amendment that counsel has not read.

5          THE COURT: Okay.

6          MR. GOODSELL: And then you tell me if my

7  interpretation -- well, you don't have to tell me -- but I

8  will tell you what my interpretation of those were.  Part

9  (b):

10              "Buyer shall employ all of seller's current

11              business employees as of the closing date, with

12              the exception of Linda Koelling."

13  Now that tells me that whether those were elementary school

14  employees, whatever employees they were, they were on

15  Burlingame's payroll as of the 10th, or -- let me see, as of

16  the closing date, as of the 9th.  Okay?  It doesn't say that

17  we're going to employ them -- we're going to use them, but

18  you're going to pay for them.  It says, they're going to be

19  on our payroll.  Now that's how I read that provision;

20  that's what it meant to me.

21              It says in Part (c):

22              "Seller shall retain responsibility for salary,

23              wages, commission, bonuses, and related payroll

24              taxes for all business employees for all periods

25              up to and including the closing date."

1    Now that seems to me to clarify that we have
2    responsibility for those obligations to the closing date
3    and not after.  If you then go --
4    THE COURT: Well, if I could stop you for a
5    second.  It leaves unanswered the question, earned or
6    payable.  The word is missing.  It doesn't say "earned" up
7    to or --
8    MR. GOODSELL: Well, the next statement says:
9         "Seller shall pay prior to the closing date
10        salaries, wages and benefits earned through the
11        closing date by each business employee."
12   But, given the two prior statements, there's nothing in
13   there that suggests, and for elementary teachers who are
14   not going to be paid but are going to be employed during
15   the summer, that you're going to still be responsible for
16   those.  If that had happened, this deal couldn't have
17   closed.
18        THE COURT: Is the term "business employee" --
19        MR. GOODSELL: That's defined in the Asset
20   Purchase Agreement.  It's everybody; it's the staff and the
21   teachers --
22        THE COURT: It's everybody.  So it includes the
23   teachers.
24        MR. GOODSELL: Yes.
25        THE COURT: In other words, the teachers who are

1   on this nine-month work, twelve-month pay, they fit within

2   the definition of business employee.

3          MR. HOWARD: It's everybody.

4          MR. GOODSELL: That's right.

5          THE COURT: Well, that's what I thought, but I

6   wanted to clarify -- I mean I didn't want to go off and say

7   there was some other definition for teachers.  Okay.

8          MR. GOODSELL: Right.  So essentially the argument

9   you're hearing here is that we should be paying for

10  Burlingame's employees, and that's just not what was ever

11  contemplated by anybody.

12         THE COURT: Well, but don't you also agree, using

13  my example of what if the company, the business, had shut

14  down on July 8th, the teachers who were owed July and August

15  paychecks would have pre-conversion claims; wouldn't they?

16         MR. GOODSELL: Sure.

17         THE COURT: Because they earned it.

18         MR. GOODSELL: That's right.  And if we had in

19  fact back in May converted this case to a Chapter 7, that

20  would have been true for everybody who had contract

21  payments.

22         THE COURT: Yes, of course.  Look, I guess what

23  I'm saying to you is, I now understand -- I mean I

24  understand the argument -- I haven't figured out what I'm

25  supposed to do about it --

1              MR. GOODSELL: Well, let me just add, because I

2    think we have to get the other shoe down, if it had

3    converted on the 8th, we would have also had an extra

4    $157,000 to pay them with.

5              THE COURT: No, I know that.  I know that.

6              MR. HOWARD: But let me also point out that what

7    Mr. Goodsell said here is just completely false.  K.C. Fund

8    took over the operation, that's cool, and hired all those

9    people, they took over the responsibility to pay those

10   people for work they did after July 9th, not work they did

11   beforehand.  It's not a question of whether or not they're

12   going to be paid later; it's a question of what they earned

13   up through July 9th, according to your order and the second

14   amendment.  So for him to say that we're asking that our

15   employees be paid, well, yes, we're asking that our

16   employees be paid; that's absolutely right.  We're asking

17   for our employees to be paid for work they did for his

18   client prior to their becoming our employees.

19             THE COURT: No, I understand.  I understand the

20   argument.  I mean I think the point that I can't tell is,

21   is this, Mr. Goodsell.  If the second amendment –- if I

22   interpret it your way, at the minimum, the 46,000 has to be

23   paid, notwithstanding the lien claims, right?

24             MR. GOODSELL: That's right.

25             THE COURT: Well, but I mean, you know, you gave

1  me the impression a few minutes ago that even to pay the

2  46,000 would be stripping it out from under a lien.  But in

3  fact --

4          MR. GOODSELL: No, it's --

5          THE COURT: -- you'd have to say -- I'm sorry, go

6  ahead.

7          MR. GOODSELL: I was just going to say, in order

8  to pay the 46,000, we would have to wait until the value or

9  validity of the liens are determined.  It's just going to

10  be an administrative claim like everybody else, and it's

11  going to have to wait until that happens.  We could

12  distribute 30 of the 46, but that's just not going to get

13  it there.  Now, if this 46 had been calculated as of the

14  9th, and if it were just limited to the 46, then I assume

15  that that would have been paid.  Mr. Bradlow and I would

16  have gotten something less than what we got.  But it wasn't

17  calculated until July 30th, and then it was not 46 -- and I

18  still don't know what number it is.  It may be 44; it may

19  be 40; it may be something else.  46 is an estimate based

20  on what the average payroll was over the number of the days

21  until the 9th.

22          MR. HOWARD: Your Honor, the thing that -- sorry,

23  I apologize, counsel.

24          MR. GOODSELL: Just a minute.  So there was

25  nothing to pay on the 9th because there was no amount that

1    had been calculated, and it took them a month to do a

2    calculation which said, oh no, it's $203,000.  Now, if I'd

3    had a 203,000 --

4            THE COURT: No, I know, but if there hadn't been a

5    bankruptcy, if this had just been a traditional sale, you'd

6    do a post-closing adjustment.

7            MR. GOODSELL: That's right.  That's right.

8            THE COURT: Sure.

9            MR. GOODSELL: But none of that was set up in

10   here, and that's what that July 2nd hearing was supposed to

11   accomplish, was to clean up all those issues.  If we had

12   known that we were going to pay 203,000 for payroll in

13   advance for these teachers, it wouldn't have closed on the

14   9th.  We would have come back in here, and we would have

15   said, these trust funds are not going to be transferred.

16           THE COURT: Hold on.  Both of you hold on for a

17   second.

18       (The court confers with the Clerks.)

19           THE COURT: All right.  Mr. Howard.  Oh, are you

20   finished, Mr. Goodsell, did you finish your point?

21           MR. GOODSELL: I guess my final point is just, I

22   don't see how we can resolve this today in the context of

23   this motion.  People who need to be here aren't here.  It's

24   not keyed up correctly.  I don't even know -- I mean I

25   suppose Mr. Howard can see if he can get consent from Mr.

1  Davis and Mr. Martel to subordinate their lien, but in the
2  absence of that, if they say no --
3       THE COURT: Well, I think in the case of Mr.
4  Martel, sure, if I have to deal with the disputed lien
5  first, then so be it, but that to me is a lay-down.  Ms.
6  Koelling is a different issue.  If Ms. Koelling wants to
7  voluntarily accommodate the payment of the teachers, it's
8  within her power to do it.  If she chooses not to, then we
9  have some due process rules, if due process rules apply.
10 Now getting back to my point, I want to know this; I
11 understand you've said it over and again that you couldn't
12 calculate what was payable pre-closing until later.  But if
13 you had been able to calculate it, it would have been paid
14 in the normal course.  The liens never would have attached.
15      MR. GOODSELL: No, it wouldn't.
16      THE COURT: Why?  Why not?
17      MR. GOODSELL: Because if we had calculated the
18 number, it would have been $46,000.
19      THE COURT: Yeah.
20      MR. GOODSELL: Okay.  There was enough money to
21 pay $46,000.  If we gave up the 157 and still had to pay
22 203, there was not money to close.  There was not enough
23 money left in the Debtor's bank account to pay $203,000,
24 and that's why I said, you can't have it both ways.  If we
25 keep the 157, and we're responsible for the 203, then

1   that's one scenario.  If we were supposed to just pay out

2   the 46, then that's a different scenario, and maybe Linda

3   Koelling or her attorney would say, look, if we've got 30

4   and it's another 16, fine.  But I don't see them coming

5   back and saying, sure, take the 203, and by the way, let

6   Burlingame keep the 157.

7           THE COURT: No, I understand.  Mr. Howard, you've

8   been patient.

9           MR. HOWARD: This is really quite frustrating.

10          THE COURT: Well, it's -- this has been -- welcome

11  to the club.

12          MR. HOWARD: I know.  I know.  Having read an

13  awful lot of this stuff -- look, they didn't know because

14  they didn't figure it out.  They were the ones under the

15  rules, under your orders, and under the APA, who were

16  supposed to make those determinations, and they could have

17  made them on or before July 9th, easily.  The fact that we

18  made them later doesn't matter, and in fact, we didn't make

19  them later.

20          THE COURT: Well, but focus on what --

21          MR. HOWARD: The person who made them later was

22  their employee.  All they had to do was ask her.  She would

23  have figured it out for them as she figured it out for us.

24  They had the contractual --

25          THE COURT: Okay, but listen to what Mr. Goodsell

1  said.  If magically Mr. Goodsell and the bookkeeper could
2  have figured it out, then there wouldn't have been enough
3  money, both to pay the payroll and to turn over the
4  tuitions too.  There just wasn't enough money.  So what do
5  I do about it?
6          MR. HOWARD: Well, first of all, there would have
7  been --
8          THE COURT: Why?  How?
9          MR. HOWARD:  -- for two reasons.  One was,
10 because it would have been paid out of escrow, number one.
11 Number two, they wouldn't have paid $92,000 to Mr. Goodsell
12 and Mr. Bradlow, because that would have been subordinate
13 to those.  So there would have been at least another
14 92,000.
15          THE COURT: Why would it have been subordinate?
16          MR. HOWARD: Because your order says so, because
17 your order says that they will be paid after the payment of
18 those things.
19          THE COURT: In that same order?
20          MR. HOWARD: Yes.
21          THE COURT: Where is that?
22          MR. HOWARD: If you look at item 6 on page 3, and
23 then you go to item 7.
24          THE COURT: In the order?
25          MR. HOWARD: In the order, yeah.  Oh, I'm sorry,

1   item –- I apologize; it's paragraph 12.

2         THE COURT: Okay.  "Debtor is authorized to pay

3         the remaining cash on hand, estimated at

4         60,000..."

5   Okay.

6         MR. HOWARD: Yeah, that's after –- that's the

7   remaining cash on hand, and that's after the payments under

8   item 6 and item 11, which is the advance deposits and

9   tuition.

10        THE COURT: Okay.  Let me –- just give me a minute

11   please to read –-

12        MR. HOWARD: If you look at –-

13        THE COURT: Wait.  Just time out for one second,

14   please.

15     (Pause.)

16        Okay.  Okay, Mr. Goodsell, yes.

17        MR. GOODSELL: I was just going to say, yeah,

18   there's nothing in 11 that talks about making any payroll

19   payments.

20        THE COURT: Well, I think, in my mind, the

21   reference to all prepaid or advance tuition, deposits and

22   fees, was what we now know as the 157.  I mean to put a

23   label on it, it was for prepaid tuition for the coming

24   year.

25        MR. GOODSELL: Yeah.

1        THE COURT: That was always on the table, always
2   for discussion.

3        MR. GOODSELL: The only thing that was ever
4   discussed.

5        THE COURT: You made representations to me on the
6   record that based upon the cash available and setting aside
7   the 157, and I think you said, and covering a payroll
8   amount, there would be $60,000 available to pay to you two,
9   you and Mr. Bradlow, and I told the Judsons and Burlingame
10  I was interpreting the contract to authorize that and they
11  acquiesced on that.  So the question is, what I can
12  possibly do about it.  Mr. Howard, what should I do about
13  this now?  You know, I understand the bad feelings.  Let's
14  look forward; what are my options to fix this?

15       MR. HOWARD: Your option -- first of all, that
16  money that went into purchasing all these assets was
17  purchasing a lot of things, and it was purchasing
18  performance by the other side.  And it was taking care, as
19  Mr. McMillan said, of paying things and solving problems
20  that the other side wasn't doing, the Debtor was not doing.
21  So that money should have gone originally, and it should
22  never have gone into Mr. Goodsell's account, it shouldn't
23  have any liens because it should never have gone out of the
24  escrow; it should have been paid, and the people who are
25  sitting out here in the gallery, these are the people who

1   are not getting paid who have been messed over by Ms.

2   Koelling's bad acts.  It's really a shame.

3            THE COURT: Well, no one is here defending Ms.

4   Koelling, but don't blame Mr. Goodsell for Ms. Koelling.

5            MR. HOWARD: Well, I'm -- okay.  I won't blame Mr.

6   Goodsell out of professional courtesy, Your Honor, but --

7            THE COURT: No, out of historical fact -- Mr.

8   Bradlow and Mr. Goodsell have carried this case to where it

9   got to where it could close.  Go ahead.  Your clients may

10  have a different point of view.  I do not.

11           MR. HOWARD: What should happen, I believe, Your

12  Honor, is you should order that the teachers be paid out of

13  that account, because they should have been paid before

14  that money ever left the escrow, and you should order that

15  the prepaid tuitions be returned to Burlingame.

16           THE COURT: The prepaid tuitions have been.

17           MR. HOWARD: Well, it didn't say --

18           THE COURT:  You mean the summer camp?

19           MR. HOWARD: Yeah.

20           THE COURT: You know, the summer camp, as I said a

21  minute ago, that just bubbled up to the surface.  I don't

22  recall -- I could be wrong -- I don't ever recall

23  discussions about that.

24           MR. GOODSELL: It was never discussed.

25           MR. HOWARD: But you see, Your Honor, it was

1  not -- because we were denied access to the books and

2  record, it was not incumbent on us, and by the way, under

3  the APA and your orders, it said they were to account for

4  all that. Now when we went in, Kathy Parker, who was the

5  one who understood all of that, did in fact account. The

6  problem was, Mr. Goodsell didn't ask her the right

7  question. All he asked was, how much was prepaid for 2009-

8  2010. He should have said, how much is prepaid for all

9  activities that were going to be delivered after July 9th,

10  and he didn't. Had he done that, she would have said, oh,

11  it's 153 plus 69.

12       THE COURT: Okay, but -- so in effect you're

13  saying, again, we're back to my opening comment, you want

14  me to order out of the 322 in the trust account to tell Mr.

15  Goodsell to pay $272,000.

16       MR. HOWARD: That's correct.

17       THE COURT: And Mr. Goodsell, your point is that

18  the 322 is proceeds of the sale, and the liens attached,

19  and therefore can't be paid without due process to the lien

20  claimants.

21       MR. GOODSELL: Well, that's -- I think that's the

22  first and fundamental obstacle. The second one is, I don't

23  think that the Debtor owes $272,000. I think at best, it's

24  going to be somewhere around 46.

25       THE COURT: Well, let's try it this way. Let's go

back into my feeble brain and say what I thought I was
authorized saying.  I thought I was authorizing treat as
trust a certain species of debt that in a Chapter 7 would
be just like everybody else, and that was the prepaid
tuitions, what we know is the 157.  And I frankly had no
thought one way or the other about the difference between
wages earned and wages payable and wages earned.  And it's
too bad that the second amendment didn't clarify that, but
read literally, the second amendment I think favors the
Burlingame interpretation in terms of the language that we
discussed.  I understand your point about context in
subparagraph (c) and subparagraph (b), but the fact of the
matter is, the document didn't say payable as of the close;
it said earned as of the close.  And I don't know how I can
deny that for the deferred salaries for teachers, they were
earned before the close.

So if -- in my mind this is perhaps a practical
analysis rather than a legal one, the second amendment
empowered the Debtor to make that payment by the purchase
price, so it would seem to me that if I accept the argument
that the 202 should be paid, then the question is, did the
liens of Koelling and Martel ever attach, and I think in a
sense I could say they didn't attach because they weren't
net proceeds.  The cost of closing the deal is a cost of
doing business like the escrow fees and, you know, the

1  recording fees and every other fee.  This was a cost of

2  closing, and the liens attach to the net proceeds.

3        So that suggests to me that Burlingame's got --

4  or K.C.'s got the stronger argument on that.  I don't

5  necessarily agree with K.C. though as far as the summer

6  camp payments, and, frankly, I don't know whether there

7  should be a credit against the 202 for the 157 that was

8  paid.  I mean in my mind I don't think there can be because

9  I and everybody seemed to agree to it, sign on to it.  So I

10 guess what I'm saying is, that my sense is and the best

11 interpretation I can put on paragraph 3(c) of the amendment

12 is the 202 or 203, excuse me, should have been paid by the

13 Debtor, wasn't, and therefore ought to be now, and not the

14 balance.  Now that -- I mean, you know --

15        MR. GOODSELL: Then I don't see why it should have

16 any greater priority than any other administrative claim.

17        THE COURT: Well, I mean, you know, that's --

18        MR. GOODSELL: The escrow closed.  Everybody

19 closed the escrow.  It is where it is now.  I don't think

20 going back and saying, well, you know, if -- to the extent

21 that they're going back and saying, well, if we had known

22 and done the calculations, we would have been asking for

23 another $203,000, I'd have been back in here in front of

24 you saying, we're not giving up the 157.

25        THE COURT: Oh, we would have been back here with

1   Mr. Huckins complaining that you weren't opening up the

2   books and records, and I would have said, then fine, we'll

3   delay the closing until you open up the books and records.

4           MR. GOODSELL: That's right.

5           THE COURT: I mean Burlingame closed.

6           MR. GOODSELL: That's right.  So they obviously

7   got what they thought they bargained for.  We got what we

8   thought we bargained for, and I think the problem is if

9   there's a breach of contract, you know, it's time to put on

10  the witnesses.  I mean we should have a hearing.  If the

11  Court concludes that the Debtor is liable for July and

12  August payroll payments, then those people can make an

13  administrative claim.  I don't see why it's of any greater

14  significance today than it would have been if everything --

15  if the case were converted to a 7 on the 8th.  Their claims

16  would not have had any greater priority, and that's been

17  discussed in this court before.

18          THE COURT: Can you respond to that, Mr. McMillan?

19          MR. McMILLAN: Yes, Your Honor.  This is all very

20  simple because there was the sale, and the Court has the

21  order for the sale.  It has the sale agreement, and we're

22  just here under 105, for quiet title in Burlingame for

23  those funds.  That's what this is about.  It's not about a

24  breach of contract.  It's about the Court determining who's

25  the owner and doing so under its authority under 105(a), to

1  interpret that order --

2         THE COURT: But that argument doesn't get you

3  anywhere because Burlingame is not the owner.  Burlingame

4  is saying, make the seller perform the contract.

5         MR. McMILLAN: No --

6         THE COURT: And the seller under the paragraph you

7  pointed me to said, seller, you are supposed to pay the

8  payroll.  So now you're asking me to tell the seller to pay

9  the payroll.

10        Now suppose -- worst case -- suppose the money

11 disappeared; somebody stole it, and do you agree that as a

12 matter of bankruptcy law, as harsh as it may sound, the

13 unpaid employees would be no better off than the unpaid

14 everybody else in the Chapter 11.  It would just be another

15 Chapter 11 claim, right?

16        MR. McMILLAN: Albeit, it would be a priority --

17        THE COURT: No, it wouldn't.  All claims are equal

18 in the Chapter 11, right?

19        MR. McMILLAN: Okay.  I'm with you.

20        THE COURT: Isn't that true?

21        MR. McMILLAN: Of course.  Under Chapter 7,

22 there's a distinction.

23        THE COURT: Right.  Right.  And -- I mean that's

24 not a happy result either, but I think that's what Mr.

25 Goodsell is saying is, if my interpretation of the contract

1  is the seller has an obligation, then his response is well,

2  okay, welcome to the club; has an obligation to pay the

3  payroll; has an obligation to pay the professionals; has an

4  obligation to pay any other creditor unpaid during the

5  Chapter 11.

6      MR. McMILLAN: Well, in my looking at it, the way

7  I interpret what happened, is Mr. Goodsell –- he was

8  appointed to sign the papers.  He is an officer of the

9  court.  He was involved in the sale.  And the money, when

10 it was turned over to him, it wasn't –- he wasn't acting on

11 behalf of the estate.  That money that sits in his trust

12 account, that's still in the escrow.  The way that I see

13 this, it's still within the power of the Court to interpret

14 this and order the disgorgement of it or the direction of

15 where that money is going to go, whether it's going to go

16 into the assets of the estate or whether it's going to be

17 tendered over to the employees according to the APA.

18     Your Honor, this is something that's within your

19 authority to interpret under 105(a) to resolve this sale.

20 This is still part of the sale transaction.

21     MR. HOWARD: And, Your Honor, you reserve in your

22 orders jurisdiction to –-

23     THE COURT: No one's questioning my jurisdiction.

24 Look, I'm just trying to find the right –- the best answer.

25 I mean I thought we were finally going to be done with one

1  of the most difficult cases that I have ever presided over,

2  and I'm sure that the principal lawyers and Mr. Bradlow

3  have never seen one like this and hope we never do again.

4          MR. McMILLAN: I'm sorry to hear that, Your Honor.

5          THE COURT: Well, it's just been disaster from

6  early on, but again, I'm not going to revisit that.  The

7  Judsons know about the history of it.  Ms. Koelling knows

8  the history of it.

9          MR. McMILLAN: Your Honor, what I -- you have the

10 documents in front of you.  You're familiar with the APA.

11 It was implied -- it was understood throughout this that

12 the teachers were going to get paid.  The parents' deposits

13 were going to be taken care of, and that's all that we're

14 here asking for.

15         THE COURT: Well, I understand.  I understand.

16 Mr. Goodsell, I understand your point too.  I'm going to

17 authorize or direct the payment of the 203,000 out of the

18 trust account, and I'm not going to direct the payment of

19 the 67,000.  I understand your point, and I realize what

20 that does to the estate, but there's a certain degree of

21 fairness that I think was intended here, and I wish there

22 had been a little more precision in the way 3(b) came out,

23 but it says what it says, and I can't -- I can't, in

24 fairness to Burlingame -- but to the next party who enters

25 into a contract with a bankruptcy estate, to say, draft

1  your agreement and then the judge will interpret it some

2  other way, and so I come to the problem with this in mind,

3  with my own involvement in mind.  I'm repeating myself, but

4  bankruptcy priorities notwithstanding, the parents who

5  prepaid the tuition for 2009-2010 and the employees who are

6  the worker bees, they were going to be protected, and that

7  was my intention, and it would have been, certainly for the

8  employees who did the work, much like happens often when we

9  have conversions of cases, we make sure the payroll is

10  covered.  The people least able to control the destiny are

11  the more likely victims of the thing going bad.

12        You know, if we had it to do over again, would it

13  have been different?  Who knows.  It seemed at all times

14  that the most important thing was to keep the school

15  functioning.  As far as I know, it's still functioning.

16  It's a disaster from the point of view of the

17  professionals, from the point of view of other creditors,

18  probably the point of view of a lot of other people that I

19  haven't mentioned.  But to me, the fairest interpretation

20  of what was intended, both in terms of the spirit of

21  getting the deal done and the written agreement from the

22  buyer's point of view was consistent with that.

23        So I'm going to grant the motion in part.  I'm

24  going to direct that the estimated -- that the 203,010 for

25  wages be paid from the monies in your trust account.  I'm

1  going to ask for help from counsel on whether it's more

2  appropriate to turn it over to K.C. to make the

3  distributions, or whether Kids Connection wants to, through

4  you, Mr. Goodsell -- which I don't think you want to be a

5  paymaster -- want to do it.  I think, again, as tense and

6  difficult as this has been, it might be easier to turn the

7  money over to K.C. to make the payroll, but I want to hear

8  from you on that.

9       I'm going to deny it as to the summer camp and

10  that related deposit.  That's after the fact.  I never

11  heard of that before.  I'm not going to create a special

12  protected class from, you know, that could have been dealt

13  with earlier, and I'm certainly not going to impose any

14  sanctions on anyone at all.  Again, Mr. Howard, I

15  understand and appreciate your diligence, but from my point

16  of view, those two gentlemen in the later months,

17  particularly Mr. Goodsell, was the most valuable player on

18  the team, despite all the bad will that existed with Ms.

19  Koelling, and to this day, I presume with Ms. Koelling and

20  the Burlingame folks.

21       And I'm simply not going to make Mr. Goodsell

22  take the heat, and I would hope, by the way, that if there

23  are any further matters that come before me, that we get

24  the invective out of the papers.  I don't really think

25  that's constructive to be critical of one another, even if

1  you feel that way.  Just draft it, read it, and feed it to

2  your dog.  Don't file papers to me that are ad hominem

3  attacks, and that goes for both sides.

4        So it's not the best solution.  It's a solution.

5  And so that will be my order.  I'll ask you, Mr. Howard, to

6  prepare an order and it should say for the reasons stated

7  on the record.  I'm not going to make findings.  My

8  comments and the colloquy on the record are what they are.

9  Mr. Goodsell, I appreciate that you believe that there is

10 some unfairness here to other unpaid Chapter 11 claims, and

11 to -- perhaps to the lien claimants.  I'm going to protect

12 you by authorizing it over your objections, if you like,

13 and, you know, I've complimented you on the work you've

14 done, and I'm still grateful for the work you've done.  And

15 I look forward, as I'm sure you do, to having this case

16 over with.

17       So, not the best result, but it's a result.  So,

18 Mr. Howard, you can submit the order.  Make sure Mr.

19 Goodsell approves the form of it.  Questions?

20       MR. McMILLAN: Thank you, Your Honor.

21       MR. HOWARD: Thank you, Your Honor.

22       THE COURT: Anything further?

23       MR. McMILLAN: No, Your Honor.

24       THE COURT: Okay.  Well, let's talk on the record.

25 How do you want to do the payroll?  Do you want to take

1  that up -- talk to your client or do you want to --

2          MR. GOODSELL: Yeah, I should talk to Ms.

3  Koelling.

4          THE COURT: Huh?

5          MR. GOODSELL: I should talk to Linda Koelling

6  first, Your Honor.

7          MR. McMILLAN: Your Honor, if I could add

8  something, because the payroll involves tax withholdings --

9          THE COURT: Right.

10         MR. McMILLAN:  -- I would suggest and request

11 that either we do it or we have a third party that's a

12 payroll company or something like that to have it taken

13 care of so we can make sure --

14         THE COURT: Well, I mean there's an expense

15 involved there.  I mean, the estate can't bear the expense.

16         MR. HOWARD: Well then we'll take responsibility

17 for doing it.  We can make -- and actually, there is a

18 payroll company in place already.

19         THE COURT: Well, no, I know there is.  I mean

20 isn't that easier, Mr. Goodsell, and that protects you, if

21 I direct you to pay the money over to K.C.'s counsel, and I

22 direct that counsel distribute it in accordance with

23 whatever arrangements his client makes with a payroll

24 service?  I don't believe Burlingame is going to pocket

25 this money.  I believe they're going to pay it.  I'm sure

1  you believe -- you may believe otherwise, but I don't think

2  they're going to do anything but pay the employees.

3          MR. HOWARD: Well, the way to make sure of that,

4  is that we would simply have it sent to the payroll company

5  and not to Burlingame.

6          THE COURT: Well, we could do that too.

7          MR. HOWARD: And Burlingame would pick up the cost

8  of the payroll.

9          THE COURT: Mr. Howard, I don't believe that you

10 or your clients are going to play games with this money.

11 I'm just trying to figure out the way to move it from where

12 it is to where it ought to end up, so if you want to talk

13 to your client about it, Mr. Goodsell, that's fine, but I

14 think the better result would be to do it the way we're

15 talking.

16          MR. GOODSELL: And, Your Honor, what do we do if

17 we have objections to that sum, nothing?  If people are

18 asking for vacation that aren't entitled to it, I mean,

19 that's why I said, this is all so premature.  We don't even

20 agree with their number.

21          THE COURT: Well, I mean where do I go to get the

22 right number?

23          MR. GOODSELL: You know, that's why it needs to be

24 teed up in a different way.

25          THE COURT: I can't -- I can't -- that's not fair

1  to the employees.

2          MR. GOODSELL: But it's --

3          THE COURT: Well, how do I do it?  What do you

4  want me to do?  What do you want me to do to get the

5  amounts to each and every employee, what he or she --

6          MR. GOODSELL: We should have an opportunity to

7  get the detail for each and every employee.  We've asked

8  for all kinds of information, some of which we got; some of

9  which we didn't.  Mary Lynne Kassenbom (Phonetic) who put

10  this together, in her declaration, says, I don't know -- I

11  just put numbers in here.  I don't know what they are.  I

12  know for a fact, Your Honor, and I put it in my

13  declaration, that both Mary Lynne and Diane Markham

14  (Phonetic) originally put in a claim for vacation.  And I

15  said, show me a copy of the contract on which your vacation

16  is based.  Show me a copy of the vacation accrual so I can

17  figure out what accrued pre-petition; what accrued post-

18  petition.  And what I got back was a statement from Mary

19  Lynne saying, well, we decided not to make a claim because

20  we want to be consistent with the teachers.

21          Linda Koelling said no, in fact their contract

22  never provided for it.  This is not a question of them

23  having made a claim and then decided that it was better to

24  be like the others.  I can't do that.  All right?  Without

25  going in, sitting down with -- well, Mary Lynne is gone

1  now; she doesn't work there anymore, so probably with Kathy

2  and saying, how do you come to each of these numbers.

3  Remember, this is not just, you know, here's how I prorated

4  the payroll; this is prospective, vacation, bonuses,

5  commissions –- I mean it's a whole bundle of stuff that

6  just ends up as one number, and I don't know that it's

7  right.

8          THE COURT: How do I resolve that, Mr. Howard?

9          MR. HOWARD: It's very simple.  Mary Lynne

10  Kassenbom sat down with the payroll company.  As she made

11  very clear in her declaration, she didn't figure these

12  things out herself, and she didn't say what Mr. Goodsell –-

13  the words Mr. Goodsell put in her mouth here.  What she

14  said was, and she was very careful with me, by the way,

15  when we did that declaration, because originally I thought

16  she had figured it out herself.  She said no, I didn't.  I

17  had the payroll company sit down with the figures, and the

18  ledgers themselves, which are attached to her declaration,

19  are very clear.  They tell exactly the story, who was

20  supposed to get what, and it's got a breakdown.  There

21  isn't any more –- there isn't any more detail than that.

22          The ledgers we gave Mr. Goodsell several times

23  are 20 pages long.  He has all the detail he needs, and

24  here's the thing I would say, as an advocate for

25  Burlingame, I don't need to advocate for Burlingame here.

1 The only objective person or objective body to do this is

2 the payroll company.  They know how to do this because

3 they've been doing it for --

4         THE COURT: Well, but the payroll company doesn't

5 know anything more than you tell the payroll company.  They

6 don't know whether someone is entitled to a vacation or

7 isn't entitled to vacation.  I mean, look, if you tell me

8 that employee Jones has a gross salary of a thousand

9 dollars, the payroll company can compute the State and

10 Federal withholding.  You know, anybody can do that with

11 the right program.  This is a question of entitlement in

12 the first place, as I understand it; isn't that right?

13 Isn't that your point, Mr. Goodsell?

14         MR. GOODSELL: That's correct.

15         THE COURT: And whether the salary is correct for

16 the individual employee.  I have no idea how to fix it.  I

17 mean --

18         MR. McMILLAN: Your Honor, can I jump in here?

19         THE COURT: Yes, sir.

20         MR. McMILLAN: California employers have an

21 obligation to keep track of this.  What happened in this

22 case is earlier the Debtor delegated it to the payroll

23 company.  The payroll company has kept track of accrued

24 vacation.  It's reflected in the records that were

25 maintained by the Debtor's delegee, the payroll company.

1  The information that we're -- the monies that we're asking
2  for is coming from that.

3       Furthermore, we were going to take care of this
4  back in the original agreement.  They decided to take care
5  of it in the second agreement.  That's why we're here.
6  This has been dragging on for six months, but now we have a
7  number, Your Honor.  There's a number in these papers, and
8  we have a number that the Court already tentatively agreed
9  to order.  There may be some potentially in a world of
10 possibilities, maybe somebody is not getting enough; maybe
11 somebody is getting a little bit extra, but is it close
12 enough, Your Honor?  We submit it is, and certainly the
13 time has passed for this argument to be happening.

14      This should have happened way before the APA.  So
15 you have a set of documents, Your Honor, that has some
16 validity, that has -- that's coming from the custodian of
17 records.  That's their payroll company.  This wasn't us
18 going and messing with it.  This is their documents, their
19 records that they were required to keep under California
20 law, and that's all we're asking for, is just that amount.

21      MR. HOWARD: And if I may, just say one last thing
22 about --

23      THE COURT: Wait one second, please.  Yes, Mr.
24 Goodsell.  Were you going to speak?  Who was going to
25 speak?  Sorry, Mr. Howard.

1   MR. HOWARD: I was.  I must point out too that the
2   only competent evidence you have in front of you about what
3   this is and how much is owed is the evidence that we've
4   submitted.  Mr. Goodsell has not given you any evidence at
5   all from a competent source that tells you that anything
6   we've said here is improper or inaccurate or in any way
7   wrong.
8           THE COURT: Well, you don't have access to the
9   records anymore; do you?
10          MR. GOODSELL: Your Honor, every single record of
11  Kids Connection is now in Burlingame's possession.  I don't
12  know how I can do this.  In addition --
13          THE COURT: Well, Mr. Goodsell, again, I want you
14  to be a lawyer, not a payroll clerk, but what would --
15  you're telling me that you think there may be some
16  overstatements in Ms. Kassenbom's backup.  How would you
17  like to solve the problem?
18          MR. GOODSELL: All right.  She started from
19  something.
20          THE COURT: Well, she said she got it from the
21  payroll company.
22          MR. GOODSELL: That's impossible.
23          THE COURT: Well, okay.
24          MR. GOODSELL: The payroll company does not call
25  each employee --

1        THE COURT: Just tell me what you want to do.

2        MR. GOODSELL: Okay.

3        THE COURT: If I tell you that the 203 or a lesser

4  amount, if a lesser amount is the proper amount, goes out

5  of your trust account to the payroll company, how would you

6  like to have an opportunity to agree or disagree with the

7  figures?

8        MR. GOODSELL: First of all, when I got this

9  ledger, I asked for a copy of the individual employee

10  vacation ledgers.  I don't know how you could run a

11  business without keeping track of that.

12        THE COURT: Well, I assume that your client did in

13  the past.

14        MR. GOODSELL: I assume so.  And so I assume that

15  still exists.

16        THE COURT: Okay.

17        MR. GOODSELL: Now that's going to tell me whether

18  the accrued vacation is accurate or not.  I don't know if,

19  for staff people -- and I do know that staff spends a lot

20  of time out of the office –- I don't know if that time is

21  accurately recorded.  I don't know if staff just has a

22  floating schedule or if there's supposed to be some sort of

23  vacation accrual that they get or don't get.

24        THE COURT: Okay.  I'm going to look at an

25  employee.  I won't name the employee, but I'm just going to

1  say, here's an employee and this employee, according to the

2  payroll, is owed three, two hundred and twenty-five

3  dollars.

4          MR. GOODSELL: Okay.

5          THE COURT: You want an opportunity to say, no, he

6  or she really is only owed a lesser amount.

7          MR. GOODSELL: Or some portion of that is vacation

8  that accrued two years ago.

9          THE COURT: Well, okay.  I meant "owed" under --

10  my interpretation of the agreement.

11          MR. GOODSELL: Right.

12          THE COURT: How are you going to go about doing

13  that?

14          MR. GOODSELL: I'm going to actually have to be a

15  payroll clerk.  I have to do that at my own office.

16          THE COURT: Do you want -- and whose cause are you

17  serving here?  I mean, do you want to do this?  This is not

18  compensable to you.  I mean what are you trying to achieve?

19  In other words, your opposing counsel have said there's a

20  prima facie case been made.  You haven't rebutted.  Okay.

21  I'm fine, you haven't rebutted.  But why do you want to

22  rebut it?

23          MR. GOODSELL: If this were brought up on a motion

24  for summary judgment, I'd be filing a 56(f) response.

25          THE COURT: I know you would, but I guess what I'm

1   asking is, what are you trying to achieve?  I understand if

2   there's $200 too much, that $200 stay in the bankruptcy

3   estate.  But how is this cost effective?  I'm not telling

4   you, you can't do it; I'm saying how do you want to go

5   about it?

6               MR. GOODSELL: I don't know --

7               THE COURT: At your billing rate, to go in and

8   subpoena the payroll records?

9               MR. GOODSELL: I won't know if it's cost effective

10  really until I'm done.  That's the problem.  This number is

11  so much bigger than what it was supposed to be that -- and

12  I told you, I've got two examples of employees who claimed

13  tens of thousands of dollars in vacation --

14              THE COURT: And are those figures still in this

15  figure?

16              MR. GOODSELL: No, they're not.

17              THE COURT: They're out.

18              MR. GOODSELL: But I don't know what other ones

19  are in.

20              THE COURT: Okay.  Look, one part of me says

21  you're doing the right thing.  You don't like my ruling

22  about 203,000 going out the door, but that's my ruling.

23  But you're saying, wait a minute, maybe it's 195 or 192 or

24  some lower figure.

25              MR. GOODSELL: That's right.

1    THE COURT: And every dollar that doesn't have to

2    be paid is a dollar that stays in the bankruptcy estate.

3    MR. GOODSELL: That's right.

4    THE COURT: That's a worthwhile cause, but it's

5    not worthwhile if you're going to, you know, have

6    depositions and document productions and so on, to save

7    minimal amounts of money.  But tell me how I would do this.

8    What device would you like me to put in place so you can

9    have a reasonable chance to review the numbers?

10   MR. HOWARD: Your Honor, we would make one offer.

11   We would offer -- my client just indicated, we would offer

12   to make Mary Lynne Kassenbom and the payroll company

13   available to Mr. Goodsell early next week.  He can sit down

14   with them and ask any questions he wants to.  He can walk

15   through all the figures he wants to.  He can make sure that

16   they're all accurate, but we need to get it on so we can

17   get these poor people paid.  They need to be paid.

18   THE COURT: Does that work?

19   MR. GOODSELL: I can't do it before Thursday.  I'd

20   do it Thursday or Friday.

21   THE COURT: Well, here's what I'm inclined to do.

22   I made my decision on the concept.  I could either hold for

23   a few days an order, or I could sign an order that says,

24   you are to turn over from your trust account up to 203 --

25   whatever that -- 203,310, and you may withhold any amounts

1 on which you have a bona fide disagreement on the amounts,

2 so that if you come to an employee and say there's 5,000

3 too much in there, you withhold 5,000, and you either work

4 it out with that employee or Burlingame or we have another

5 hearing.

6 But again, we're going to involve the employees,

7 because Burlingame is carrying the ball for the employees,

8 but it's their money, and so if Employee "X", according to

9 the records, should be getting $6,000 and you think he

10 should only be getting 4,000, then that employee has to be

11 heard too, has to have a right to be heard. So does that

12 work? If I say you are directed to pay up to that figure,

13 withholding amounts that are attributable to individual

14 employees on which you have a good faith belief that

15 there's a dispute. If you're willing to take it, that

16 works for me.

17 MR. GOODSELL: I can't consent to an order

18 directing me to pay money to Burlingame. I just can't do

19 that without my client's input.

20 THE COURT: I said Burlingame's payroll -- the

21 payroll service. You're not paying Burlingame. You're

22 really paying the employees.

23 MR. GOODSELL: I understand, and that element -- I

24 mean, you could order it, but I can't consent to it.

25 THE COURT: But you didn't answer my question.

1  You have made emphatically the argument that maybe there's

2  some fluff in here.

3         MR. GOODSELL: Right.

4         THE COURT: And I'm offering you a way to find the

5  fluff.  Does that work?

6         MR. GOODSELL: I'm happy to go on Thursday or

7  Friday and meet with Mary Lynne, if they can produce her,

8  or meet with Kathy, and if they want to pull out the

9  documentation that they relied on, then I should have an

10 answer on that question by the end of next week.

11        THE COURT: Okay.  But suppose --

12        MR. GOODSELL: How the Court wants to work that

13 into an order, I don't know, but that's what I can do.

14        THE COURT: Well, I just offered you a way to do

15 it.  I could direct from your trust account you are to pay,

16 you know, let's say on -- let me look at my calendar --

17 September 1st, you are to pay on September 1st not in excess

18 of 203,310 to Burlingame's payroll service company, and you

19 may withhold from that amount any amounts for whom you have

20 a good faith belief that there is a dispute as to the

21 amount, so that if it's one person for $2,000, you can

22 withhold the $2,000.  And then we will have a further

23 hearing, and that person can come and prove up his case.

24 Again, we're back to the individual employees.  It's their

25 right.

1    I've made a decision to let them get paid.  But

2  I'm respecting your entitlement to complain if there's a

3  basis.  So if you go to the bookkeeper and the payroll

4  company next week, and you're satisfied -- done deal.  You

5  turn over the 203 to the payroll service company.  And I

6  can make a further order that this is at K.C.'s request and

7  the payroll service company is ordered to distribute it

8  only to the employees and not to anyone else.  I have no

9  doubt that they're going to comply, and if they pay it to

10  somebody else, they'll answer to me.  I don't, and you're

11  don't really think that's going to be a problem; do you?

12    MR. GOODSELL: As long as I'm not stipulating to

13  the decision, but only to the process, then I guess I'm

14  okay.

15    THE COURT: Well, you're telling -- no, I've made

16  my decision.  You're entitled to appeal it; you're entitled

17  to disagree with it.  I respect you too much to say you

18  can't.  I'm trying to come up with a way that doesn't take

19  too long, that gets the money out the door to the people

20  that are waiting for it, and that protects you if you have

21  a legitimate complaint.  And, Mr. Goodsell, I know -- I

22  hope I know that you'll be practical.  If somebody's got an

23  extra 102 bucks in there, I don't think we want to have a

24  hearing for 102 bucks.  But --

25    MR. GOODSELL: I'm not looking for 102 bucks.

1      THE COURT:  -- if somebody's got a vacation

2  entitlement that they're not entitled, all you have to do

3  is good faith believe that there's a dispute, period.  That

4  money stays in your trust account, that disputed amount.

5  And if it's Mr. "X," then we have -- you'll have to

6  initiate it -- a motion to determine whether Mr. "X" gets

7  that money or the estate keeps that money.  I don't care if

8  K.C. Funding carries the burden to protect their interest,

9  but it's Mr. X and Y and Z -- or Miss -- who are the

10 beneficiaries, so they will have to be given the due

11 process.  Now that's the best I can do for you.  Yes, sir.

12     MR. McMILLAN: Your Honor, it seems as if the

13 hang-up with pay, at least in part, seems to be the

14 vacation pay.  So could we have the order at least say that

15 all of the pay that is not for vacation pay is to be

16 tendered immediately --

17     MR. GOODSELL: No --

18     MR. McMILLAN:  -- and the remainder --

19     THE COURT: No, I'm going to -- look, you moved

20 fast.  I heard this matter on an expedited basis over the

21 Debtor's objection, and I've given you much of what you've

22 asked for.  I don't mind --

23     MR. McMILLAN: And we appreciate it, Your Honor.

24     THE COURT:  -- and I don't mind -- and I'm sorry

25 for the employees who are inconvenienced.  At least some of

1  them have at least gotten the economic protection from your

2  clients; some of them have not.  That's really not relevant

3  to the analysis.  I don't think it's going to be the end of

4  the world for them to wait a few more days, and I'm putting

5  the burden on Mr. Goodsell to have a good faith basis to

6  dispute.

7          MR. McMILLAN: As good faith under --

8          THE COURT: You know, we know it when we see it.

9          MR. McMILLAN; All right.

10         THE COURT: I know the absence of it.  I don't

11 have to define it, and so do you, any experienced lawyer or

12 professional businessperson.  If Mr. Goodsell comes back

13 here and says, you know, look at this person, Joe has got

14 an extra 50 bucks in there, then Mr. Goodsell better have

15 something else to say.  If he says Mr. So-and-So isn't

16 entitled to a $5,000 vacation, that's sounds like good

17 faith to me.  I, for one, would like to think it'll never

18 come to be, but I'm not going to deny him the right to make

19 that inquiry, both because it's unfair to overpay someone,

20 and secondly, it's unfair to short the estate any more than

21 it's already being -- going short.

22         MR. McMILLAN: Certainly.  And then when Mr.

23 Goodsell gathers up the people that he has objected, what

24 we'll do is we'll set a hearing date and do an evidentiary

25 hearing and prove up the wage and hour claim that they

1  have?

2      THE COURT: Something like that.  I mean I haven't

3  thought through the procedure.  I just made this up.  In my

4  scheme of things, by September 1st, a substantial sum of

5  money will have been paid over to the payroll and it can

6  get distributed, you know, and the withhold amount, I guess

7  that would be the right thing to do.  If Mr. Goodsell says,

8  you know, Employee Jones isn't entitled to $5,000 of

9  payroll -- I mean of vacation -- or whatever the dispute

10  is, he files a motion to determine -- it's done by motion;

11  I'll do it by motion -- to determine that that is the

12  amount that's owing.

13      And again, I assume that your side will carry the

14  laboring oar, but that's for you to decide later.  And

15  frankly, it's for the employee to decide.  It's his or her

16  right to be heard on that subject, and it's his or her

17  right to compromise, or, frankly, to default.  I mean I'm

18  serious about this.  If Employee "X" is served with a

19  motion and says, the hell with it, I don't care, then I

20  don't want K.C. in there arguing the case.  The employee

21  has to say that's my money; I'm entitled to it.

22      I really don't mind if, as I say, if you want to

23  do the legal work for them or argue the case for them, but

24  they have to -- they have to express themselves, otherwise

25  the estate is going to keep the money by default.  My own

1  instincts tell me we're not going to have a lot of issues

2  here.

3       MR. McMILLAN: Your Honor, as far as the -- to the

4  extent that there are claims that are proven to be

5  legitimate that were objected to by Mr. Goodsell, will

6  that -- will Burlingame and the employees have a right to

7  request payment from the administrative -- from the estate

8  the expense of that?

9       THE COURT: We're taking this $203,000, and I'm

10 leaving it in a trust account.  Let's assume that the bulk

11 of it is paid over to the payroll company, and there's

12 $10,000 at issue.  If the employee persuades me that he or

13 she is entitled to it, I'll order Mr. Goodsell to pay the

14 10,000 to that employee.  It's a hybrid, but it's my way of

15 trying to come to a proper result.

16      So, your side, Mr. Howard and Mr. McMillan, you

17 are to take your first cut at the order, get Mr. Goodsell

18 to agree.  Once again, by September 1st, Mr. Goodsell is

19 directed -- authorized and directed to pay from his trust

20 account up to 203,310 to pay the employees in the amounts

21 identified in Ms. Kassenbom's declaration, provided that

22 Mr. Goodsell may withhold any amounts attributable to any

23 employees that he has a good faith belief he has a good

24 faith dispute.

25      So, he is authorized by my order to withhold the

1  disputed amounts.  So therefore, on September 1st, there

2  will either be $203,000 paid over, or there'll be some

3  lesser amount plus an identification or documentation by

4  Mr. Goodsell where he has a dispute.  Mr. Goodsell, if it

5  turns out -- well, I'm assuming this can all happen next

6  week, because you said it could.  I mean if it turns out

7  Kassenbom or the payroll person isn't available, I don't

8  know what we're going to do, but we're going to try.

9       And I will be here for most of next week, and if

10  there's a dispute about the order, I can resolve it.

11  Hopefully we'll finish with this aspect of the case.  Okay?

12       ALL COUNSEL: Thank you, Your Honor.

13       THE COURT: And by the way, in fairness to Mr.

14  Goodsell, put in the order that your request for sanctions

15  is denied.

16       MR. McMILLAN: Okay.  We will.

17       THE COURT: Good luck.  Thank you, Mr. Goodsell.

18       MR. GOODSELL: Thank you, Mr. Goodsell and Mr.

19  Bradlow.

20     (Whereupon, the proceedings are concluded at 12:42

21  p.m.)

22

23

24

25

1

2

3

4

5

6                      CERTIFICATE OF TRANSCRIBER

7

8

9          I certify that the foregoing is a correct

10   transcript from the digital sound recording of the

11   proceedings in the above-entitled matter.

12

13   DATED: September 20, 2009

14

15                      By:   /s/ Jo McCall

16

17

18

19

20

21

22

23

24

25