```
1  CAMPEAU GOODSELL SMITH
   A Law Corporation
2  SCOTT L. GOODSELL, SBN 122223
   WILLIAM J. HEALY, SBN
3  440 N. First Street, Suite 100
   San Jose, California 95112
4  (408) 295-9555

5  Attorneys for Debtor
```

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| In re: | ) | Case No. 08-30026-DM |
|---|---|---|
| KIDS CONNECTION, INC., | ) | CHAPTER 11 |
|  | ) | Date: to be determined |
|  | ) | Time: |
| Debtor. | ) | Judge: Hon. Dennis Montali |
|  | ) | 235 Pine Street, 22nd Floor |
|  |  | San Francisco, California |

**FINAL APPLICATION FOR COMPENSATION AND**
<u>**REIMBURSEMENT OF EXPENSES BY ATTORNEY FOR DEBTOR**</u>

**TABLE OF CONTENTS**

Case Administration / Post-Petition Operations  3

Burlingame Asset Purchase Agreement  4

Other Prospective Purchasers  6

District Court Appeal  6

Creditor Claims and Avoidance Actions  7

CNB Motion for Relief from Stay  9

U.S. Trustee Motion to Convert Case  9

Fee Applications  9

Conclusion  10

CERTIFICATION BY ATTORNEY FOR DEBTOR  12

The Application of Campeau Goodsell Smith ("CGS") respectfully represents:

Applicant is a professional corporation, each of whose attorneys is duly licensed and admitted to practice before the above-entitled court, and serve as attorneys for the debtor herein, having been so retained upon order of this court dated February 19, 2008. As such attorneys, Applicant has performed various legal services, particulars of which are hereinafter set forth:

### CASE ADMINISTRATION / POST-PETITION OPERATIONS

During the course of this Chapter 11 case, Applicant CGS has conferred regularly with the Debtor's principals and staff about obligations required of it pursuant to the Bankruptcy Rules and U.S. Trustee Guidelines, and has assisted the debtor in the preparation of required reports. CGS has met with the U.S. Trustee, and attended various Court status conferences, and has thereafter communicated on various subjects with representatives of the U.S. Trustee's office and the Bankruptcy Clerk's office with respect to issues arising in this case. CGS has regularly conferred with several counsel taking part in this case representing individual creditors.

As Debtor's general bankruptcy counsel, CGS has been asked by Debtor to address and advise on various bankruptcy-specific and non-bankruptcy-specific issues arising in its general business operations, such as personnel issues, banking and financial issues, and corporate issues. CGS has routinely assisted Debtor and its bookkeeping personnel in resolving its monthly operating report issues. In particular, in April/May 2009, at the request of the Court and examiner Bradlow, CGS assisted examiner Bradlow and Debtor in preparing cashflow projections for Debtor's current and projected operations.

In July 2009 and thereafter, CGS assisted Debtor in winding up its various insurance obligations, and recovering pre-paid deposits and other funds.

In November 2009, Debtor's President Linda Koelling advised CGS that she was resigning her responsibilities as officer/director and as designated responsible person (and

delivered a resignation letter to CGS). CGS inquired after and identified a replacement person willing to serve as officer/director and as designated responsible person for Debtor's affairs; the individual was interviewed by Linda Koelling and engaged by her on Debtor's behalf. CGS filed an application to approve the new responsible person. Later, apparently on advice of her personal attorney Davis, Linda Koelling recanted her resignation(s) (but also recanted her position that she remained responsible person at the Chapter 7 meeting of creditors).

In connection with the foregoing activities, CGS has expended 61.5 hours, at a cost to the estate of $23,208.00.

## BURLINGAME ASSET PURCHASE AGREEMENT

After this Court's March 2009 approval of the Burlingame asset purchase transaction, CGS continued to work with Burlingame's counsel to conclude the sale transaction. CGS conferred with Burlingame's counsel and examiner Bradlow re concerns about the asset purchase agreement, and CGS assisted in revising the collateral documents, exhibits and related schedules. Throughout this time, Debtor and CGS were also continually producing more and more documentation to Burlingame and responding to various inquiries about real property taxes, known and suspected real property liens, appraisals, on-site meetings, and CDSS licensing issues.

In connection with the Burlingame asset purchase process, CGS has also been required to become familiar with California Department of Social Services ("CDSS") requirements for operating, licensing and transferring private school enterprises. CGS has reviewed CDSS application requirements, has spoken with CDSS personnel concerning those requirements, and has conferred with other private school operators about CDSS licensing processes.

When Debtor's officer(s) declined to execute documents pertinent to the Asset Purchase Agreement, CGS attorney Goodsell consented to execute certain critical documents. Burlingame and Debtor stipulated to such authorization, and the Court approved the stipulation.

In late June 2009, Burlingame finally obtained its permanent CDSS license.

In early July 2009, CGS finalized all documents, due diligence, schedules, exhibits and pleadings relating to the Burlingame Asset Purchase Agreement. CGS repeatedly conferred with Burlingame's counsel (insofar as examiner Bradlow withdrew in May 2009) to resolve asset purchase agreement issues, and CGS assisted in revising the document and related schedules. CGS appeared at several Court hearings working toward Court approval of the Burlingame asset purchase agreement and, in the end, CGS attorney Goodsell signed the final Burlingame asset purchase transaction documents.

Shortly after the escrow closed, CGS was informed by Burlingame's agents that Burlingame was demanding over $200,000.00 (from the net $350,000.00 proceeds) as additional compensation. CGS requested proof of Burlingame's calculations, and discussed the basis for Burlingame's claims with Debtor's management; Debtor's management factually contested Burlingame's assertions concerning WHO should pay for post-closing payroll claims and from WHICH MONIES those claims should be paid – given that in all prior years, prepaid Fall tuition was applied to pay summer school payrolls. CGS so advised Burlingame's counsel. Burlingame thereafter filed its motion to compel payments and for sanctions. After hearing, this Court obligated CGS attorney Goodsell to make a "good faith" assessment of the payroll claims. Attorney Goodsell met with Burlingame employee Kassebaum and concluded that various claims were factually and legally inappropriate for payment. The Court disagreed with that assessment.

Ultimately, having failed to obtain a stay pending appeal of the Payroll Order, attorney Goodsell directed disbursement of certain funds in accordance with that order; all remaining funds held were subsequently transferred to trustee Elder upon conversion of this case.

In connection with the foregoing, Applicant has expended 265.2 hours, at a cost to the estate of $91,045.50.

# OTHER PROSPECTIVE PURCHASERS

Subsequent to this Court's approval of the Burlingame Asset Purchase Agreement in March 2009, Debtor's management and CGS continued to maintain open communication lines with previously-interested and new prospective asset purchasers. Several previously-interested and new prospective asset purchasers expressed on-going interest should Burlingame fail to meet its contract obligations. In each instance, CGS informed prospective purchasers of the Court's pre-existing approval of the Burlingame Asset Purchase Agreement and of the conditions subsequent (CDSS license approval, purchase money financing and other items) which were met/unmet. CGS met briefly with at least one prospective asset purchasers previously contacted by Debtor's management. When Burlingame concluded its pre-closing obligations, CGS so advised the various other interested purchasers.

In connection with the foregoing, CGS has expended 7.5 hours, at a cost to the estate of $2,625.00.

# DISTRICT COURT APPEAL

After the Court entered its order directing payment of payroll claims, and consistent with CGS' prior communications with Debtor's management and CGS' understanding of the underlying factual issues, CGS filed an appeal of the Payroll Order and sought expedited review by the District Court.

The District Court scheduled a series of hearings and briefing schedules on expedited review of Debtor's request for a stay of payments pending the appeal. CGS was directed to brief whether the Payroll Order was immediately appealable, and whether it constituted a money judgment. CGS researched and responded to the District Court's inquiries. The District Court ultimately concluded that the Payroll Order was subject to immediate appeal, and that it did constitute a money judgment. However, the District Court also concluded that the Payroll Order

was not a money judgment subject to automatic stay upon posting of a supercedeas bond, and the District Court declined to exercise discretion to stay any payments pending appeal.

CGS timely sought a writ of mandate from the Ninth Circuit Court of Appeals on the issue that the Payroll Order, as a money judgment, was entitled to automatic stay upon posting of a supercedeas bond (i.e., that the District Court was not permitted to exercise discretion if a supercedeas bond was posted), however, after taking the matter under submission for 2 weeks, the Court of Appeal declined to intervene in the matter.

In connection with the foregoing, CGS has expended 107 hours, at a cost to the estate of $41,592.50.

## CREDITOR CLAIMS AND AVOIDANCE ACTIONS ANALYSIS

When it became evident after March 2009 that creditors were unlikely to be paid in full as a result of the approved Burlingame asset sale transaction, CGS undertook to evaluate any potential preference claims or avoidance actions which Debtor might assert to recover or retain monies for its general creditors. In addition, CGS assisted the Debtor in responding to various insurance and unemployment claims.

*Martel Claim.* Shortly after Debtor filed its voluntary petition in January 2008, attorney Martel recorded a lien against Debtor's real property for attorneys fees owed for varous pre-petition services. On several occasions, CGS contacted attorney Martel and requested that he remove the improper post-petition lien – to which he gave equivocal responses. Eventually, CGS prepared and filed a complaint seeking to avoid Martel's improper lien. After conversion of Debtor's Chapter 11 case, trustee Elder's counsel substituted themselves in that action.

*Koelling Claim.* In/about August 2008, trustee Brady filed a proof of claim for $1,500,000 based on Linda Koelling's alleged rights under an employment agreement. In/about September 2008, trustee Brady abandoned any interest in Linda Koelling's stock in Kids

Connection. In/about December 2008, trustee Brady withdrew her proof of claim in this case, as part of a compromise in the Koelling Chapter 7 bankruptcy case, and released the recorded Koelling lien against the Debtor's real property. However, in/about June 2009, Koelling's attorney Davis advised this Court that Koelling maintained an on-going security interest in proceeds from any sale of Debtor's assets. On several occasions, CGS contacted attorney Davis and requested evidence that Koelling retained any secured claim after the compromise approved by the Oakland Bankruptcy Court; CGS conferred with trustee Brady counsel Bostick and reviewed the hearing transcript, and concluded that no secured claim remained. Eventually, in light of attorney Davis' intransigence, CGS prepared and filed a complaint seeking to avoid Koelling's alleged unrecorded lien. After conversion of Debtor's Chapter 11 case, trustee Elder's counsel substituted themselves in that action.

*York Litigation.* In/about May 2009, CGS learned that alleged creditor York had filed a personal injury claim against Debtor and others. CGS assisted Debtor in referring the claim to Debtor's insurer, and conferred with insurance counsel about the pending automatic stay.

*Workers Compensation/Unemployment Claims.* During the course of these proceedings, and particularly after the Burlingame asset purchase transaction closed, various employees filed claims for workers compensation and unemployment. CGS conferred with Debtor's management about each such claim, and CGS assisted Debtor in responding to the claims made to Debtor's insurers.

*CNB/Fitzpatrick Claims.* Secured creditors CNB and Fitzpatrick filed various demands in connection with the Burlingame asset purchase transaction escrow. CGS assisted Debtor in evaluating and reconciling those claims.

In connection with the foregoing, CGS has expended 42 hours, at a cost to the estate of $14,815.50.

## CNB MOTION FOR RELIEF FROM STAY

In late May 2009 (about one month before the Burlingame asset sale transaction closed), City National Bank ("CNB") filed its motion for relief from stay to foreclose on its collateral. CNB was significantly oversecured by Debtor's real estate and personal property. CNB subsequently prepared and offered a stipulation to continue the hearing on its motion, which CGS signed on debtor's behalf. When the Burlingame asset sale transaction closed on July 9, 2009, CNB withdrew its motion (which was moot).

In connection with the foregoing, Applicant has expended 1.6 hours, at a cost to the estate of $635.00.

## U.S. TRUSTEE MOTION TO CONVERT CASE

In November 2009, the U.S. Trustee Office filed its motion to convert Debtor's Chapter 11 case to a Chapter 7 proceeding, alleging that Debtor had concluded its asset sale to Burlingame and had no further actions necessary. Applicant CGS prepared and filed a response detailing the further actions which Debtor intended to undertake. At the Bankruptcy Court hearing on the U.S. Trustee's motion, the Court entered its order converting the case.

In connection with the foregoing, Applicant has expended 3.9 hours, at a cost to the estate of $1,515.00.

## FEE APPLICATIONS

CGS has spent 35.3 hours in preparing and responding on its interim fee application in this matter (this time is reflected in this instant application because it was incurred after the March 23, 2009 cutoff date for that interim fee application), at a cost to the estate of $14,757.50.

In addition, CGS has spent 33.2 hours in preparing this final fee application, at a cost to the estate of $14,110.00.

## CONCLUSION

In the course of its representation in these matters from January 2008 through December 2009, CGS has devoted approximately 1,800 hours of professional services to the Debtor herein. In this final fee application, CGS seeks compensation for 562.4 hours of professional services, as indicated on its Project Billing Summary, which is attached as Exhibit A. The Statement identifies the individuals who have performed specific services as follows:

| | | |
|---|---|---|
| Scott L. Goodsell (SLG) | 260.80 | $425.00/hr. |
| Scott L. Goodsell (SLG) | 3.50 | No Charge |
| William J. Healy (WJH) | 285.90 | $350.00/hr. |
| William J. Healy (WJH) | 2.80 | No Charge |
| Kari Lynn Silva (KLS) | 9.40 | $275.00/hr. |

In view of the time expended and the responsibilities assumed, Applicant respectfully submits that the reasonable value of its services hereinabove set forth is $213,490.00.

CGS has also expended the sum of $2,814.20 for court fees, hearing transcripts, photocopying, postage, telephone and other costs, as follows:

| | | |
|---|---|---|
| Photocopy Charges | $ | 857.73 |
| Computer Research / LEXIS / PACER | | 238.81 |
| Postage Charges | | 33.07 |
| Court Fees | | 1,341.50 |
| Telephone Charges / Court Call | | 31.50 |
| Delivery Charges / FEDEX | | 311.59 |

CGS follows the *Guidelines for Compensation of Professionals* issued by this Bankruptcy Court and all request for costs reimbursement are based on the *Guidelines*.

CGS believes that the services so rendered and costs so incurred herein were necessary and that the fees and costs requested constitute reasonable and necessary fees expended on behalf of the estate. In accordance with CGS' Disclosure of Compensation previously submitted, CGS has previously received a retainer in the amount of $30,000.00 from the debtor in connection with the Chapter 11 case, which the Court has previously allowed CGS to apply to its allowed fees. In

addition, CGS has also been paid $59,738.37 on account of its interim fee award of $200,000.00. After application of these sums, there remains a balance owing to CGS of $584,095.64.

No part of the monies previously received by CGS has been shared with any person, and no agreement or understanding exists between CGS and any other person for the sharing of compensation received or to be received for services rendered in connection with this case, except with the members and associates of CGS' law firm.

WHEREFORE, Applicant prays that this court enter its order (i) approving as interim compensation those Chapter 11 attorneys' fees incurred and costs expended by CGS in its representation as further set forth above; (ii) authorizing debtor/trustee to pay to CGS the sum of $584,095.64 for services rendered and costs expended but not yet compensated by the debtor as set forth in this Application, and (iii) for such further relief as this court deems just and proper.

DATED: April 28, 2010          CAMPEAU GOODSELL SMITH


                               By    /s/ Scott L. Goodsell
                                     Scott L. Goodsell
                                     Attorneys for Debtor

# CERTIFICATION ON FINAL APPLICATION FOR COMPENSATION AND REIMBURSEMENT OF EXPENSES BY ATTORNEY FOR DEBTOR

I, Scott L. Goodsell, say:

1. I am a principal with the law firm of Campeau Goodsell Smith ("CGS"), attorneys of record for the debtor herein. I make this declaration in support of the said law firm's application for interim compensation and reimbursement of expenses as attorneys for the debtor in this Chapter 11 case. If called as a witness, I would competently testify as follows:

2. In accordance with the Disclosure of Compensation previously submitted, CGS has previously received a retainer in the amount of $30,000.00 from the debtor for the Chapter 11 case, which has been applied to its accrued fees pursuant to Court order. In addition, CGS has also been paid $59,738.37 on account of its interim fee award of $200,000.00.

3. No part of the monies previously received by CGS has been shared with any person, and no agreement or understanding exists between CGS and any other person for the sharing of compensation received or to be received for services rendered in connection with this case, except with the members and associates of CGS' law firm.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at San Jose, California, on April 28, 2010.

/s/ Scott L. Goodsell
Scott L. Goodsell